## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PHYSICIANS FOR SOCIAL )
RESPONSIBILITY )
1111 14th Street, NW, Suite 700 )
Washington, DC 20005; )
)
NATIONAL HISPANIC MEDICAL )
ASSOCIATION )
1920 L Street, NW, Suite 725 )
Washington, DC 20036; )
)
INTERNATIONAL SOCIETY FOR )
CHILDREN'S HEALTH AND THE )
ENVIRONMENT )
1100 E. Woodfield Road, Suite 350 )
Schaumburg, IL 60173; )
)
JOE ÁRVAI )
1419 Kearney Road )
Ann Arbor, MI 48104; )           Civil Action No. _____
)
EDWARD LAWRENCE AVOL )
1520 First Street )               **COMPLAINT FOR**
Manhattan Beach, CA 90266; )  **DECLARATORY RELIEF, INJUNCTIVE**
)                **RELIEF, AND VACATUR**
and )
)
ROBYN WILSON )
2859 Eastcleft Dr. )
Columbus, OH 43221, )
)
                    *Plaintiffs,* )
)
        v. )
)
SCOTT PRUITT, Administrator, U.S. )
Environmental Protection Agency, in his )
official capacity, )
1200 Pennsylvania Ave., NW )
Washington, DC 20460, )
)
                    *Defendant.* )

**INTRODUCTION**

1.      Plaintiffs Physicians for Social Responsibility, National Hispanic Medical
Association, International Society for Children's Health and the Environment, Professor Edward
Lawrence Avol, Dr. Robyn Wilson, and Dr. Joseph Árvai seek review of a directive issued by
Scott Pruitt, Administrator of the Environmental Protection Agency ("EPA" or "Agency"), on
October 31, 2017 ("Directive"), that bars recipients of EPA grants from serving on EPA federal
advisory committees.

2.      Though included in a document titled "Strengthening and Improving Membership
on EPA Federal Advisory Committees," the Directive impairs the ability of the committees to
provide expert and balanced advice to the Agency by preventing the participation of highly-
qualified scientists and medical professionals that receive EPA grants, while allowing persons
receiving industry funding to serve.

3.      The Directive is unlawful and arbitrary and capricious in violation of:

    a.  uniform federal ethics requirements issued by the Office of Government Ethics
        ("OGE"), pursuant to statutory authority under 18 U.S.C. § 208(c) and
        Presidential authority delegated to OGE by Executive Order;

    b.  procedural requirements applicable to supplemental federal ethics regulations, to
        the extent that the Directive purports to supplement, rather than override, the
        uniform federal ethics requirements;

    c.  the Federal Advisory Committee Act, 5 U.S.C. App. II § 1 *et seq.*, and its
        implementing regulations, 41 C.F.R. Part 102–3, which require EPA to assure
        "fair balance" in the membership of federal advisory committees and avoid
        inappropriate influence by "any special interest"; and

     d.   statutes defining the membership requirements and duties of EPA federal advisory

           committees, including the Clean Air Science Advisory Committee, 42 U.S.C.

           § 7409, the Science Advisory Board, 42 U.S.C. § 4365, and the Science Advisory

           Panel, 7 U.S.C. § 136w(d), which direct EPA to select advisory committee

           members on the basis of their expertise and qualifications.

4.     By this action, Plaintiffs seek declaratory relief, injunctive relief, and vacatur of the Directive.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction under 28 U.S.C. § 1331.

6.     Venue is proper in this judicial district under 28 U.S.C. § 1391(c)(2), (e)(1) because:

     a.   Plaintiffs Physicians for Social Responsibility and National Hispanic Medical

           Association both reside and have their respective principal places of business in

           this district;

     b.   Defendant resides in this district; and

     c.   a substantial part of the acts or omissions giving rise to the claim occurred in this

           judicial district.

## PARTIES

7.     Plaintiff Physicians for Social Responsibility ("PSR") is a national non-profit organization that, guided by the values and expertise of medicine and public health, works to protect human life, human health, and the environment.  PSR's strategy for achieving its mission is to educate and activate the medical and broader health community, and the public, through research, analysis, collaboration, and targeted communications and to advocate for government and societal change at the local, state, national, and international level.

8.      Plaintiff National Hispanic Medical Association ("NHMA") is a non-profit organization representing the interests of 50,000 licensed physicians and other health care professionals in the United States.  NHMA was founded and incorporated in 1994 with its principal place of business in Washington, D.C.  NHMA's mission is to empower Hispanic physicians and health care professionals to lead efforts to improve the health of Hispanic and other underserved populations.  NHMA achieves its mission by working in collaboration with Hispanic state medical societies, residents, medical students, and other public and private sector partners.  NHMA also serves as a resource to federal agencies, Congress, and the White House, providing these policymakers with expert information in order to strengthen health care delivery to Hispanic communities across the nation.  NHMA provides networking opportunities for its members and other stakeholders who impact the health of Hispanic communities, including an annual conference that brings together health care professionals, government representatives, and others.  NHMA develops leaders who can serve on boards, including federal advisory committees, that impact health policies and the health of Hispanic communities.  NHMA actively nominates its members to federal advisory committees.

9.      Plaintiff International Society for Children's Health and the Environment ("ISCHE") is a non-profit organization of professional scientists that works to promote children's health by addressing the unique vulnerabilities of children to pollutants.  ISCHE promotes research into the threats children face from environmental hazards and measures to protect them from those hazards.  It translates these research findings into policy solutions to protect children.  ISCHE makes current scientific findings more accessible to the health care, public health, and policy communities via position papers, technical reports, and testimony.  ISCHE also promotes the training of professionals in children's environmental health.

4

10.     Plaintiff Edward Avol is a Professor of Clinical Preventive Medicine at the Keck School of Medicine at the University of Southern California.  His expertise is in exposure assessment and the respiratory and cardiovascular effects of airborne pollutants in at-risk populations, including children and individuals with compromised lung function.

11.     Plaintiff Dr. Robyn Wilson is Associate Professor of Risk Analysis and Decision Science in the School of Environment and Natural Resources at the Ohio State University.  Her expertise is in the area of the individual decision-making process under conditions of risk and uncertainty.  Dr. Wilson was a member of the U.S. Environmental Protection Agency's Chartered Science Advisory Board until she was removed from her position pursuant to the Directive.

12.     Plaintiff Dr. Joseph Árvai is the Max McGraw Professor of Sustainable Enterprise, and the Director of the Erb Institute for Global Sustainable Enterprise at the University of Michigan.  His expertise is in the risk and decisions sciences.  Professor Árvai recently completed his second full term as a member of the U.S. Environmental Protection Agency's Chartered Science Advisory Board, and is a member of the U.S. National Academy of Sciences' Board on Environmental Change and Society.

13.     Defendant Scott Pruitt is the Administrator of the Environmental Protection Agency.  Plaintiffs sue him in his official capacity as the Agency's highest-ranking official. Pruitt is responsible for the supervision and management of all decisions and actions of the EPA, and charged with complying with federal laws and regulations governing federal advisory committees and their membership.

# FACTUAL BACKGROUND

I.     EPA ADVISORY COMMITTEES

14.     EPA uses advisory committees to obtain valuable expertise, insight, and recommendations that guide the Agency's decision-making in fulfilling its core mission of protecting human health and the environment.   Some EPA advisory committees are established by statute, some by the President, and some by the EPA Administrator.

15.     EPA currently manages 22 federal advisory committees.  They advise the Agency on a wide range of topics, including pesticides, drinking water quality, air quality, rural community welfare, and children's health.

16.     EPA advisory committees are subject to the Federal Advisory Committee Act and uniform federal ethics rules established by the Office of Government Ethics ("OGE").  The EPA Administrator is responsible for ensuring compliance with applicable laws and regulations.  The Administrator must ensure that they are fairly balanced, not unduly influenced by special interests, and free of impermissible conflicts of interest.

17.     EPA advisory committees play a crucial role in assisting EPA in carrying out its statutory duties.

18.     EPA advisory committees play a crucial role in ensuring the scientific accuracy of agency reports and findings.  For example, in 2015, the EPA released a draft report on a five-year study of fracking and drinking water.  Although the executive summary claimed that EPA had found no evidence of "widespread, systemic impacts" on water supplies, [1] the body of the report documented multiple cases in which fracking had contaminated communities' drinking

---

[1] EPA, Office of Research and Development, Assessment of the Potential Impacts of Hydraulic Fracturing for Oil and Gas on Drinking Water Resources: External Review Draft at ES-6 (June 2015) (available at http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=523539).

water with toxic chemicals.  The Science Advisory Board ("SAB") investigated the discrepancy between the summary and EPA's findings and publicly raised "concerns regarding the clarity and adequacy of support for several major findings."[2]  The Science Advisory Board urged the agency to reconsider, and EPA revised the report.[3]

19.     The Committees also provide expert advice to EPA.  For example, in 2008 EPA promulgated a rule lowering the primary national ambient air quality standard for ozone from 80 parts per billion to 75 parts per billion.  *Mississippi v. EPA*, 744 F.3d 1334 (D.C. Cir. 2013).  Polluting industries challenged EPA's decision to lower the standard.  *Id.*  EPA justified the decision to lower the standard, in part, based on a unanimous recommendation by the Clean Air Scientific Advisory Committee to set the standard at a lower level, between 60 and 70 parts per billion.  *Id.* at 1344-46.  EPA's decision was upheld by a reviewing court based, in part, on the scientific analysis and recommendations of the Clean Air Scientific Advisory Committee.  *Id.* at 1345.

20.     EPA advisory committees are made up of subject matter experts.

21.     Service by qualified and knowledgeable members is critical to the effective operation of EPA advisory committees.

22.     Many EPA advisory committee members are academic scientists and medical professionals employed by universities, hospitals, or other not-for-profit organizations who conduct cutting-edge scientific and technical research relevant to the work of the committees and

---

[2] Science Advisory Board, Office of the Administrator, Letter at 2 (Aug 11, 2016) (available at https://yosemite.epa.gov/sab/sabproduct.nsf/0/BB6910FEC10C01A18525800C00647104/$File/EPA-SAB-16-005+Unsigned.pdf).

[3] Coral Davenport, *Reversing Course, E.P.A. Says Fracking Can Contaminate Drinking Water*, N.Y. Times, December 13, 2016 (available at https://www.nytimes.com/2016/12/13/us/reversing-course-epa-says-fracking-can-contaminate-drinking-water.html?_r=2).

of EPA.  Much of this work serves the public interest, not the interests of private, for-profit

entities, and is wholly or partially funded by federal grants, including federal grants administered

by EPA.

II.    EPA'S LONG-STANDING PRACTICE OF APPOINTING EPA GRANTEES TO
       SERVE ON ITS FEDERAL ADVISORY COMMITTEES

23.    EPA has a consistent, decades-long practice of appointing EPA grantees to its

federal advisory committees.  Grantees who are not full-time federal employees typically serve

as special government employees.  EPA has never before viewed the receipt of EPA funds as

disqualifying a person from service on federal advisory committees.

24.    EPA has consistently taken the position that the fact that a person receives an

EPA grant does not indicate a lack of independence from or lead to improper influence by the

Agency on the committee.

25.    EPA research grant recipients are selected on their merits through a competitive

process. The process incorporates independent peer review to prevent improper influence over

the selection process.

26.    The National Academy of Sciences has conducted two independent reviews of

EPA's primary program for support of scientific research, called Science to Achieve Results

("STAR").  The National Academy of Sciences has found that the STAR program is a

competitive, peer-reviewed program created to improve EPA's access to the best scientists and

engineers; that the STAR program has a rigorous peer-review process; and that the EPA has

taken effective steps to ensure that the process does not suffer from conflicts of interest and is

independent.

27.     EPA has taken the position that working under an EPA grant does not impair a scientist's ability to provide independent technical or scientific advice to EPA.  Only last year, EPA's position was that "the mere fact that EPA has awarded research grants to members of an [EPA advisory committee] does not establish that those members lack independence in violation of the [statute establishing the committee], or that the panel is improperly influenced by EPA."[4]

28.     EPA has interpreted independence for purposes of scientific peer review as requiring that the reviewer not have been involved in producing the draft to be reviewed.  It has not construed independence to suggest that EPA grantees are unable to provide disinterested advice.

29.     EPA has consistently applied and conformed to uniform federal ethics regulations promulgated by OGE in its forms, guidance, and practice.

30.     In a government-wide handbook establishing recommended approaches to peer review, the Office of Management and Budget has agreed with EPA's consistent position that receipt of a grant does not automatically mean that the grantee has a conflict of interest or lacks independence.[5]

31.     EPA has taken the position that the most important factor in selecting advisory committee members is their knowledge, expertise, and skills.

32.     Because EPA is a major sponsor of significant research, recipients of EPA funding are often leading experts in their fields of research and their expertise is valuable to EPA.  EPA has taken the position that excluding its grantees from service on advisory

---

[4] Memorandum Of Points And Authorities In Support Of Defendant's Motion To Dismiss at 34, Energy & Environment Legal Institute v. EPA, No. 1:16-cv-00915-TSC (D.D.C. July 15, 2016), ECF 11-2.

[5] Office of Management and Budget, Final Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664, 2669 (Jan. 14, 2005).

committees would disqualify some of those most qualified to render expert scientific and technical advice.

33.     Until the Directive was issued, the only financial limitations on special government employees were those imposed by uniform federal ethics rules.

34.     Until the Directive was issued, if a member of a federal advisory committee worked for an entity receiving an EPA grant—whether a government contractor, an academic institution, or a non-profit organization—that person could participate in matters of general applicability and was precluded from participating only in those matters that affect his or her employer in a special and distinct way.

III.    THE PRUITT DIRECTIVE PROHIBITING EPA GRANTEES FROM SERVING ON EPA FEDERAL ADVISORY COMMITTEES

35.     On October 31, 2017, Pruitt issued a Directive that bars EPA grant recipients from service on any EPA federal advisory committee.  The Directive appears in a document titled "Strengthening and Improving Membership on EPA Federal Advisory Committees," which is attached to this complaint as Exhibit A.

36.     In a statement announcing the decision, Administrator Pruitt stated that the purpose of the Directive is to "ensure that there's integrity in the process and that the scientists that are advising us are doing so with not any type of appearance of conflict."

37.     Pruitt continued, "when we have members of those committees, that have received tens of millions of dollars in grants, at the same time that they're advising this agency on rulemaking, that is not good and that is not right."

38.     The Directive provides: "Members shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in

10

receipt of EPA grants, either as principal investigator or co-investigator, or in a position that

otherwise would reap substantial direct benefit from an EPA grant."

39.     A memorandum from Administrator Pruitt to other agency officials, issued the

same day, describes the basis and purpose of the Directive.  The memorandum is attached to this

complaint as Exhibit B.

40.     The memorandum claims that a prohibition on grantee service is needed to

"strengthen[] the integrity, objectivity, and reliability of EPA [advisory committees]."  It asserts

that receipt of EPA grants "can create the appearance or reality of potential interference with

[recipients'] ability to independently and objectively serve as [an advisory committee] member."

41.     The memorandum states that the Directive is "in addition to EPA's existing

policies and legal requirements preventing conflicts of interest among the membership of the

Agency's [advisory committees]."

42.     In issuing the Directive, Administrator Pruitt stated, "This policy directive will

take effect immediately."

43.     After issuing the Directive, EPA did not reappoint EPA grantees who had been

serving on EPA advisory committees.

44.     After issuing the Directive, EPA sought and accepted the resignations of EPA

grantees who had been serving on EPA advisory committees.

45.     A total of at least six grant recipients who were members of the EPA Science

Advisory Board were removed pursuant to the Directive.  One of those members was Plaintiff

Dr. Robyn Wilson.  Prior to issuance of the Directive, Dr. Wilson received an email from EPA

seeking confirmation that she was a current recipient of EPA funding.  Dr. Wilson confirmed

that she was.  Subsequent to issuance of the Directive, Dr. Wilson was asked whether she would

like to remain on the SAB or retain the EPA funding.  She subsequently received an email notifying her that she had been removed from the SAB.

46.     EPA staff is continuing to implement the Directive, including by sending email inquiries to current advisory committee members asking whether they currently receive any EPA grants.

47.     After issuing the Directive, EPA appointed new advisory committee members to replace members removed pursuant to the Directive.  Many of the replacement appointees work directly for industries regulated by EPA or receive financial support from such industries.  For example, after issuing the Directive, EPA appointed the following individuals as members of the Science Advisory Board: Robert Merritt, an executive with Total, one of the world's largest oil and gas companies; Larry Monroe, an executive with Southern Company, an electric utility that operates coal- and gas-fired power plants; and Kimberly White, a Senior Director at the American Chemistry Council, a trade association for the chemical industry.

48.     Other people who receive salaries or other financial support from industries regulated by EPA continue to serve as members of EPA advisory committees.

49.     EPA did not provide public notice of the Directive for the purpose of taking public comment, nor did it take public comment.

50.     EPA did not promulgate the Directive jointly with OGE, publish the Directive in the Federal Register, or codify the Directive as an addendum to the uniform federal ethics rules in title 5 of the Code of Federal Regulations.  The Director of OGE did not concur in or co-sign the Directive.

## LEGAL BACKGROUND

51.     Several interrelated legal authorities define and limit the authority of all federal agencies, including EPA, with respect to federal advisory committees and their members.

I.      UNIFORM FEDERAL ETHICS RULES.

52.     Pursuant to statutory authority and authority delegated by the President, OGE has

established a comprehensive and uniform scheme for addressing potential conflicts of interest

that may arise where an executive-branch employee—including a special government employee

serving on a federal advisory committee—participates in a matter in which he or she has a

financial interest.

53.     Statutory authority for the uniform federal ethics rules promulgated by OGE is

provided by 18 U.S.C. §§ 201-09.

54.     Congress enacted 18 U.S.C. §§ 201-09 to address bribery, graft, and conflicts of

interest among public officials.

55.     The legislative history of these statutory provisions emphasizes the risk that

excessive and unnecessary conflict of interest rules may pose to the ability of federal agencies to

access the best scientific and technical advice.  S.Rep. No. 2213, 87th Cong., 2d Sess., at 6-7.  It

explains that the statute strikes a careful and deliberate balance between the need to avoid

conflicts of interest and the importance of having talented individuals be able to serve on federal

advisory committees.  *Id.*

56.     Soon after enactment of these provisions, the Attorney General published a

memorandum analyzing their purpose.  Dep't of Justice, Memorandum Regarding Conflict of

Interest Provisions of Public Law 87-849, 28 Fed. Reg. 985 (Feb. 1, 1963).  It explained that the

purpose of the Section 208 conflict of interest provisions is to "help the Government obtain the

temporary or intermittent services of persons with special knowledge and skills whose principal

employment is outside the Government."  *Id.*  Prior statutory requirements were "unnecessarily

severe" and "impeded the departments and agencies in the recruitment of experts for important

work."  *Id.*

57.     OGE too has analyzed the Congressional purpose in enacting 18 U.S.C. §§ 201-09.  Those provisions "announced . . . that [Congress] had established conflict-of-interest measures with regard to [special government employees] that gave due regard to their proper interests and to those of the Government as well—measures that eliminated the need for ad hoc corrective adjustments in the future."[6]

58.     Section 208 prohibits federal employees from participating in any particular matter that will have a direct and predictable effect on their financial interests.  18 U.S.C. § 208(a).  Its requirements apply to special government employees, including federal advisory committee members making recommendations or rendering advice.  *Id*. § 208(b)(3).

59.     Section 208 establishes several classes of circumstances in which the risk of a financial conflict of interest is or may be deemed sufficiently small or remote that the public official is permitted to participate in the matter at issue.  *Id*. § 208(b)(1)-(3).  One of these exceptions is specific to special government employees that serve on federal advisory committees, and permits those employees to participate in the event that a responsible official certifies that the potential for a conflict of interest is outweighed by the need for the individual's services.  *Id*. § 208(b)(3).

60.     Section 208(d)(2) grants OGE authority to implement the provisions of section 208(b) by promulgating "uniform" federal regulations.  18 U.S.C. § 208(d)(2).  Such regulations must be promulgated in consultation with the U.S. Attorney General and shall "list and describe exemptions" and "provide guidance with respect to the types of interests that are not so

---

[6] Memorandum dated July 9, 1982 from J. Jackson Walter, Director of the Office of Government Ethics, to Heads of Departments and Agencies of the Executive Branch regarding Members of Federal Advisory Committees and the Conflict-of-Interest Statutes at 2.

substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee."  *Id.*

61.     OGE's authority and obligation to promulgate uniform federal ethics rules is reinforced by Executive Order 12731.  That Executive Order, entitled "Principles of Ethical Conduct for Government Officers and Employees," directs OGE to establish ethics regulations for executive branch employees, in consultation with the Attorney General and the Office of Personnel Management.  Executive Order 12731 § 201(a), (c).

62.     The Executive Order provides that the regulations promulgated by OGE constitute "a single, comprehensive, and clear set of executive-branch standards of conduct."  *Id.* § 201(a).

63.      Pursuant to these authorities, OGE has promulgated uniform federal ethics regulations governing financial conflicts of interest.

64.     As OGE explained in promulgating the regulations, the "uniformity" required by law "cannot be achieved if agencies can pick and choose which provisions they adopt or override."  57 Fed. Reg. 35,006, 35,0110 (Aug. 7, 1992).

65.     Under the OGE regulations, an employee is disqualified from participating in a "particular matter" in which she has a financial interest if the matter will have "a direct and predictable effect on that interest."  5 C.F.R. § 2635.402(c).  A potentially disqualifying matter is one that is focused on the interests of specific people or discrete, identifiable classes of people, such as an adjudicative proceeding, an application for a permit, a contract, or a criminal charge. 5 C.F.R. § 2635.402(b)(3).  It "does not extend to the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons."  *Id.*  A direct and predictable effect requires a "close causal link" between the government action and the

financial effect and a real, as opposed to a "speculative possibility that the matter will affect the financial interest." *Id.* § 2635.402(b)(1).

66. The OGE regulations expressly address potential conflicts of interest that may arise where a special government employee, serving as a member of a federal advisory committee, participates in a matter in which she may have a financial interest.  5 C.F.R. § 2640.203(g).  The relevant regulation provides, in part:

> A special Government employee serving on an advisory committee within the meaning of the Federal Advisory Committee Act . . . may participate in any particular matter of general applicability where the disqualifying financial interest arises from his non-Federal employment or non-Federal prospective employment, provided that the matter will not have a special or distinct effect on the employee or employer other than as part of a class.

*Id.* (emphasis omitted.)

67. OGE regulations also provide illustrative examples to clarify what does and does not constitute an impermissible conflict for a special government employee serving on a federal advisory committee.  *Id.*

68. The regulations provide the following as an illustration of a situation where a special government employee <u>may</u> participate in a matter: "A chemist employed by a major pharmaceutical company has been appointed to serve on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials involving human subjects. Even though the chemist's employer is in the process of developing an experimental AIDS vaccine and therefore will be affected by the new standards, the chemist may participate in formulating the advisory committee's recommendations."  *Id.*

69. The regulations provide the following as an illustration of a situation where a special government employee may <u>not</u> participate in a matter: "The National Cancer Institute (NCI) has established an advisory committee to evaluate a university's performance of an NCI

grant to study the efficacy of a newly developed breast cancer drug.  An employee of the

university may not participate in the evaluation of the university's performance because it is not a

matter of general applicability."  *Id.*

70.     The OGE regulations establish procedures by which other federal agencies may

supplement the uniform federal ethics requirements.  Under the regulations:

> (a) An agency that wishes to supplement this part shall prepare and submit to the Office
> of Government Ethics, for its concurrence and joint issuance, any agency regulations that
> supplement the regulations contained in this part . . . .
> (b) After concurrence and co-signature by the Office of Government Ethics, the agency
> shall submit its supplemental agency regulations to the Federal Register for publication
> and codification at the expense of the agency in title 5 of the Code of Federal
> Regulations. Supplemental agency regulations issued under this section are effective only
> after concurrence and co-signature by the Office of Government Ethics and publication in
> the Federal Register.

5 C.F.R. § 2635.105(a), (b).

71.     Executive Order 12731, like the OGE regulations, authorizes other federal

agencies to supplement the OGE regulations with "regulations of special applicability to the

particular functions and activities of that agency," but requires that "[a]ny supplementary agency

regulations" be promulgated jointly with OGE as an addendum to the uniform federal ethics

regulations.  Executive Order 12731 § 301(a).

## II.     FEDERAL ADVISORY COMMITTEE ACT

72.     Congress enacted the Federal Advisory Committee Act ("FACA") in 1972 to

improve the performance of federal advisory committees.  In enacting FACA, Congress found

and declared that standards and uniform procedures should govern the committees'

establishment, operation, administration, and duration.  5 U.S.C. App. II, § 2(b)(4).

73.     FACA was intended to protect against undue influence by special interests over

government decision-making.  As the House Report emphasized:

One of the great dangers in this unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns.  Testimony received at hearings before the Legal and Monetary Affairs Subcommittee pointed out the danger of allowing special interest groups to exercise undue influence upon the Government through the dominance of advisory committees dealing with matters in which they have vested interests. . . .This lack of balanced representation of different points of view and the heavy representation of parties whose private interests could influence their [advisory committee] recommendations would be prohibited by the provisions contained in [] the bill.

H.R. Rep. No. 92-1017, 92d Cong., 2d Sess. 6 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491,

3496.

74.    FACA contains two requirements to prevent undue influence by any special

interest, one related to the membership of federal advisory committees and another related to

their advice and recommendations.  First, with respect to membership, FACA requires that any

legislation establishing a federal advisory committee "shall . . . require the membership of the

advisory committee to be fairly balanced in terms of the points of view represented and the

functions to be performed by the advisory committee."  5 U.S.C. App. II, § 5(b)(2).  Second,

with respect to advice and recommendations, FACA requires that such legislation ensure that the

advisory committee's advice and recommendations will not be "inappropriately influenced by

the appointing authority or any special interest, but will instead be the result of the advisory

committee's independent judgment."  *Id.* § 5(b)(3).

75.    FACA also applies these requirements to advisory committees established or

utilized by federal agencies or other federal officials.  5 U.S.C. App. II, § 5(c); 5 U.S.C. App. II,

§ 3(2) (defining "advisory committee").

76.    FACA directs the Administrator of the General Services Administration ("GSA")

to prescribe administrative guidelines and management controls applicable to advisory

committees.  *Id.* § 7(c).

18

77.     FACA directs the heads of other federal agencies to establish uniform administrative guidelines and management controls that are consistent with the GSA regulations. *Id.* § 8(a).

78.     GSA has promulgated FACA implementing regulations addressing the obligations of agencies establishing or utilizing federal advisory committees.  *See* 41 C.F.R. Part 102–3.

79.     The GSA regulations require agency heads, including the EPA Administrator, to:

    a.    comply with FACA and the GSA regulations, 41 C.F.R. § 102-3.105(a); and

    b.    "[d]evelop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 102-3.105(g).

80.     The GSA regulations address the "interests and affiliations" of advisory committee members by directing agency heads to adhere to the uniform federal ethics rules established by OGE. Specifically, they direct agency heads, including the EPA Administrator, to assure that they comply "with applicable conflict of interest statutes, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules."  *Id.* § 102-3.105(h).

81.     The GSA regulations explain that advisory committee members may be regular federal employees, special government employees, or representatives, and that most advisory committee members are special government employees or representatives.  41 C.F.R. § 102–3.130(h); *id.* § 102–3 App. A. to Subpart C (Question IV).  They provide that special government employees are covered by the uniform federal ethics rules.  *Id.* § 102–3 App. A. to Subpart C (Question IV).

82.     The GSA regulations do not deem receipt of an agency grant to disqualify an

individual from serving on a federal advisory committee that advises that same agency.

III.     STATUTES ESTABLISHING ADVISORY COMMITTEES

83.     Many of the federal advisory committees managed by EPA are created by statute.

84.     The Clean Air Scientific Advisory Committee ("CASAC") is established by

Section 109 of the Clean Air Act enacted on August 7, 1977.  42 U.S.C. § 7409.  The CASAC

shall be "composed of seven members including at least one member of the National Academy

of Sciences, one physician, and one person representing State air pollution control agencies."  *Id.*

§ 7409(d)(2)(A).  The CASAC shall:

> (i) advise the Administrator of areas in which additional knowledge is required to
> appraise the adequacy and basis of existing, new, or revised national ambient air quality
> standards, (ii) describe the research efforts necessary to provide the required information,
> (iii) advise the Administrator on the relative contribution to air pollution concentrations
> of natural as well as anthropogenic activity, and (iv) advise the Administrator of any
> adverse public health, welfare, social, economic, or energy effects which may result from
> various strategies for attainment and maintenance of such national ambient air quality
> standards.

*Id.* § 7409(d)(2)(C).

85.     The Science Advisory Board is established by the Environmental Research,

Development, and Demonstration Authorization Act of 1978.  42 U.S.C. § 4365.  "The

Administrator of the Environmental Protection Agency shall establish a Science Advisory Board

which shall provide such scientific advice as may be requested by the Administrator" or various

congressional committees.  *Id.* § 4365(a).  Each member of the SAB "shall be qualified by

education, training, and experience to evaluate scientific and technical information on matters

referred to the Board under this section."  *Id.* § 4365(b).

86.     The Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory

Panel is established by section 25(d) of the Federal Insecticide, Fungicide, and Rodenticide Act

("FIFRA").  7 U.S.C. § 136w(d).  The Panel:

> shall consist of 7 members appointed by the Administrator from a list of 12 nominees, 6
> nominated by the National Institutes of Health and 6 by the National Science Foundation,
> utilizing a system of staggered terms of appointment. Members of the panel shall be
> selected on the basis of their professional qualifications to assess the effects of the impact
> of pesticides on health and the environment.  To the extent feasible to insure
> multidisciplinary representation, the panel membership shall include representation from
> the disciplines of toxicology, pathology, environmental biology, and related sciences. If a
> vacancy occurs on the panel due to expiration of a term, resignation, or any other reason,
> each replacement shall be selected by the Administrator from a group of 4 nominees, 2
> submitted by each of the nominating entities named in this subsection.

*Id.*

IV.    THE ADMINISTRATIVE PROCEDURE ACT.

87.    The Administrative Procedure Act ("APA") authorizes judicial review of final

agency action.  5 U.S.C. § 704.

88.    The APA directs the reviewing court to hold unlawful and set aside agency action,

findings, and conclusions found to be: arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right; or without observance of procedure required by law.  5 U.S.C.

§ 706(2)(A), (C), (D).

**STANDING**

I.    THE PRUITT DIRECTIVE HARMS EPA GRANTEES WHO WISH TO SERVE ON
     EPA ADVISORY COMMITTEES AND DEPRIVES EPA OF HIGH-QUALITY
     EXPERT ADVICE.

89.    The Directive has immediately and directly injured Dr. Wilson by leading to her

removal with a full year remaining on her term. As a result, Dr. Wilson is suffering loss of

professional opportunity in the form of professional and public service opportunities.

90.     The Directive injures members of PSR, NHMA, and ISCHE, as well as Professor

Avol, Dr. Árvai, and Dr. Wilson by forcing them to choose between serving on the EPA advisory

committees and receiving grants to fund important scientific research.

91.     As a result, members of PSR, NHMA, and ISCHE, as well as Professor Avol, Dr.

Árvai, and Dr. Wilson, suffer loss of professional opportunity in the form of professional and

public service opportunities or research funding.

92.     For example, Dr. Jonathan Levy, a current PSR member and a professor at Boston

University School of Public Health, is an expert on the relationship between exposure to air

pollutants and human health effects.  He is a current recipient of an EPA grant, through the

Center for Research on Environmental and Social Stressors in Housing Across the Life Course,

entitled Disparities in Exposure and Health Effects of Multiple Environmental Stressors Across

the Life Course. The grant began in 2015 and runs through June 2020.  Dr. Levy previously

served on two EPA advisory committees, the Advisory Council on Clean Air Compliance

Analysis from 2009-2014 and the Clean Air Subcommittee of the Board of Scientific Counselors

in 2009.  Dr. Levy views service on EPA advisory committees as a valuable professional and

public service opportunity, and is interested in serving on EPA advisory committees in the

future. Because he is a recipient of an EPA grant that continues through 2020, the Directive bars

him from service on EPA advisory committees and causes him to suffer a loss of professional

and public service opportunities.

93.     Another example is Dr. Deborah Cory-Slechta, a current PSR member and a

professor at the University of Rochester Medical School, where she runs a laboratory focused on

understanding the contribution of environmental chemical exposures to human diseases and

disorders of the central nervous system.  Dr. Cory-Slechta has a long track record of and

commitment to public service.  Dr. Cory-Slechta has served on numerous national review and

advisory panels of the Environmental Protection Agency, the National Institutes of Health

("NIH"), the National Institute of Environmental Health Sciences, the Food and Drug

Administration, the National Center for Toxicological Research, the National Academy of

Sciences, the Institute of Medicine, the Agency for Toxic Substances and Disease Registry, and

the Centers for Disease Control.  She served on EPA's Science Advisory Board for six years, and

serves currently on EPA's Chemical Assessment Advisory Committee.  Dr. Cory-Slechta has

been a recipient of EPA research grants in the past, including from 2005 to 2012 and from 2010

to 2015, and, but for the Directive, would apply for EPA research grants in the future. If forced

to choose between service on EPA advisory committees and EPA grants, Dr. Cory-Slechta

intends to prioritize public service and continue serving on the Chemical Assessment Advisory

Committee.  As a result, she will be ineligible for EPA grants, and will suffer a loss of

professional opportunity.

94.     Dr. Rob McConnell is a current member of ISCHE and a professor of preventive

medicine at the University of Southern California.  He has spent the past 20 years studying the

health effects of air pollution on children.  He has been a recipient of EPA grants in the past

supporting this work and is a recipient of a current EPA grant supporting the Southern California

Children's Environmental Health Center.  The grant began in 2013 and runs through 2018.  Dr.

McConnell also serves on the EPA Scientific Advisory Committee advising EPA on the review

of the air pollution particulate standard.  Because he is a recipient of an EPA grant, the Directive

bars him from service on the EPA advisory committee.  This causes him to suffer a loss of

professional and public service opportunity.

95.     Professor Avol is similarly harmed by the Directive.  Professor Avol is an expert in the harm air pollution causes to children's respiratory and cardiovascular health.  Professor Avol is a former recipient of EPA funding, having served as a core co-Director/investigator in one of the EPA-NIH co-funded Children's Environmental Health Centers.  He has also served on EPA advisory committees multiple times, including the Clean Air Science Advisory Committee Expert Panel reviews for nitrogen and sulfur oxides (from 2007 through 2009), for particle matter (from 2009 through 2012), and for ozone (from 2011 through 2014).  Professor Avol views service on EPA federal advisory committees as an opportunity to give back to society and advance the public good, as well as an important means of career advancement and intellectual growth. He is likely to apply for EPA grant funds to support his future research activities, and is interested in future participation on EPA advisory committees. Because of the Directive, he cannot do both, and will suffer a loss of professional opportunity.

96.     Dr. Árvai is also similarly harmed by the Directive.  Dr. Árvai is an internationally recognized expert in the risk and decision sciences; his research focuses on how individuals and groups can improve the quality of decision making in situations where tradeoffs are required across environmental, social, and economic priorities.  He, like other parties to this action, has a long track record of and commitment to public service.  Dr. Árvai served as a consultant to the EPA's Science Advisory Board Staff Office (on the topic of valuing the protection of ecological systems and services) between 2003 and 2008.  He also served between 2011 and 2017 as a member of the EPA's Chartered Science Advisory Board.  In addition, he has served on several committees and boards at the National Academy of Sciences, including the Board on Environmental Change and Society, the Roundtable on Public Interfaces of the Life Sciences, and the Committee on Strategies and Methods for Climate-Related Decision Support.

Dr. Árvai has been a recipient of EPA grants, as well as other federal agency grants, in the past, and were it not for the directive, would apply for EPA research grants in the future.  If forced to choose between service on EPA advisory boards and EPA grants, Dr. Árvai would prefer to prioritize public service.  As a result, he will be ineligible for future EPA grants, and he and his graduate students will suffer a loss of professional opportunities.

97.     Scientists who receive or would like to obtain EPA funding, including members of the Plaintiff organizations, as well as Professor Avol, Dr. Árvai, and Dr. Wilson, suffer concrete harm from the Directive.  The Pruitt directive makes them ineligible for service on EPA advisory committees if they receive grant funding.  Serving on an EPA advisory committee is both a valuable professional credential and an opportunity to give back to the scientific community and the nation through public service.  Losing eligibility for such service is a loss of a valuable professional opportunity.

98.     Under the Directive, scientists who serve on EPA advisory committees must forgo EPA research funding.  EPA is an important source of funding, particularly for cutting-edge and influential research.  Competition for these grants is high, and receipt of a grant is itself a professional recognition.  The ability to conduct experiments or research and to produce scientific knowledge is central to career advancement in the sciences.  For scientists at academic institutions, such grants fund not only their own salaries but also lab space, equipment, and graduate students who assist in conducting research, all of which are important to their research and professional advancement.  Indeed, the inability to attract sufficient grant funding can be fatal to a scientist's career.  Being forced to forgo such funding is a loss of a valuable professional opportunity.

99.     Additionally, the Directive causes significant harm to the public interest.
Regardless of which path scientists choose as a result of the Directive—forgoing grants to fund
new scientific knowledge or forgoing service—society loses out.  Where researchers forgo
grants, cutting-edge research may go unfunded.  Where they forgo service, the public and the
government are deprived of expertise on critical issues.  At the same time as the Directive purges
qualified individuals, it leaves in place people with financial interests in industries that are
regulated by EPA.  It thus leaves EPA advisory committees at greater risk of capture by special
interest groups.

100.    The injuries described above frustrate the organizational objectives of PSR,
NHMA, and ISCHE, which include the advancement of scientific research on matters important
to public health and the effective use of scientific knowledge to inform health policy, including
the policies of the EPA.

## COUNT 1: VIOLATION OF UNIFORM FEDERAL ETHICS RULES

101.    Plaintiffs incorporate by reference the allegations contained in the preceding
paragraphs as if fully set forth herein.

102.    The law governing financial interests of executive branch employees expressly
addresses conflicts of interest among members of federal advisory committees—most of whom
serve as "special Government employees."  18 U.S.C. § 208(a)-(b).  It also directs the Office of
Government Ethics to promulgate "uniform regulations" implementing the statutory provisions.
*Id.* § 208(d)(2).

103.    Those implementing regulations establish "uniform" federal ethics requirements
across all government agencies.  18 U.S.C. § 208(d)(2); *see also* Executive Order 12731
§ 201(a), (c) (stating that the regulations promulgated by OGE constitute "*a single,*

*comprehensive*, and clear set of executive-branch standards of conduct" (emphasis added)).

Consequently, EPA lacks authority to adopt a policy that conflicts with OGE regulations.

104.    The OGE regulations specifically address the risk of financial conflicts of interest

for special government employees serving on federal advisory committees, and provide, in

relevant part:

> A special Government employee serving on an advisory committee within the meaning of the Federal Advisory Committee Act . . . may participate in any particular matter of general applicability where the disqualifying financial interest arises from his non-Federal employment or non-Federal prospective employment, provided that the matter will not have a special or distinct effect on the employee or employer other than as part of a class.

5 C.F.R. § 2640.203(g) (emphasis omitted).

105.    The Directive erects a total bar on the participation of special government

employees that receive EPA research grants, and thus bars them from advising on *any* matter.

This absolute bar exists even when a special government employee's financial interest is in the

form of a salary from his or her non-Federal employer, such as a university or other non-profit

organization, and thus "arises from his [or her] non-Federal employment."

106.    In adopting the Directive, EPA did not acknowledge that its previous, consistent

position conflicts with the Directive, acknowledge that it is changing position, or explain why it

is doing so.

107.    The Directive conflicts with the uniform federal ethics rules adopted by OGE.

Consequently, the Directive is "arbitrary and capricious, an abuse of discretion, or otherwise not

in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right." 5 U.S.C. § 706(2)(A), (C).

### COUNT 2: VIOLATION OF PROCEDURAL REQUIREMENTS FOR
### SUPPLEMENTING FEDERAL ETHICS RULES

108.    Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

109.    Under the OGE regulations, an agency that wishes to supplement the uniform

federal ethics rules must "prepare and submit to the Office of Government Ethics, for its

concurrence and joint issuance, any agency regulations that supplement the regulations contained

in this part."  5 C.F.R. § 2635.105(a).  Only "[a]fter concurrence and co-signature by the Office

of Government Ethics," may the agency submit its supplemental regulations for publication and

codification in title 5 of the Code of Federal Regulations.  *Id.* § 2635.105(b).  Such supplemental

agency regulations "are effective only after concurrence and co-signature by the Office of

Government Ethics and publication in the Federal Register."  *Id.*

110.    Executive Order 12731 provides that individual agencies may "[s]upplement, as

necessary and appropriate, the comprehensive executive branch-wide regulations of the Office of

Government Ethics, with regulations of special applicability to the particular functions and

activities of that agency."  Executive Order 12731 § 301(a).  However, "[a]ny supplementary

agency regulations shall be prepared as addenda to the branch-wide regulations and promulgated

jointly with the Office of Government Ethics, at the agency's expense, for inclusion in Title 5 of

the Code of Federal Regulations."  *Id.*

111.    The Directive's bar on grant recipients serving on EPA advisory committees is a

supplemental regulation within the meaning of 5 C.F.R. § 2635.105.  Administrator Pruitt did not

prepare and submit the Directive to OGE for its concurrence and joint issuance.  EPA did not

obtain the concurrence and co-signature of OGE on the directive and thereafter submit the

directive to the Federal Register for publication for inclusion in Title 5 of the Code of Federal Regulations.

112.    In issuing the directive without complying with the applicable procedural requirements, Administrator Pruitt acted arbitrarily, capriciously, or not in accordance with law and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## COUNT 3: VIOLATION OF FACA

113.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

114.    FACA protects against undue influence by special interests over government decision-making and requires that advisory committees have a fair balance of viewpoints in their memberships.

115.    FACA's mandates are applicable to every advisory committee established or utilized by federal agencies or other federal officials, including the EPA advisory committees covered by the Directive.  *Id.* App. II § 5(c); *see also Id.* App. II, § 3(2) (defining "advisory committee").

116.    For decades, EPA has had an unbroken historical practice of not treating the receipt of EPA funds as disqualifying a person from serving on a federal advisory committee. EPA has long and consistently taken the position that the fact that a person receives an EPA grant does not indicate a lack of independence or render the person subject to improper influence.

117.    Until recently, EPA has adhered to the provisions of the uniform federal ethics rules governing special government employees serving on EPA advisory committees.  If a member of a federal advisory committee works for a company, government contractor, or academic institution that receives EPA funding, that person may participate in matters of general

applicability.  He or she is precluded from participating only in those matters that directly affect his or her employer in a special and distinct way.

118.    The Directive is arbitrary, capricious, and contrary to FACA in numerous ways.

119.    First, the Directive marks a sharp departure from this past practice.  It deems receipt of EPA grants as cause to disqualify prospective members from serving on EPA advisory committees if they are the principal investigator or co-investigator or reap substantial direct benefits from an EPA grant.  Directive, ¶ 1.  EPA has a long-standing practice of taking the opposite position.  In adopting the Directive, EPA did not acknowledge that its previous, consistent position conflicts with the Directive, acknowledge that it is changing position, or explain why it is doing so.

120.    EPA has not offered, and cannot offer, a rational explanation for reversing its prior practice.

121.    Second, the new disqualification rule of the Directive appears under the heading, "Strengthen Member Independence," and describes the general direction to ensure "[m]embers shall be independent from EPA."  *Id*.  To the extent this is the rationale offered for the policy reversal, it runs counter to EPA's past position and government-wide policy, without any reasoned explanation.  In the past, EPA has taken the position that independence in a peer review means that the peer reviewers were not involved in producing the draft or document that is undergoing peer review.  This is also the position embodied in the Office of Management and Budget's Final Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664.  EPA has not offered, and cannot offer, a reasoned explanation for departing from this long-standing government policy and its own position, or articulated a rational connection between facts found and conclusion reached.

122.    Third, to the extent that EPA interprets FACA to require that every individual on a federal advisory committee must be independent of the agency, its interpretation is contrary to the statute and unreasonable.  FACA requires only that the <u>committees'</u> advice and recommendations reflect the <u>committees'</u> independent judgment. To the extent that EPA claims that individual members' receipt of EPA grants prevents the <u>committee</u> from exercising independent judgment in developing advice and recommendations, EPA's claim lacks record support and EPA has failed to establish a rational connection between the facts found and the conclusion reached.

123.    Fourth, the Directive treats similarly situated prospective committee members differently without any rational explanation.  It lacks any comparable disqualification for serving on federal advisory committees for people who receive grants or other financial benefits from industry entities that have vested interests in EPA regulation and the scientific advice on which EPA bases its regulatory decisions.  EPA allows individuals who work directly for or receive compensation from regulated industries or whose financial interests are impacted by EPA regulation to serve on federal advisory committees.  EPA has offered no justification—rational or otherwise—for treating EPA grants as disqualifying while financial support or even employment by regulated industries is not.

124.    In the past, EPA has treated employment by a regulated industry as a factor in ensuring both that the advisory committee is not dominated by a special interest and also in ensuring the advisory committee will have a fair balance of viewpoints among its membership. Implementing the Directive, EPA has removed scientists whose institutions receive EPA grants from several EPA advisory committees and has replaced those members with others, some of whom work directly for or receive funding from industries financially impacted by EPA

regulations and decisions.  The result has been an increase in the proportion of advisory committee members who may have a vested interest that disfavors stronger EPA regulation. EPA has not explained how it is meeting its obligations under FACA to ensure its advisory committees have balanced memberships and are not unduly influenced by regulated entities by removing members who have no such vested interest and appointing more members with such interests.

125.    The Directive is arbitrary, capricious, and contrary to FACA. *See* 5 U.S.C. § 706(2)(A).

### COUNT 4: VIOLATION OF STATUTES ESTABLISHING COMMITTEES

126.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

127.    Many of the EPA advisory committees subject to the Directive are established by statute or regulation, which define the membership requirements and duties of the Committees and their members.  These statutes make subject matter expertise the principal factor in determining the membership of several EPA advisory committees.  *See, e.g.*, 42 U.S.C. § 7409 (establishing the CASAC); 42 U.S.C. § 4365 (establishing the SAB); 7 U.S.C. § 136w(d) (establishing the FIFRA Scientific Advisory Panel).  These statutes do not disqualify any individual on the basis of receiving grants from the Agency.

128.    Past EPA practice and government-wide policy make expertise the most important factor in selecting scientific reviewers.  The Directive's preamble similarly states that "it is in the public interest to select the most qualified, knowledgeable, and experienced candidates."  In the past, EPA has taken the position that eliminating from peer review committees all scientists who have received grants or otherwise been affiliated with EPA would eliminate many of those most qualified to render expert advice.

129.    Defendant Pruitt has not explained, and cannot rationally explain, how disqualifying scientists who work for institutions that receive EPA grants is consistent with past agency practice or the statutory direction to recruit the most qualified scientists for service on EPA advisory committees.

130.    The Directive is arbitrary, capricious, and contrary to the statutes establishing EPA advisory committees. *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

131.    Declare that the Directive conflicts with OGE regulations governing financial conflicts of interest, 5 C.F.R. § 2640.203(g), and is unlawful because it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

132.    Declare that the Directive is contrary to OGE regulations governing the procedures for promulgating supplemental agency regulations, 5 C.F.R. § 2635.105, and, therefore, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

133.    Declare that the Directive is arbitrary, capricious, and contrary to FACA.

134.     Declare that the Directive is arbitrary, capricious, and contrary to statutes authorizing EPA advisory committees.

135.    Vacate and set aside the Directive and actions taken by EPA in reliance on the Directive.

136.    Enjoin Administrator Pruitt from removing any individual from an EPA advisory committee pursuant to the Directive or otherwise implementing the provision of the Directive barring EPA grant recipients from service on EPA advisory committees.

137.    Enjoin Administrator Pruitt to reinstate any individual removed from an EPA advisory committee pursuant to the Directive or caused by the Directive to resign from an EPA advisory committee.

138.    Order such other and further relief as justice may require.

DATED: December 21, 2017

/s/ Susan Kraham (w/permission)
Susan Kraham (D.C. Bar No. NY0170)
Michael Burger
Columbia Environmental Law Clinic
Morningside Heights Legal Services
435 W. 116th St.
New York, NY 10027
212-854-4500
skraha@law.columbia.edu
mburger@law.columbia.org

*Attorneys for Joe Árvai and Robyn Wilson*

/s/ Neil Gormley
Neil Gormley (D.C. Bar No. 1008462)
Tosh Sagar (D.D.C. Bar No. D00497; CA Bar No. 286822)
Earthjustice
1625 Massachusetts Avenue, N.W.
Suite 702
Washington, D.C. 20036
202-667-4500
ngormley@earthustice.org
tsagar@earthjustice.org

Patti Goldman (D.C. Bar No. 398565)
Earthjustice
705 Second Avenue
Suite 203
Seattle, WA 98104
206-343-7340
pgoldman@earthjustice.org

*Attorneys for Physicians for Social Responsibility, National Hispanic Medical Society, International Society for Children's Health and the Environment, and Edward Lawrence Avol*