## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHYSICIANS FOR SOCIAL RESPONSIBILITY<br>1111 14th Street, NW, Suite 700<br>Washington, DC 20005;<br><br>NATIONAL HISPANIC MEDICAL ASSOCIATION<br>1920 L Street, NW, Suite 725<br>Washington, DC 20036;<br><br>INTERNATIONAL SOCIETY FOR CHILDREN'S HEALTH AND THE ENVIRONMENT<br>1100 E. Woodfield Road, Suite 350<br>Schaumburg, IL 60173;<br><br>JOE ÁRVAI<br>1419 Kearney Road<br>Ann Arbor, MI 48104;<br><br>EDWARD LAWRENCE AVOL<br>1520 First Street<br>Manhattan Beach, CA 90266;<br><br>and<br><br>ROBYN WILSON<br>2859 Eastcleft Dr.<br>Columbus, OH 43221,<br><br>*Plaintiffs,*<br><br>v.<br><br>SCOTT PRUITT, Administrator, U.S. Environmental Protection Agency, in his official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br><br>*Defendant.* | Civil Action No. 1:17-cv-02742-TNM<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND VACATUR** |

1

**INTRODUCTION**

1.      Plaintiffs Physicians for Social Responsibility, National Hispanic Medical

Association, International Society for Children's Health and the Environment, Professor Edward

Lawrence Avol, Dr. Robyn Wilson, and Dr. Joseph Árvai seek review of a directive issued by

Scott Pruitt, Administrator of the Environmental Protection Agency ("EPA" or "Agency"), on

October 31, 2017 ("Directive"), that bars recipients of EPA grants from serving on EPA federal

advisory committees.

2.      Though included in a document titled "Strengthening and Improving Membership

on EPA Federal Advisory Committees," the Directive impairs the ability of the committees to

provide expert and balanced advice to the Agency by preventing the participation of highly-

qualified scientists and medical professionals that receive EPA grants, while allowing persons

receiving industry funding to serve.

3.      The Directive is final agency action reviewable under the Administrative

Procedure Act, 5 U.S.C. § 704.

4.      The Directive is unlawful and arbitrary and capricious in violation of:

  a.  uniform federal ethics rules issued by the Office of Government Ethics ("OGE")

      and the Department of Justice, pursuant to statutory authority under 18 U.S.C.

      § 208(d) and Presidential authority delegated to OGE and the Department of

      Justice by Executive Order;

  b.  procedural requirements that federal agencies other than OGE and the Department

      of Justice must follow to issue supplemental ethics rules;

  c.  the Federal Advisory Committee Act, 5 U.S.C. App. II § 1 *et seq.*, and its

      implementing regulations, 41 C.F.R. Part 102–3, which require EPA to assure

      "fair balance" in the membership of federal advisory committees and avoid

2

inappropriate influence by "the appointing authority or by any special interest" on the committees' advice and recommendations; and

d.   statutes defining the membership requirements and duties of EPA federal advisory committees, including the Clean Air Science Advisory Committee ("CASAC"), 42 U.S.C. § 7409, the Science Advisory Board ("SAB"), 42 U.S.C. § 4365, and the Science Advisory Panel, 7 U.S.C. § 136w(d), which direct EPA to select advisory committee members on the basis of their expertise and qualifications.

5.      By this action, Plaintiffs seek declaratory relief, injunctive relief, and vacatur of the Directive.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1331.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(c)(2), (e)(1) because:

a.    Plaintiffs Physicians for Social Responsibility and National Hispanic Medical Association both reside and have their respective principal places of business in this district;

b.   Defendant resides in this district; and

c.   a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

8.      Plaintiff Physicians for Social Responsibility ("PSR") is a national non-profit organization that, guided by the values and expertise of medicine and public health, works to protect human life, human health, and the environment.  PSR's strategy for achieving its mission is to educate and activate the medical and broader health community, and the public, through

3

research, analysis, collaboration, and targeted communications and to advocate for government and societal change at the local, state, national, and international level.

9. Plaintiff National Hispanic Medical Association ("NHMA") is a non-profit organization representing the interests of 50,000 licensed physicians and other health care professionals in the United States. NHMA was founded and incorporated in 1994 with its principal place of business in Washington, D.C. NHMA's mission is to empower Hispanic physicians and health care professionals to lead efforts to improve the health of Hispanic and other underserved populations. NHMA achieves its mission by working in collaboration with Hispanic state medical societies, residents, medical students, and other public and private sector partners. NHMA also serves as a resource to federal agencies, Congress, and the White House, providing these policymakers with expert information in order to strengthen health care delivery to Hispanic communities across the nation. NHMA provides networking opportunities for its members and other stakeholders who impact the health of Hispanic communities, including an annual conference that brings together health care professionals, government representatives, and others. NHMA develops leaders who can serve on boards, including federal advisory committees, that impact health policies and the health of Hispanic communities. NHMA actively nominates its members to federal advisory committees.

10. Plaintiff International Society for Children's Health and the Environment ("ISCHE") is a non-profit organization of professional scientists that works to promote children's health by addressing the unique vulnerabilities of children to pollutants. ISCHE promotes research into the threats children face from environmental hazards and measures to protect them from those hazards. It translates these research findings into policy solutions to protect children. ISCHE makes current scientific findings more accessible to the health care,

public health, and policy communities via position papers, technical reports, and testimony. ISCHE also promotes the training of professionals in children's environmental health.

11.     Plaintiff Edward Avol is a Professor of Clinical Preventive Medicine at the Keck School of Medicine at the University of Southern California.  His expertise is in exposure assessment and the respiratory and cardiovascular effects of airborne pollutants in at-risk populations, including children and individuals with compromised lung function.

12.     Plaintiff Dr. Robyn Wilson is Associate Professor of Risk Analysis and Decision Science in the School of Environment and Natural Resources at the Ohio State University.  Her expertise is in the area of the individual decision-making process under conditions of risk and uncertainty.  Dr. Wilson was a member of the U.S. Environmental Protection Agency's Chartered Science Advisory Board until she was removed from her position pursuant to the Directive.

13.     Plaintiff Dr. Joseph Árvai is the Max McGraw Professor of Sustainable Enterprise, and the Director of the Erb Institute for Global Sustainable Enterprise at the University of Michigan.  His expertise is in the risk and decisions sciences.  Professor Árvai recently completed his second full term as a member of the U.S. Environmental Protection Agency's Chartered Science Advisory Board, and he is a member of the U.S. National Academy of Sciences' Board on Environmental Change and Society.

14.     Defendant Scott Pruitt is the Administrator of the Environmental Protection Agency.  Plaintiffs sue him in his official capacity as the Agency's highest-ranking official. Administrator Pruitt is responsible for the supervision and management of all decisions and actions of the EPA, and he is charged with complying with federal laws and regulations governing federal advisory committees and their membership.

## FACTUAL BACKGROUND

I.    EPA ADVISORY COMMITTEES

15.    EPA uses advisory committees to obtain valuable expertise, insight, and recommendations that guide the Agency's decision-making in fulfilling its core mission of protecting human health and the environment.   Some EPA advisory committees are established by statute, some by the President, and some by the EPA Administrator.

16.    EPA currently manages 22 federal advisory committees.  They advise the Agency on a wide range of topics, including pesticides, drinking water quality, air quality, rural community welfare, and children's health.

17.    EPA advisory committees are subject to the Federal Advisory Committee Act ("FACA") and federal ethics laws, as well as regulations established by the General Services Administration ("GSA") under FACA and uniform federal ethics regulations established by the Office of Government Ethics and the Department of Justice.  The EPA Administrator is responsible for ensuring compliance with these laws and regulations.

18.    Although full-time EPA staff can serve on EPA advisory committees[1], and each committee's meetings are run by a "Designated Federal Officer" who is a full-time agency employee, 41 C.F.R. § 102–3.120, most members of EPA advisory committees serve as "Special Government Employees" ("SGEs").  Under the Federal Advisory Committee Act, SGEs serving in the federal government may be paid a salary by the appointing authority.  *See* 5 U.S.C. App.

---

[1] EPA, Serving on the EPA Science Advisory Board: A Handbook for Members and Consultants, at 2 (March 2012) (available at https://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/Serving%20on%20the%20EPA%20Science%20Advisory%20Board:%20A%20Handbook%20for%20Members%20and%20Consultants/$File/Serving%20on%20the%20EPA%20Science%20Advisory%20Board%20SABSO-12-001.pdf) (identifying financial disclosure form required for full-time federal employees who serve on EPA advisory committees).

II, § 7(d)(1); 41 C.F.R. 101-6.1033.  EPA's policy, as noted in a handbook for members of its

advisory committees, "is to pay SGE members…an hourly compensation for time spent

preparing for and participating in advisory meetings.  The compensation is intended as an

'honorarium' to thank you for your service, not as a replacement for salary from your

employer."[2]  Nonetheless, as EPA recognizes, "[s]ome members and consultants waive

compensation at the request of their employers or because of tax considerations.  Even if you

serve without compensation, you are still subject to the SGE ethics and conflict-of-interest

rules."

     19.     EPA advisory committees play a crucial role in assisting EPA in carrying out its

statutory duties.

     20.     EPA advisory committees play a crucial role in ensuring the scientific accuracy of

agency reports and findings.  For example, in 2015, the EPA released a draft report on a five-

year study of fracking and drinking water.  Although the executive summary claimed that EPA

had found no evidence of "widespread, systemic impacts" on water supplies,[3] the body of the

report documented multiple cases in which fracking had contaminated communities' drinking

water with toxic chemicals.  The Science Advisory Board investigated the discrepancy between

the summary and EPA's findings and publicly raised "concerns regarding the clarity and

---

[2] *Id*. at 3.

[3] EPA, Office of Research and Development, Assessment of the Potential Impacts of Hydraulic
Fracturing for Oil and Gas on Drinking Water Resources: External Review Draft, at ES-6 (June
2015) (available at http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=523539).

adequacy of support for several major findings."[4]   The Science Advisory Board urged the agency

to reconsider, and EPA revised the report.[5]

21.     The Committees also provide expert advice to EPA.  For example, in 2008 EPA

promulgated a rule lowering the primary national ambient air quality standard for ozone from 80

parts per billion to 75 parts per billion.  *Mississippi v. EPA*, 744 F.3d 1334 (D.C. Cir. 2013).

Polluting industries challenged EPA's decision to lower the standard.  *Id.*  EPA justified the

decision to lower the standard, in part, based on a unanimous recommendation by the Clean Air

Scientific Advisory Committee to set the standard at a lower level, between 60 and 70 parts per

billion.  *Id.* at 1344-46.  EPA's decision was upheld by a reviewing court based, in part, on the

scientific analysis and recommendations of the Clean Air Scientific Advisory Committee.  *Id.* at

1345.

22.     EPA scientific advisory committees are made up of subject matter experts.

Service by qualified and knowledgeable members is critical to the effective operation of these

committees.

23.     Many EPA advisory committee members are academic scientists and medical

professionals employed by universities, hospitals, or other not-for-profit organizations who

conduct cutting-edge scientific and technical research relevant to the work of the committees and

of EPA.  Much of this work serves the public interest, not the interests of private, for-profit

---

[4] Science Advisory Board, Office of the Administrator, Letter, at 2, 131 (Aug 11, 2016)
(available at
https://yosemite.epa.gov/sab/sabproduct.nsf/0/BB6910FEC10C01A18525800C00647104/$File/
EPA-SAB-16-005+Unsigned.pdf).

[5] Coral Davenport, *Reversing Course, E.P.A. Says Fracking Can Contaminate Drinking Water*,
N.Y. Times, December 13, 2016 (available at
https://www.nytimes.com/2016/12/13/us/reversing-course-epa-says-fracking-can-contaminate-
drinking-water.html?_r=2).

entities, and is wholly or partially funded by federal grants, including federal grants administered by EPA.

II.     EPA GRANT PROGRAMS

24.     EPA grants support scientific research in a wide range of areas important to protection of public health and the environment.

25.     Much of the funding provided by an EPA grant is used by universities and research centers to cover administrative costs, facilities, laboratory space, and equipment, and to support graduate students, post-graduate students, and other staff.  Typically, only a small portion of an EPA grant is used by universities or research centers to pay individual scientists' salary or other compensation.

26.     As the Congressional Research Service recently explained in response to a Congressional request for information from a House of Representatives Subcommittee investigating the receipt of EPA grants by members of EPA advisory committees, EPA grants "typically are to the academic institution where the member is employed, and only a very small proportion, if any, of the grant may be paid in the form of salary to the member."[6]

27.     Further, according to the Congressional Research Service, "In some cases, grants are for major national research centers that house numerous research projects and potentially involve dozens of students and post-doctoral fellows and several professors."  CRS Memo at 10. In addition, "some grants are provided by multiple agencies, and the multi-agency total for the project may be stated in the database, although only a portion of the funding derives from EPA's

_____

[6] CRS, Memorandum to House Subcommittee on Energy and Environment, Committee on Science, Space, and Technology, EPA Grants to Members of Selected EPA Advisory Committees, at 1 (Mar. 12, 2013).

budget.  For this reason it would be inappropriate to sum the grant amounts to obtain a total EPA

funding amount across committee members or any single committee member." *Id.*

28.  EPA research grant funding is determined according to scientific merit through a

competitive peer review process to prevent improper influence over the selection process.

29.  The National Academy of Sciences has conducted two independent reviews of

EPA's primary program for support of scientific research, called Science to Achieve Results

("STAR").  The National Academy of Sciences has found that the STAR program is a

competitive, peer-reviewed program created to improve EPA's access to the best scientists and

engineers; that the STAR program has a rigorous peer-review process; and that the EPA has

taken effective steps to ensure that the process does not suffer from conflicts of interest and is

independent.

30.  EPA's grant-making authority to universities, hospitals, and other non-profit

organizations is also subject to the regulations and guidance set forth by the Office of

Management and Budget in 2 CFR Parts 215 and 220, which establish criteria for allocation of

grant funds to payment of salaries and other costs for those institutions and organizations.


III.  ADVISORY COMMITTEE MEMBER SELECTION AND ETHICS REVIEW

31.  Before issuance of the Directive, the receipt of EPA research funding did not

create a per se bar to service on EPA federal advisory committees.  Rather, such funding was

evaluated, along with other affiliations and sources of funding, as part of the member selection

and ethics review process.

32.  Like other affiliations and sources of funding, funding from EPA is required to be

disclosed on EPA Form 3110-48, which is submitted to the agency as a standard part of the

member selection and ethics review process.  Submission of Form 3110-48 is required by the

Ethics in Government Act, and the form begins with an explanation of the federal ethics rules applicable to members of EPA federal advisory committees.  The Form must be submitted before the start of service and annually thereafter.[7]

33.    Under standard EPA procedure prior to issuance of the Directive, EPA grant funding disclosed on Form 3110-48 was then evaluated by agency staff and agency ethics officials for compliance with federal ethics laws and regulations.  This review included consideration and evaluation of possible conflicts of interest and whether the funding created an appearance of a lack of impartiality.

34.    Under the ethics rules as interpreted by the Office of Government Ethics and as applied by EPA, if a member of a federal advisory committee worked for an entity receiving an EPA grant—whether a government contractor, an academic institution, or a non-profit organization—that person could participate in matters of general applicability and was precluded from participating only in those matters that affect the member or the employer in a special and distinct way.

35.    Where a scientist serving on an EPA federal advisory committee had a possible conflict of interest or a potential appearance of partiality regarding a particular matter, the scientist recused him- or herself from that matter but continued his or her service on the committee.  For example, two EPA scientists who received EPA grants to study the Great Lakes recused themselves from the SAB's quality review of a draft report from the SAB Great Lakes Restoration Initiative Action Plan Panel.[8]  However, they continued to serve on the SAB and

---

[7] EPA, Serving on the EPA Science Advisory Board: A Handbook for Members and Consultants, at 1 (March 2012).

[8] Summary Minutes of the United States Environmental Protection Agency (U.S. EPA) Science Advisory Board (SAB) Quality Review Teleconference, at 2 (Dec. 6, 2011) (available at:

participated in consideration of other matters.  *See id.*  Similarly, where an EPA federal advisory

committee was reviewing or discussing a study on which one of the members was an author or

co-author, that member would recuse him- or herself from participating in that matter but

continue his or her service on the committee.[9]

36.     EPA has never before viewed the receipt of EPA funds as per se disqualifying

from service on federal advisory committees.  To the contrary, EPA's consistent position has

been that the fact that a person is a beneficiary of an EPA research grant does not necessarily

impair his or her ability to provide objective, unbiased, and independent technical or scientific

advice to EPA or lead to improper influence by the Agency on the committee.

37.     Only last year, EPA defended against a lawsuit that claimed that possession of an

agency grant establishes a lack of independence, susceptibility to improper influence, and lack of

balance in terms of the points of view represented on the committee.  EPA's position in that

lawsuit was that "the mere fact that EPA has awarded research grants to members of an [EPA

advisory committee] does not establish that those members lack independence . . ., or that the

---

https://yosemite.epa.gov/sab/sabproduct.nsf/MeetingCal/16D1EBEBDCBDC96785257816005E
1DBD/$File/Minutes-12.-6.11-final.pdf (last accessed March 28, 2018).

[9] *See e.g.*, Summary Minutes of the U.S. Environmental Protection Agency (EPA) Clean Air
Scientific Advisory Committee (CASAC) and CASAC Oxides of Nitrogen Review Panel Public
Teleconference, at 2 (Jan. 24, 2017) (available at
https://yosemite.epa.gov/sab/sabproduct.nsf/bf498bd32a1c7fdf85257242006dd6cb/3D55071607
5767D68525808A004D52C6/$File/CASAC+NOx+January+24+2017+Minutes.pdf) (last
accessed March 28, 2018) (noting recusal of Dr. Jerrett because he was a coauthor of the study
being discussed); Summary Minutes of the U.S. Environmental Protection Agency (EPA) Clean
Air Scientific Advisory Committee (CASAC) Sulfur Oxides Panel Public Meeting, at 4 (Jan. 27-
28, 2016) (available at
https://yosemite.epa.gov/sab/sabproduct.nsf/bf498bd32a1c7fdf85257242006dd6cb/998DF8A643
78168185257F1B005D8C5B/$File/CASAC+SOx+Jan+27-28,+2016+Minutes.pdf) (last
accessed March 28, 2018) (noting recusal of Dr. Balmes because he was a coauthor of the study
being discussed).

panel is improperly influenced by EPA,"[10] and "does not demonstrate that a scientist who has received a research grant shares the funding-agency's point of view."[11]

38.     A report issued by the EPA Office of the Inspector General ("OIG") in 2013 reflects the consistency of this view: "[t]he EPA does not consider a prospective or current member's receipt of an agency or other federal research grant to create the basis for a financial conflict of interest. This is consistent with other federal guidance in this area."[12]  Consistent with the ethics rules, the EPA OIG also states that "[a] prospective or active member's research or grant is a potential concern if the FAC, panel, or subcommittee plans to address work performed under the research grant."

39.     In a government-wide handbook establishing recommended approaches to peer review, the Office of Management and Budget ("OMB") agrees with EPA's consistent position that receipt of a grant does not automatically mean that the grantee has a conflict of interest or lacks independence.  OMB's Final Bulletin on Peer Review states "[w]hen an agency awards grants through a competitive process that includes peer review, the agency's potential to influence the scientist's research is limited.  As such, when a scientist is awarded a government research grant though an investigator-initiated, peer-reviewed competition, there generally

---

[10] Memorandum Of Points And Authorities In Support Of Defendant's Motion To Dismiss at 34, Energy & Environment Legal Institute v. EPA, No. 1:16-cv-00915-TSC (D.D.C. July 15, 2016), ECF 11-2.

[11] *Id.* at 3.

[12] EPA Office of the Inspector General, EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees, EPA Report 13-P-0387, at 9 (Sept. 11, 2013) (available at: https://www.epa.gov/sites/production/files/2015-09/documents/20130911-13-p-0387.pdf).

should be no question as to that scientist's ability to offer independent scientific advice to the agency on other projects."[13]

40.     This view is also consistent with the view of agency grants and independence, conflicts of interest, bias and impartiality expressed in EPA's Peer Review Handbook.  In the peer-review context, EPA requires that reviewers not have been involved in producing the draft to be reviewed.  EPA has never taken the position that being the beneficiary of an EPA research grant disqualifies scientists from providing independent, objective, and unbiased peer review of other scientific work.

41.     EPA has consistently taken the position that the most important factor in selecting advisory committee members is their knowledge, expertise, and skills.

42.     Because EPA is a major sponsor of significant research, recipients of EPA funding are often leading experts in their fields of research and their expertise is valuable to EPA.  EPA has taken the position that excluding its grantees from service on advisory committees would disqualify some of those most qualified to render expert scientific and technical advice.

IV.     THE PRUITT DIRECTIVE PROHIBITING SCIENTISTS WHOSE WORK IS SUPPORTED BY EPA GRANTS FROM SERVING ON EPA FEDERAL ADVISORY COMMITTEES

43.     On October 31, 2017, Administrator Pruitt issued a Directive barring EPA grant recipients from service on any EPA federal advisory committee, which is attached to this complaint as Exhibit A.

_____

[13] OMB, Final Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664, 2669 (Jan. 14, 2005).

44.     Part One of the Directive provides: "Members [of EPA federal advisory committees] shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant."

45.     The Directive also contains Parts Two, Three, and Four.  This lawsuit challenges Part One only.

46.     In a statement announcing the Directive, Administrator Pruitt explained that issuance of the Directive was motivated in part by concerns about financial conflicts of interest. Pruitt stated that the purpose of the Directive is to "ensure … that the scientists that are advising us are doing so with not any type of appearance of conflict."  Pruitt claimed that members of EPA advisory committees "have received tens of millions of dollars in grants, at the same time that they're advising this agency on rulemaking" and stated, "that is not good and that is not right."

47.     Pruitt stated that the Directive is that scientists "will have to choose either the grant or service but not both."

48.     Pruitt stated, "This policy directive will take effect immediately."  He explained that EPA would advise scientists of the policy, and that scientists whose work is supported by EPA grants and who also serve on EPA advisory committees "will have to make a choice."

49.     Congressman Lamar Smith, a supporter of the Directive, was invited by Administrator Pruitt to make a statement when the Directive was announced.  Congressman Smith claimed, "For eight years, the EPA has had science boards filled with members who have had conflicts of interest, and the Administrator mentioned this a minute ago."

50.     Congressman Smith stated that the Directive "puts . . . into practice" the principles of the EPA Science Advisory Board Reform Bill, a Bill co-sponsored by Congressman Smith that would, among other things, amend governing statutes to impose a requirement that members of the Science Advisory Board not be recipients of EPA grants or contracts.  The Bill has not been enacted.

51.     Administrator Pruitt claimed specifically that "some of the members of [the Clean Air Scientific Advisory Council, the Science Advisory Board, and the Board of Scientific Counselors] have received 77 million dollars over a three-year period."  Senator Inhofe, who was also invited by Administrator Pruitt to make a statement announcing the Directive, stated, "as it's been pointed out by Administrator Pruitt, six out of seven of the members of the Clean Air Scientific Advisory Committee had a total of more than 119 million dollars in EPA grants."  These claims appear to be based on the incorrect assumption that all or most of the funding awarded in EPA research grants go to individual scientists.  In fact, as the Congressional Research Service has explained, only a very small portion of such funding, if any, is used by universities or independent centers to pay scientists' salary or other compensation.

52.     A memorandum from Administrator Pruitt to other agency officials, issued the same day, purports to further explain the basis and purpose of the Directive.  The memorandum is attached to this complaint as Exhibit B.

53.     The memorandum claims that a prohibition on grantee service is needed to "strengthen[] the integrity, objectivity, and reliability of EPA [advisory committees]."  It asserts that receipt of EPA grants "can create the appearance or reality of potential interference with [recipients'] ability to independently and objectively serve as [an advisory committee] member."

54.     The memorandum states that the Directive is "in addition to EPA's existing policies and legal requirements preventing conflicts of interest among the membership of the Agency's [advisory committees]."

55.     After issuing the Directive, EPA sought and accepted the resignations of EPA grantees who had been serving on EPA advisory committees.

56.     After issuing the Directive, EPA did not reappoint EPA grantees who had been serving on EPA advisory committees.

57.     A total of at least six EPA grant recipients who were members of the EPA's Chartered Science Advisory Board were removed pursuant to the Directive.  One of those members was Plaintiff Dr. Robyn Wilson.  Approximately one week prior to issuance of the Directive, Dr. Wilson received an email from EPA seeking confirmation that she was a current recipient of EPA funding.  Dr. Wilson confirmed that she had just received funding for the first time from the EPA, through her involvement in the Great Lakes Restoration Initiative, a multi-team project lead by the Great Lakes Commission, an interstate compact agency.  Subsequent to issuance of the Directive, Dr. Wilson was asked whether she would like to remain on the SAB or retain the EPA funding.  On November 3, 2017, she received an email notifying her that she had been removed from the SAB due to the Directive.

58.     The November 3 email was also sent to five other university-based scientists then serving on the Chartered SAB who were recipients of EPA grants.  They were Kiros Berhane, a Professor in the Division of Biostatistics and Director of the Graduate Programs in Biostatistics and Epidemiology in the Department of Preventive Medicine at the University of Southern California; Robert Johnston, Director of the George Perkins Marsh Institute and Professor of the Department of Economics at Clark University; Catherine Karr, a Professor of Pediatrics and of

Environmental and Occupational Health Sciences at the University of Washington; Francine

Laden, a Professor of Environmental Epidemiology at Harvard T.H. Chan School of Public

Health; and Kari Nadeau, Professor in the Department of Medicine, Division of Pulmonary &

Critical Care Medicine at Stanford University School of Medicine.

59.    The roster of SAB membership was posted to EPA's website on November 3,

2017.  It did not include Dr. Wilson's name, confirming that she was no longer a member of the

Board.  It also did not include the names of the five other scientists who received the email

notifying them they were no longer on the SAB.

60.    Asked in early November about whether Dr. Wilson had been removed from the

SAB, EPA spokesperson Liz Bowman made clear that the matter was settled, telling the

*Washington Post*, "[t]he Administrator has issued a directive which clearly states his policy in

this regard."[14]

61.    EPA staff has also implemented the Directive by sending email inquiries to

members of EPA advisory committees other than the Chartered SAB asking whether they

currently receive any EPA grants.

62.    Dr. Rob McConnell, who served as a member of the CASAC Particulate Matter

Review Panel as of the date of the Directive, received an email from EPA asking him whether he

receives any EPA grant funding.  Attached to that email was an earlier email, dated November

29, 2017, from Chris Zarba, then head of the EPA staff office that oversees CASAC, the Science

Advisory Board, and their various panels and subcommittees.  The email to agency staff states

---

[14] Dennis, Brady and Eilperin, Juliet, *"Mr. Pruitt is welcome to officially fire me"—as EPA carries out controversial policy, one scientist balks*, Washington Post, November 10, 2017 (available at https://www.washingtonpost.com/news/energy-environment/wp/2017/11/10/epa-extends-controversial-conflict-of-interest-policy-to-nearly-two-dozen-advisory-boards/?utm_term=.6dd256cb66f5).

that "[t]he EPA Administrator has issued a new directive on federal advisory committee membership" and that "membership on current SAB and CASAC panels will reflect this policy change if the member has a current active EPA grant." Dr. McConnell responded with an email confirming that he is a listed investigator under an EPA grant.

63.     On March 26, 2018, Dr. McConnell received a phone call from an EPA staff person in which the staff person asked for more information about Dr. McConnell's grant and, after receiving confirmation that the grant is still active and is likely to be extended, confirmed that Dr. McConnell must choose between his EPA-funded research and his service on the CASAC Particulate Matter Review Panel, because of the Directive.  On March 30, 2018, Dr. McConnell informed the same EPA staff person by email that he has chosen continued EPA grant-funded research over continued service on the CASAC Particulate Matter Review Panel.

64.     Following issuance of the Directive, in December 2017, EPA removed at least two members of the Environmental Economics Subcommittee of the Science Advisory Board: Greg Lowry, a Carnegie Mellon University professor who is also deputy director of the National Science Foundation's Center for the Environmental Implications of NanoTechnology; and Greg Van Houtven, an environmental economist at RTI International, a nonprofit research institute in North Carolina.  Both were recipients of EPA grant funding at the time of their removal.

65.     After issuing the Directive, EPA appointed new advisory committee members to replace members removed pursuant to the Directive.  Many of the replacement appointees work directly for industries regulated by EPA or receive financial support from such industries.  For example, after issuing the Directive, EPA appointed the following individuals as members of the Science Advisory Board: Robert Merritt, an executive with Total, one of the world's largest oil and gas companies; Larry Monroe, an executive with Southern Company, an electric utility that

operates coal- and gas-fired power plants; and Kimberly White, a Senior Director at the American Chemistry Council, a trade association for the chemical industry.

66.     EPA did not provide public notice of the Directive for the purpose of taking public comment, nor did it take public comment.

67.     EPA did not promulgate the Directive jointly with OGE, publish the Directive in the Federal Register, or codify the Directive as an addendum to the uniform federal ethics rules in Title 5 of the Code of Federal Regulations.  The Director of OGE did not concur in or co-sign the Directive.

## LEGAL BACKGROUND

68.     Several interrelated legal authorities define and limit the authority of all federal agencies, including EPA, with respect to federal advisory committees and their members.

## I.     UNIFORM FEDERAL ETHICS RULES

69.     Pursuant to statutory authority and authority delegated by the President, and with the concurrence of the Department of Justice, OGE has established a comprehensive and uniform scheme for addressing ethical and appearance issues that may arise where an executive-branch employee—including a special government employee serving on a federal advisory committee—participates in a matter in which he or she has a financial interest.

70.     Statutory authority for the uniform federal ethics rules promulgated by OGE and the Department of Justice is provided by 18 U.S.C. §§ 201-09.

71.     The legislative history of these statutory provisions emphasizes the risk that excessive and unnecessary conflict-of-interest rules may pose to the ability of federal agencies to access the best scientific and technical advice.  S.Rep. No. 2213, 87th Cong., 2d Sess., at 6-7.  It explains that the statute strikes a careful and deliberate balance between the need to avoid

conflicts of interest and the importance of having talented individuals be able to serve on federal advisory committees.  *Id.*

72.     Soon after enactment of these provisions, the Attorney General published a memorandum analyzing their purpose.  Dep't of Justice, Memorandum Regarding Conflict of Interest Provisions of Public Law 87-849, 28 Fed. Reg. 985 (Feb. 1, 1963).  It explained that the purpose of the Section 208 conflict of interest provisions is to "help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is outside the Government."  *Id.*  Prior statutory requirements were "unnecessarily severe" and "impeded the departments and agencies in the recruitment of experts for important work."  *Id.*

73.     OGE too has analyzed the Congressional purpose in enacting 18 U.S.C. §§ 201-09.  Those provisions "announced . . . that [Congress] had established conflict-of-interest measures with regard to [special government employees] that gave due regard to their proper interests and to those of the Government as well—measures that eliminated the need for ad hoc corrective adjustments in the future."[15]

74.     Section 208 prohibits federal employees from participating in any particular matter that will have a direct and predictable effect on their financial interests.  18 U.S.C. § 208(a).  Its requirements apply to special government employees, including federal advisory committee members making recommendations or rendering advice.  *Id*. § 208(b)(3).

75.     Section 208 establishes several classes of circumstances in which the risk of a financial conflict of interest is or may be deemed sufficiently small or remote that the public

---

[15] Memorandum dated July 9, 1982 from J. Jackson Walter, Director of the Office of Government Ethics, to Heads of Departments and Agencies of the Executive Branch regarding Members of Federal Advisory Committees and the Conflict-of-Interest Statutes at 2.

official is permitted to participate in the matter at issue.  *Id*. § 208(b)(1)-(3).  One of these exceptions is specific to special government employees that serve on federal advisory committees, and permits those employees to participate in the event that a responsible official certifies that the potential for a conflict of interest is outweighed by the need for the individual's services.  *Id*. § 208(b)(3).

76.     Section 208(d)(2) grants OGE authority to implement the provisions of section 208(b) by promulgating "uniform" federal regulations.  18 U.S.C. § 208(d)(2).  Such regulations must be promulgated in consultation with the U.S. Attorney General and shall "list and describe exemptions" and "provide guidance with respect to the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee."  *Id.*

77.     The authority and obligation for OGE and the Department of Justice to promulgate uniform federal ethics rules is reinforced by Executive Order 12731.  That Executive Order, entitled "Principles of Ethical Conduct for Government Officers and Employees," directs OGE to establish ethics regulations for executive branch employees, in consultation with the Attorney General and the Office of Personnel Management.  Executive Order 12731 § 201(a).  It instructs OGE to promulgate regulations interpreting the conflict-of-interest statute, 18 U.S.C. § 208, "with the concurrence of the Attorney General."  *Id*. § 201(c).

78.     The Executive Order provides that the regulations constitute "a single, comprehensive, and clear set of executive-branch standards of conduct."  *Id*. § 201(a).

79.      Pursuant to these authorities, OGE has promulgated uniform federal ethics regulations, with the concurrence of the Department of Justice.  OGE, Standards of Ethical Conduct for Employees of the Executive Branch, 57 Fed. Reg. 35,006 (Aug. 7, 1992).  OGE

adheres to notice and comment procedures in the development and revision of these regulations, and considers and addresses the views of other federal agencies through the notice and comment process.  5 C.F.R. § 2638.101(a)(1).

80.     In promulgating the federal ethics regulations with the Department of Justice, OGE recognized that the federal ethics regulations must be "uniform," and that the uniformity required by law "cannot be achieved if agencies can pick and choose which provisions they adopt or override."  57 Fed. Reg. at 35,009-10.

81.     The uniform federal ethics regulations establish the "executive branch ethics program," which "works to ensure that public servants make impartial decisions based on the interests of the public when carrying out the governmental responsibilities entrusted to them, serve as good stewards of public resources, and adhere to the Constitution and laws of the United States."  5 C.F.R. § 2638.101(a)-(b).  The "primary mission" of the executive branch ethics program is to prevent conflicts of interest on the part of executive branch employees.  *Id.* § 2638.101(b).  This mission includes "both conflicts of interest and the appearance of conflicts of interest."  *Id.*  The program "seeks to ensure the integrity of governmental decision making and to promote public confidence."  *Id.* § 2638.101(c).

82.     Under the uniform federal ethics regulations, and in accordance with 18 U.S.C. § 208, an employee is disqualified from participating in a "particular matter" in which she has a financial interest if the matter will have "a direct and predictable effect on that interest."  5 C.F.R. § 2635.402(c); 18 U.S.C. § 208(a).  A potentially disqualifying matter is one that is focused on the interests of specific people or discrete, identifiable classes of people, such as an adjudicative proceeding, an application for a permit, a contract, or a criminal charge.  5 C.F.R. § 2635.402(b)(3).  It "does not extend to the consideration or adoption of broad policy options

that are directed to the interests of a large and diverse group of persons." *Id.*  A direct and predictable effect requires a "close causal link" between the government action and the financial effect and a real, as opposed to a "speculative possibility that the matter will affect the financial interest." *Id.* § 2635.402(b)(1).

83.     Particularly relevant to Directive, the uniform federal ethics regulations address the potential for ethical problems that may arise where a special government employee, serving as a member of a federal advisory committee, participates in a matter in which he or she may have a financial interest arising from his or her non-federal employment.  5 C.F.R. § 2640.203(g).  The regulations expressly authorize special government employees on federal advisory committees to participate in any such matter of general applicability "provided that the matter will not have a special or distinct effect on the employee or employer other than as part of a class." *Id.* (emphasis omitted).

84.     The uniform federal ethics regulations also provide illustrative examples to clarify what does and does not constitute an impermissible conflict for a special government employee serving on a federal advisory committee.  *Id.*

85.     The regulations provide the following as an illustration of a situation where a special government employee <u>may</u> participate in a matter: "A chemist employed by a major pharmaceutical company has been appointed to serve on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials involving human subjects. Even though the chemist's employer is in the process of developing an experimental AIDS vaccine and therefore will be affected by the new standards, the chemist may participate in formulating the advisory committee's recommendations."  *Id.*

86.     The regulations provide the following as an illustration of a situation where a special government employee may <u>not</u> participate in a matter: "The National Cancer Institute (NCI) has established an advisory committee to evaluate a university's performance of an NCI grant to study the efficacy of a newly developed breast cancer drug.  An employee of the university may not participate in the evaluation of the university's performance because it is not a matter of general applicability."  *Id.*

87.     Agencies are prohibited from promulgating regulations inconsistent with the uniform federal ethics regulations.  18 U.S.C. § 208(d) (regulations must be "uniform" for the executive branch); 5 C.F.R. § 2638.602 ("Each agency may, subject to the prior approval of the Office of Government Ethics, issue regulations not inconsistent with this part and this subchapter, using the procedures set forth in § 2635.105 of this chapter.").  An agency that wishes to promulgate ethics-related regulations, even if they are consistent with the uniform federal regulations, must obtain OGE's "prior approval."  *Id.  See also* 5 C.F.R. § 2635.105(c)(3).

88.     The regulations establish procedures by which other federal agencies may supplement the uniform federal ethics requirements.  Under the regulations:

> (a) An agency that wishes to supplement this part shall prepare and submit to the Office of Government Ethics, for its concurrence and joint issuance, any agency regulations that supplement the regulations contained in this part . . . .
> (b) After concurrence and co-signature by the Office of Government Ethics, the agency shall submit its supplemental agency regulations to the Federal Register for publication and codification at the expense of the agency in title 5 of the Code of Federal Regulations. Supplemental agency regulations issued under this section are effective only after concurrence and co-signature by the Office of Government Ethics and publication in the Federal Register.

5 C.F.R. § 2635.105(a), (b).

89.     OGE Legal Advisory 11-07 "identifies the types of agency ethics policies that fall within the exclusive authority of OGE" under 5 C.F.R. § 2635.105 and which "as a result, must be developed through the OGE supplemental agency regulation process."[16]  The Legal Advisory confirms that agencies may issue "ethics-related" regulations outside of the supplemental regulation process of 5 C.F.R. § 2635.105 only "[w]hen there is specific and direct congressional authority to issue ethics related regulations independent from OGE."  *Id.* at 2-3.  Further, even when such authority exists, "OGE must concur that an ethics related regulation is appropriately promulgated separately within the agency's independent regulations."  *Id.* (citing 5 C.F.R. § 2635.105(c)(3)).

90.     Executive Order 12731, like the regulations, authorizes other federal agencies to supplement the uniform federal ethics regulations with "regulations of special applicability to the particular functions and activities of that agency," but requires that "[a]ny supplementary agency regulations" be promulgated jointly with OGE as an addendum to the uniform federal ethics regulations.  Executive Order 12731 § 301(a).


II.     FEDERAL ADVISORY COMMITTEE ACT

91.     Congress enacted the Federal Advisory Committee Act in 1972 to improve the performance of federal advisory committees.  In enacting FACA, Congress found and declared that standards and uniform procedures should govern the committees' establishment, operation, administration, and duration.  5 U.S.C. App. II, § 2(b)(4).

---

[16] OGE, The OGE Supplemental Agency Regulation Process, at 2 (Oct. 31, 2011) (available at https://www.oge.gov/web/oge.nsf/All%20Documents/9BD57BC11A77D50085257E96005FBE C5/$FILE/LA-11-07.pdf?open).

92.     FACA was intended to protect against undue influence by special interests over

government decision-making.  As the House Report emphasized:

> One of the great dangers in this unregulated use of advisory committees is that special
> interest groups may use their membership on such bodies to promote their private
> concerns.  Testimony received at hearings before the Legal and Monetary Affairs
> Subcommittee pointed out the danger of allowing special interest groups to exercise
> undue influence upon the Government through the dominance of advisory committees
> dealing with matters in which they have vested interests. . . .This lack of balanced
> representation of different points of view and the heavy representation of parties whose
> private interests could influence their [advisory committee] recommendations would be
> prohibited by the provisions contained in [] the bill.

H.R. Rep. No. 92-1017, 92d Cong., 2d Sess. 6 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491,

3496.

93.     FACA requires that any legislation establishing a federal advisory committee

"shall . . . require the membership of the advisory committee to be fairly balanced in terms of the

points of view represented and the functions to be performed by the advisory committee."

5 U.S.C. App. II, § 5(b)(2).  FACA also requires that such legislation ensure that the advisory

committee's advice and recommendations will not be "inappropriately influenced by the

appointing authority or any special interest, but will instead be the result of the advisory

committee's independent judgment."  *Id.* § 5(b)(3).

94.     FACA also applies these requirements to advisory committees established or

utilized by federal agencies or other federal officials.  5 U.S.C. App. II, § 5(c); 5 U.S.C. App. II,

§ 3(2) (defining "advisory committee").

95.     FACA directs the Administrator of the General Services Administration to

prescribe administrative guidelines and management controls applicable to advisory committees.

*Id.* § 7(c).

27

96.     FACA directs the heads of other federal agencies to establish uniform administrative guidelines and management controls that are consistent with the GSA regulations. *Id.* § 8(a).

97.     GSA has promulgated FACA implementing regulations addressing the obligations of agencies establishing or utilizing federal advisory committees. *See* 41 C.F.R. Part 102–3.

98.     The GSA regulations require agency heads, including the EPA Administrator, to:

    a.   comply with FACA and the GSA regulations, 41 C.F.R. § 102-3.105(a); and

    b.   "[d]evelop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 102-3.105(g).

99.     The GSA regulations address the "interests and affiliations" of advisory committee members by directing agency heads to adhere to the uniform federal ethics rules established by OGE.  Specifically, they direct agency heads, including the EPA Administrator, to assure that they comply "with applicable conflict of interest statutes, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules." *Id.* § 102-3.105(h).

100.    The GSA regulations explain that advisory committee members may be regular federal employees, special government employees, or representatives, and that most advisory committee members are special government employees or representatives.  41 C.F.R. § 102–3.130(h); *id.* § 102–3 App. A. to Subpart C (Question IV).  They provide that special government employees are covered by the uniform federal ethics rules.  *Id.* § 102–3 App. A. to Subpart C (Question IV).

101.    The GSA regulations do not deem receipt of an agency grant to disqualify an individual from serving on a federal advisory committee that advises that same agency.

III.    STATUTES ESTABLISHING ADVISORY COMMITTEES

102.    Many of the federal advisory committees managed by EPA are created by statute.

103.    The Clean Air Scientific Advisory Committee is established by Section 109 of the Clean Air Act enacted on August 7, 1977.  42 U.S.C. § 7409.  The CASAC shall be "composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies."  *Id.* § 7409(d)(2)(A).  The CASAC shall:

> (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

*Id.* § 7409(d)(2)(C).

104.    The Science Advisory Board is established by the Environmental Research, Development, and Demonstration Authorization Act of 1978.  42 U.S.C. § 4365.  "The Administrator of the Environmental Protection Agency shall establish a Science Advisory Board which shall provide such scientific advice as may be requested by the Administrator" or various congressional committees.  *Id.* § 4365(a).  Each member of the SAB "shall be qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board under this section."  *Id.* § 4365(b).

105.    The Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory

Panel is established by section 25(d) of the Federal Insecticide, Fungicide, and Rodenticide Act

("FIFRA").  7 U.S.C. § 136w(d).  The Panel:

> shall consist of 7 members appointed by the Administrator from a list of 12 nominees, 6 nominated by the National Institutes of Health and 6 by the National Science Foundation, utilizing a system of staggered terms of appointment. Members of the panel shall be selected on the basis of their professional qualifications to assess the effects of the impact of pesticides on health and the environment.  To the extent feasible to insure multidisciplinary representation, the panel membership shall include representation from the disciplines of toxicology, pathology, environmental biology, and related sciences. If a vacancy occurs on the panel due to expiration of a term, resignation, or any other reason, each replacement shall be selected by the Administrator from a group of 4 nominees, 2 submitted by each of the nominating entities named in this subsection.

*Id.*

## IV.   THE ADMINISTRATIVE PROCEDURE ACT

106.    The Administrative Procedure Act ("APA") authorizes judicial review of final

agency action.  5 U.S.C. § 704.

107.    The APA directs the reviewing court to hold unlawful and set aside agency action,

findings, and conclusions found to be: arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right; or without observance of procedure required by law.  5 U.S.C.

§ 706(2)(A), (C), (D).

## STANDING

108.    The Directive injures members of PSR, NHMA, and ISCHE, as well as Professor

Avol, Dr. Árvai, and Dr. Wilson by forcing them to choose between serving on the EPA advisory

committees and receiving grants to fund important scientific research.

109.    The Directive has immediately and directly injured Dr. Wilson by leading to her

removal with a full year remaining on her term.  As a result, Dr. Wilson is suffering loss of

professional opportunity in the form of professional and public service opportunities.

110.    As a result of the Directive, members of PSR, NHMA, and ISCHE, as well as Professor Avol, Dr. Árvai, and Dr. Wilson, suffer loss of professional opportunity in the form of professional and public service opportunities or research funding.

111.    For example, Dr. Jonathan Levy, a current PSR member and a professor at Boston University School of Public Health, is an expert on the relationship between exposure to air pollutants and human health effects.  He is a current recipient of an EPA grant, through the Center for Research on Environmental and Social Stressors in Housing Across the Life Course, entitled Disparities in Exposure and Health Effects of Multiple Environmental Stressors Across the Life Course.  The grant began in 2015 and runs through June 2020.  Dr. Levy previously served on two EPA advisory committees, the Advisory Council on Clean Air Compliance Analysis from 2009-2014 and the Clean Air Subcommittee of the Board of Scientific Counselors in 2009.  Dr. Levy views service on EPA advisory committees as a valuable professional and public service opportunity and is interested in serving on EPA advisory committees in the future. Because he is a recipient of an EPA grant that continues through 2020, the Directive bars him from service on EPA advisory committees and causes him to suffer a loss of professional and public service opportunities.

112.    Another example is Dr. Deborah Cory-Slechta, a current PSR member and a professor at the University of Rochester Medical School, where she runs a laboratory focused on understanding the contribution of environmental chemical exposures to human diseases and disorders of the central nervous system.  Dr. Cory-Slechta has a long track record of and commitment to public service.  Dr. Cory-Slechta has served on numerous national review and advisory panels of the Environmental Protection Agency, the National Institutes of Health ("NIH"), the National Institute of Environmental Health Sciences, the Food and Drug

Administration, the National Center for Toxicological Research, the National Academy of

Sciences, the Institute of Medicine, the Agency for Toxic Substances and Disease Registry, and

the Centers for Disease Control.  She served on EPA's Science Advisory Board for six years, and

serves currently on EPA's Chemical Assessment Advisory Committee.  Dr. Cory-Slechta has

been a recipient of EPA research grants in the past, including from 2005 to 2012 and from 2010

to 2015, and, but for the Directive, would apply for EPA research grants in the future.  Forced to

choose between service on EPA advisory committees and EPA grants, Dr. Cory-Slechta has

decided to prioritize public service and continue serving on the Chemical Assessment Advisory

Committee.  As a result, she is barred from obtaining EPA grants to support her research.  In

addition, Dr. Cory-Slechta is barred from working on EPA-funded research conducted at the

University of Rochester Medical School, her institution.  For these reasons, Dr. Cory-Slechta has

suffered and will continue to suffer loss of professional opportunity.

113.    Dr. Rob McConnell is a current member of ISCHE and a professor of preventive

medicine at the University of Southern California.  He has spent the past 20 years studying the

health effects of air pollution on children.  He has been a recipient of EPA grants in the past

supporting this work and is a recipient of a current EPA grant supporting the Southern California

Children's Environmental Health Center.  The grant began in 2013 and runs through mid-2018,

and is eligible for a no-cost extension, which are routinely granted.  Dr. McConnell also served,

as of the date of the Directive, on the CASAC Particulate Matter Review Panel advising EPA on

the review of the air pollution particulate standard.  Because he is a beneficiary of an EPA grant,

the Directive bars him from service on the EPA advisory committee.  In a phone call on March

26, 2018, an EPA staff person confirmed that Dr. McConnell must choose between his EPA-

funded research and his service on the CASAC Particulate Matter Review Panel, because of the

Directive.  On March 30, 2018, Dr. McConnell informed the same EPA staff person by email that he has chosen continued EPA grant-funded research over continued service on the CASAC Particulate Matter Review Panel.  By forcing him to forgo service on the CASAC Particulate Matter Review Panel, the Directive has caused Dr. McConnell to suffer a loss of professional and public service opportunity.

114.     Professor Avol is similarly harmed by the Directive.  Professor Avol is an expert in the harm air pollution causes to children's respiratory and cardiovascular health.  Professor Avol is a former recipient of EPA funding, having served as a core co-Director/investigator in one of the EPA-NIH co-funded Children's Environmental Health Centers.  He has also served on EPA advisory committees multiple times, including the Clean Air Science Advisory Committee Expert Panel reviews for nitrogen and sulfur oxides (from 2007 through 2009), for particle matter (from 2009 through 2012), and for ozone (from 2011 through 2014).  Professor Avol views service on EPA federal advisory committees as an opportunity to give back to society and advance the public good, as well as an important means of career advancement and intellectual growth.  He is likely to apply for EPA grant funds to support his future research activities, and is interested in future participation on EPA advisory committees.  Because of the Directive, he cannot do both, and will suffer a loss of professional opportunity.

115.     Dr. Árvai is also similarly harmed by the Directive.  Dr. Árvai is an internationally recognized expert in the risk and decision sciences; his research focuses on how individuals and groups can improve the quality of decision making in situations where tradeoffs are required across environmental, social, and economic priorities.  He, like other parties to this action, has a long track record of and commitment to public service.  Dr. Árvai served as a consultant to the EPA's Science Advisory Board Staff Office (on the topic of valuing the

protection of ecological systems and services) between 2003 and 2008.  He also served between 2011 and 2017 as a member of the EPA's Chartered Science Advisory Board.  In addition, he has served on several committees and boards at the National Academy of Sciences, including the Board on Environmental Change and Society, the Roundtable on Public Interfaces of the Life Sciences, and the Committee on Strategies and Methods for Climate-Related Decision Support.  Dr. Árvai has been a recipient of EPA grants, as well as other federal agency grants, in the past, and were it not for the Directive, would apply for EPA research grants in the future.  If forced to choose between service on EPA advisory boards and EPA grants, Dr. Árvai would prefer to prioritize public service.  As a result, he will be ineligible for future EPA grants, and he and his graduate students will suffer a loss of professional opportunities.

116.    Scientists who receive or would like to obtain EPA funding, including members of the Plaintiff organizations, as well as Professor Avol, Dr. Árvai, and Dr. Wilson, suffer concrete harm from the Directive.  The Pruitt directive makes them ineligible for service on EPA advisory committees if they receive grant funding.  Serving on an EPA advisory committee is both a valuable professional credential and an opportunity to give back to the scientific community and the nation through public service.  Losing eligibility for such service is a loss of a valuable professional opportunity.

117.    Additionally, under the Directive, scientists who serve on EPA advisory committees must forgo EPA research funding.  EPA is an important source of funding, particularly for cutting-edge and influential research.  Competition for these grants is high, and receipt of a grant is itself a professional recognition.  The ability to conduct experiments or research and to produce scientific knowledge is central to career advancement in the sciences.  For scientists at academic institutions, such grants fund lab space, equipment, and graduate

students who assist in conducting research, all of which are important to their research and professional advancement.  Indeed, the inability to attract sufficient grant funding can be damaging to a scientist's career.  Being forced to forgo such funding is a loss of a valuable professional opportunity.

118.    It would be futile for scientists who are interested in serving on EPA advisory boards, but do not currently serve, to seek appointment while in possession of an agency grant. The Directive makes clear that the agency will not appoint such individuals to the EPA advisory boards.  In addition, the removal of scientists pursuant to the Directive confirms that the agency is enforcing the policy.  Even though boilerplate language in the Directive reserves Administrator Pruitt's discretion to depart from the Directive, the EPA staff responsible for administering the member selection process and the operation of the committees do not have that discretion, and must comply with the Directive.  In addition, Administrator Pruitt has made clear that he is opposed to service on EPA advisory committees by EPA grantees and that he intends to enforce the Directive's bar on such service.  Even if the result were not pre-ordained, it would also be self-destructive to seek an appointment while receiving funding, or vice versa, as doing so would at the least place scientists at great risk of losing a current grant or a current appointment, causing disruption of ongoing work.

119.    The Directive is a government-endorsed disparagement of the objectivity and independence of the individual scientists directly affected by it, including members of PSR, NHMA, and ISCHE, as well as Professor Avol, Dr. Árvai, and Dr. Wilson, and of scientists nationwide.

120.    By disrupting and undermining the operations of important EPA advisory committees, the Directive harms public health and the health of Plaintiffs and Plaintiffs'

members.  For example, the removal of Dr. McConnell and other independent academic experts

on air pollution from the CASAC Particulate Matter Review Panel, and their replacement by

scientists with industry ties, creates a substantial risk that the forthcoming air quality standard for

particulate matter will be insufficiently health-protective, or that a sufficiently health-protective

standard will be delayed.  Particulate matter is an extremely dangerous airborne pollutant that

causes respiratory disease, heart attacks, and strokes, and is suspected to cause cancer.  Under the

Clean Air Act, EPA establishes national ambient air quality standards for particulate matter,

including fine particulate matter.  Robust scientific evidence demonstrates that there is no safe

level of exposure to fine particulate matter and that a more-protective standard is needed to

protect public health.  Under the Clean Air Act, EPA was required to review the current

particulate matter standard and adopt a revised standard as necessary to protect public health by

2017, and to obtain the recommendation of CASAC in doing so.  42 U.S.C. § 7409.  EPA has

now fallen behind even the delayed schedule for development of the standard the EPA adopted

in December 2016 in its Integrated Review Plan.[17]  EPA's exclusion of Dr. McConnell and other

independent academic scientists, pursuant to the Directive, from the Panel charged with

conducting much of the work for the particulate matter review significantly increases the serious

risk that EPA will fail to adopt a sufficiently health-protective standard for particulate matter.

Their exclusion also further delays development of a more health-protective standard, which is

already overdue, by disrupting the ongoing work of the Panel and by depriving the Panel of

needed expertise.  As a result, members and staff of PSR, NHMA, and ISCHE, as well as

Professor Avol, Dr. Árvai, and Dr. Wilson themselves, are deprived of clean air protection

---

[17] EPA, Integrated Review Plan for the National Ambient Air Quality Standards for Particulate
Matter, at 1-19 (December 2016) (available at
https://www3.epa.gov/ttn/naaqs/standards/pm/data/201612-final-integrated-review-plan.pdf).

required by law.  Their exposure to unsafe and excessive levels of particulate matter and associated air pollution, and to increased risk of grave health problems, is prolonged and increased.

121.    Among those whose health is threatened by the Directive and the disruption it will cause to development of the revised particulate matter standard are Ana Nobis, a Chicago resident, mother, and member of PSR; and Pedro Montenegro, a resident of the Washington, DC, metropolitan area and a member of the staff of NHMA.

122.    Additionally, the Directive causes significant harm to the public interest. Regardless of which path scientists choose as a result of the Directive—forgoing grants to fund new scientific knowledge or forgoing service—society loses out.  Where researchers forgo grants, cutting-edge research may go unfunded.  Where they forgo service, the public and the government are deprived of expertise on critical issues.  At the same time as the Directive purges qualified individuals, it leaves in place people with financial interests in industries that are regulated by EPA.  It thus leaves EPA advisory committees at greater risk of capture by special interest groups.

123.    The injuries described above frustrate the organizational objectives of PSR, NHMA, and ISCHE, which include the advancement of scientific research on matters important to public health; the effective use of scientific knowledge to inform health policy, including the policies of the EPA; and the promotion of public health.

### COUNT 1: VIOLATION OF UNIFORM FEDERAL ETHICS RULES

124.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

125.    The law governing financial interests of executive branch employees expressly addresses conflicts of interest among members of federal advisory committees—most of whom

serve as "special Government employees."  18 U.S.C. § 208(a)-(b).  It also directs the Office of

Government Ethics to promulgate "uniform regulations" implementing the statutory provisions.

*Id.* § 208(d)(2).

126.    Those implementing regulations establish "uniform" federal ethics requirements

across all government agencies.  18 U.S.C. § 208(d)(2); *see also* Executive Order 12731

§ 201(a), (c) (stating that the regulations promulgated by OGE constitute "*a single,*

*comprehensive*, and clear set of executive-branch standards of conduct" (emphasis added)).

Consequently, EPA lacks authority to adopt a policy that conflicts with the regulations.

127.    Under the uniform federal ethics regulations, and in accordance with 18 U.S.C.

§ 208, an employee is disqualified from participating in a "particular matter" in which she has a

financial interest if the matter will have "a direct and predictable effect on that interest."

5 C.F.R. § 2635.402(c); 18 U.S.C. § 208(a).  A potentially disqualifying matter "does not extend

to the consideration or adoption of broad policy options that are directed to the interests of a

large and diverse group of persons."  5 C.F.R. § 2635.402(b)(3).  A direct and predictable effect

requires a "close causal link" between the government action and the financial effect and a real,

as opposed to a "speculative possibility that the matter will affect the financial interest."  *Id.*

§ 2635.402(b)(1).

128.    The uniform federal ethics regulations specifically address the risk of financial

conflicts of interest for special government employees serving on federal advisory committees,

and provide, in relevant part:

> A special Government employee serving on an advisory committee within the meaning of
> the Federal Advisory Committee Act . . . may participate in any particular matter of
> general applicability where the disqualifying financial interest arises from his non-
> Federal employment or non-Federal prospective employment, provided that the matter
> will not have a special or distinct effect on the employee or employer other than as part of
> a class.

5 C.F.R. § 2640.203(g) (emphasis omitted).

129.     The Directive erects a total bar on the participation of special government employees that receive EPA research grants, and thus bars them from advising on *any* matter. The Directive bars individuals from service on EPA advisory committees even when: they are advising on broad matters of general applicability; they are not asked to consider any particular matter related to their interest in an EPA grant; or their interest in an EPA grant is entirely unrelated to the work of the committee.  In these respects, the Directive conflicts with 18 U.S.C. § 208 and the uniform federal ethics regulations.

130.     The Directive bars individuals from service on EPA advisory committees even when there is only a "speculative possibility that [a] matter will affect [their] financial interest." *Id.* § 2635.402(b)(1).  In this respect also, the Directive conflicts with 18 U.S.C. § 208 and the uniform federal ethics regulations.

131.     The Directive bars individuals from service on EPA advisory committees even when a special government employee's financial interest is in the form of a salary from his or her non-Federal employer, such as a university or other non-profit organization, and thus "arises from his [or her] non-Federal employment."  In this respect also, the Directive conflicts with 18 U.S.C. § 208 and the uniform federal ethics regulations.

132.     The Directive does not provide for individualized review to determine whether work under an EPA grant actually creates a conflicts of interest, an appearance of a lack of impartiality, or another specific ethical concern; does not provide for individualized review to determine whether such concerns are substantial; and does not provide for such concerns to be weighed against the need for the individual's service.  In this respect also, the Directive conflicts with 18 U.S.C. § 208 and the uniform federal ethics regulations.

133.    In adopting the Directive, EPA did not acknowledge that its previous, consistent

position conflicts with the Directive, acknowledge that it is changing position, or explain why it

is doing so.

134.    Consequently, the Directive is "arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law," and "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

### COUNT 2: VIOLATION OF PROCEDURAL REQUIREMENTS FOR SUPPLEMENTING FEDERAL ETHICS RULES

135.    Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

136.    Under the uniform federal ethics regulations, an agency that wishes to supplement

the uniform federal ethics rules must "prepare and submit to the Office of Government Ethics,

for its concurrence and joint issuance, any agency regulations that supplement the regulations

contained in this part."  5 C.F.R. § 2635.105(a).  Only "[a]fter concurrence and co-signature by

the Office of Government Ethics," may the agency submit its supplemental regulations for

publication and codification in Title 5 of the Code of Federal Regulations.  *Id.* § 2635.105(b).

Such supplemental agency regulations "are effective only after concurrence and co-signature by

the Office of Government Ethics and publication in the Federal Register."  *Id.*

137.    Executive Order 12731 provides that individual agencies may "[s]upplement, as

necessary and appropriate, the comprehensive executive branch-wide regulations of the Office of

Government Ethics, with regulations of special applicability to the particular functions and

activities of that agency."  Executive Order 12731 § 301(a).  However, "[a]ny supplementary

agency regulations shall be prepared as addenda to the branch-wide regulations and promulgated

jointly with the Office of Government Ethics, at the agency's expense, for inclusion in Title 5 of the Code of Federal Regulations." *Id.*

138.    The Directive's bar on grant recipients serving on EPA advisory committees is a supplemental regulation within the meaning of 5 C.F.R. § 2635.105.  Administrator Pruitt did not prepare and submit the Directive to OGE for its concurrence and joint issuance.  EPA did not obtain the concurrence and co-signature of OGE on the directive and did not thereafter submit the directive to the Federal Register for publication for inclusion in Title 5 of the Code of Federal Regulations.

139.    Even if the Directive were not a supplemental agency regulation within the meaning of 5 C.F.R. § 2635.105, EPA was still required to obtain the concurrence of OGE before issuing the Directive outside the supplemental agency regulation process because the Part One of the Directive is an ethics-related policy.  5 C.F.R. § 2635.105(c)(3). On its face, Part One of the Directive is intended to address issues regarding potential conflicts of interest and employee ethics.  The accompanying memorandum states expressly that Part One of the Directive is "in addition to" existing conflict-of-interest policies.  And the circumstances of the Directive's promulgation, including statements by Administrator Pruitt, confirm that Part One is addressed to alleged conflicts of interest and an alleged appearance of lack of impartiality by researchers serving on the EPA advisory committees.

140.    EPA did not obtain OGE's concurrence before issuing the Directive.

141.    In issuing the directive without complying with the applicable procedural requirements, Administrator Pruitt acted arbitrarily, capriciously, or not in accordance with law and "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

## COUNT 3: VIOLATION OF FACA

142.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

143.    FACA protects against undue influence by special interests over government decision-making and requires that advisory committees have a fair balance of viewpoints in their memberships.  5 U.S.C. App. II, § 5(b)(2).

144.    FACA requires EPA to ensure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority or by any special interest.  5 U.S.C. App. II, § 5(b)(3); 41 C.F.R. § 102-3.105(g).

145.    FACA's mandates are applicable to every advisory committee established or utilized by federal agencies or other federal officials, including the EPA advisory committees covered by the Directive.  *Id.* App. II § 5(c); *see also Id.* App. II, § 3(2) (defining "advisory committee").

146.    For decades, EPA has had an unbroken historical practice of not treating the receipt of EPA funds as disqualifying a person from serving on a federal advisory committee. EPA has long and consistently taken the position that the fact that a person receives an EPA grant does not indicate a lack of independence or render the person subject to improper influence.

147.    Until the Directive, EPA has adhered to the provisions of the uniform federal ethics rules governing special government employees serving on EPA advisory committees.  If a member of a federal advisory committee works for a company, government contractor, or academic institution that receives EPA funding, that person may participate in matters of general applicability.  The member is precluded from participating only in those matters that directly affect the member or his or her employer in a special and distinct way.

42

148.    The Directive is arbitrary, capricious, and contrary to FACA in numerous ways.

149.    First, the Directive marks a sharp departure from this past practice.  It deems receipt of EPA grants as cause to disqualify prospective members from serving on EPA advisory committees if they are the principal investigator or co-investigator or reap substantial direct benefits from an EPA grant.  EPA has a long-standing practice of taking the opposite position.  In adopting the Directive, EPA did not acknowledge that its previous, consistent position conflicts with the Directive, acknowledge that it is changing position, or explain why it is doing so.  EPA has not offered, and cannot offer, a rational explanation for reversing its prior practice.

150.    Second, the new disqualification rule of the Directive appears under the heading, "Strengthen Member Independence," and describes the general direction to ensure "[m]embers shall be independent from EPA."  *Id*.  To the extent this is the rationale offered for the policy reversal, it runs counter to EPA's past position and government-wide policy, without any reasoned explanation.  In the past, EPA has taken the position that independence in a peer review means that the peer reviewers were not involved in producing the draft or document that is undergoing peer review.  This is also the position embodied in the Office of Management and Budget's Final Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664.  EPA has not offered, and cannot offer, a reasoned explanation for departing from this long-standing government policy and its own position, or articulated a rational connection between facts found and conclusion reached.

151.    Third, to the extent that EPA interprets FACA to require that every individual on a federal advisory committee must be independent of the agency, its interpretation is contrary to the statute and unreasonable.  FACA requires only that the committees' advice and recommendations reflect the committees' independent judgment.  To the extent that EPA claims

that individual members' receipt of EPA grants prevents the <u>committee</u> from exercising independent judgment in developing advice and recommendations, EPA's claim lacks record support, and EPA has failed to establish a rational connection between the facts found and the conclusion reached.

152.    Fourth, the Directive treats similarly situated prospective committee members differently without any rational explanation.  It lacks any comparable disqualification for serving on federal advisory committees for people who receive grants or other financial benefits from industry entities that have vested interests in EPA regulation and the scientific advice on which EPA bases its regulatory decisions.  EPA allows individuals who work directly for or receive compensation from regulated industries or whose financial interests are impacted by EPA regulation to serve on federal advisory committees.  EPA has offered no justification—rational or otherwise—for treating EPA grants as disqualifying while financial support or even employment by regulated industries is not.

153.    In the past, EPA has treated employment by a regulated industry as a factor in ensuring both that the advisory committee is not dominated by a special interest and also in ensuring the advisory committee will have a fair balance of viewpoints among its membership. Implementing the Directive, EPA has removed scientists whose institutions receive EPA grants from several EPA advisory committees and has replaced those members with others, some of whom work directly for or receive funding from industries financially impacted by EPA regulations and decisions.  The result has been an increase in the proportion of advisory committee members who may have a vested interest that disfavors stronger EPA regulation. EPA has not explained how it is meeting its obligations under FACA to ensure its advisory committees have balanced memberships and are not unduly influenced by regulated entities by

removing members who have no such vested interest and appointing more members with such interests.

154.    Fifth, because the Directive is an arbitrary and improper exercise of EPA's authority to oversee advisory committees, and is unfairly biased against academic scientists and in favor of scientists funded by regulated industries, the Directive constitutes "inappropriate[] influence[]" by EPA over the advice and recommendations of the advisory committees.  5 U.S.C. App. II, § 5(b)(3); 41 C.F.R. § 102-3.105(g).

155.    The Directive is arbitrary, capricious, and contrary to FACA.  *See* 5 U.S.C. § 706(2)(A).

## COUNT 4: VIOLATION OF STATUTES ESTABLISHING COMMITTEES

156.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

157.    Many of the EPA advisory committees subject to the Directive are established by statute or regulation, which define the membership requirements and duties of the Committees and their members.  These statutes make subject matter expertise the principal factor in determining the membership of several EPA advisory committees.  *See*, *e.g.*, 42 U.S.C. § 7409 (establishing the CASAC); 42 U.S.C. § 4365 (establishing the SAB); 7 U.S.C. § 136w(d) (establishing the FIFRA Scientific Advisory Panel).  These statutes do not disqualify any individual on the basis of receiving grants from the Agency.

158.    Excluding EPA grantees from service on EPA advisory committees excludes a large number of people with the subject matter expertise that statutes and regulations direct EPA to prioritize in selecting members.  Indeed, scientists involved in conducting EPA-funded research are often the most qualified scientists in terms of subject-matter expertise in a given area.  EPA has not explained, and cannot rationally explain, how disqualifying scientists who

work for institutions that receive EPA grants is consistent with the statutory direction to recruit the most qualified scientists for service on EPA advisory committees.

159.    Past EPA practice and government-wide policy make expertise the most important factor in selecting scientific reviewers.  The Directive's preamble similarly states that "it is in the public interest to select the most qualified, knowledgeable, and experienced candidates."  In the past, EPA has taken the position that eliminating from peer review committees all scientists who have received grants or otherwise been affiliated with EPA would eliminate many of those most qualified to render expert advice.  In adopting the Directive, EPA did not acknowledge that its previous, consistent position conflicts with the Directive, acknowledge that it is changing position, or explain why it is doing so.

160.    The Directive is arbitrary, capricious, and contrary to the statutes establishing EPA advisory committees.  *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

161.    Declare that the Directive conflicts with federal ethics law and regulations, and is unlawful because it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

162.    Declare that the Directive is contrary to regulations establishing procedures for promulgating supplemental agency regulations and other ethics-related regulations, 5 C.F.R. §§ 2635.105, 2638.602, and, therefore, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

163.    Declare that the Directive is arbitrary, capricious, and contrary to FACA.

164.    Declare that the Directive is arbitrary, capricious, and contrary to statutes authorizing EPA advisory committees.

165.    Vacate and set aside the Directive and actions taken by EPA in reliance on the Directive.

166.    Enjoin Administrator Pruitt from removing any individual from an EPA advisory committee pursuant to the Directive or otherwise implementing the provision of the Directive barring EPA grant recipients from service on EPA advisory committees.

167.    Enjoin Administrator Pruitt to reinstate any individual removed from an EPA advisory committee pursuant to the Directive or caused by the Directive to resign from an EPA advisory committee.

168.    Order such other and further relief as justice may require.

DATED: March 30, 2018

/s/ Susan Kraham (w/permission)
Susan Kraham (D.C. Bar No. NY0170)
Michael Burger
Columbia Environmental Law Clinic
Morningside Heights Legal Services
435 W. 116th St.
New York, NY 10027
212-854-4500
skraha@law.columbia.edu
mburger@law.columbia.org

*Attorneys for Joe Árvai and Robyn Wilson*

/s/ Neil Gormley
Neil Gormley (D.C. Bar No. 1008462)
Tosh Sagar (D.D.C. Bar No. D00497; CA Bar No. 286822)
Earthjustice
1625 Massachusetts Avenue, N.W.
Suite 702
Washington, D.C. 20036
202-667-4500
ngormley@earthustice.org
tsagar@earthjustice.org

Patti Goldman (D.C. Bar No. 398565)
Earthjustice
705 Second Avenue
Suite 203
Seattle, WA 98104
206-343-7340
pgoldman@earthjustice.org

*Attorneys for Physicians for Social Responsibility, National Hispanic Medical*

*Association, International Society for
Children's Health and the Environment, and
Edward Lawrence Avol*