**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PHYSICIANS FOR SOCIAL
RESPONSIBILITY, *et al.*,

                    Plaintiffs,

    v.

E. SCOTT PRUITT, Administrator, U.S.
Environmental Protection Agency, in his
official capacity,

                    Defendant.

NO.  1:17-cv-02742-TNM

***AMICI CURIAE* BRIEF OF THE STATES OF WASHINGTON, CALIFORNIA, ILLINOIS, IOWA, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, AND OREGON, AND THE PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

*II.*    IDENTITY AND INTEREST OF *AMICI CURIAE*............................................2

III.    ARGUMENT.........................................................................................6

    A.   The Advisory Committee Directive's Negative Impacts on EPA's Core Mission Are Unjustified and Significant.......................................................6

        1.   The Directive handicaps the most independent voices contributing to EPA scientific decision-making under the ruse of rooting out non-existent conflicts of interest .................................................................6

        2.   The Directive results in concrete harms to both EPA's mission and the entities and individuals regulated by, or reliant upon, EPA's work ....12

        3.   The Directive is inconsistent with Congress' vision for members of key EPA Advisory Committees.........................................................15

    B.   The Pruitt Directive Violates Federal Conflict-of-Interest Law ................16

        1.   The Pruitt Directive is a sharp and unsupported change from prior practice at EPA ....................................................................................16

        2.   The Administrator has no discretion when it comes to complying with Office of Government Ethics regulations and requirements ...............17

        3.   The Administrator's justifications for skirting OGE requirements do not withstand scrutiny.......................................................................20

IV.    CONCLUSION....................................................................................22

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott Labs v. Gardner*
  387 U.S. 136 (1967) ...................................................................................21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
  458 U.S. 592 (1982) .....................................................................................3

*American Farm Bureau Federation v. E.P.A.*
  559 F.3d 512 (D.C. Cir. 2009) ....................................................................14

*Bowen v. Michigan Academy of Family Physicians*
  476 U.S. 667 (1986) .....................................................................................21

*Cargill Inc. v. US*
  173 F.3d 323 (5th Cir. 1999) ...............................................................16, 17

*City of Portland, Oregon v. E.P.A.*
  507 F.3d 706 (D.C. Cir. 2007) ....................................................................13

*Natural Resources Defense Council v. E.P.A.*
  808 F.3d 556 (2d Cir. 2015) ........................................................................14

*Ohio Valley Environmental Coalition v. Fola Coal Co., LLC*
  120 F. Supp. 3d 509 (S.D. W.V. 2015) .......................................................14

*U.S. v. Hercules, Inc.*
  247 F.3d 706 (8th Cir. 2001) .......................................................................14

*U.S. v. Vertac Chemical Corp.*
  33 F. Supp. 2d 769 (E.D. Ark. 1998) ..........................................................14

## <u>Statutes</u>

5 App. U.S.C. § 402 ...........................................................................................17

5 U.S.C. § 706(2) ...............................................................................................15

7 U.S.C. § 136w(d) .............................................................................................15

7 U.S.C. § 136w(d)(1) ........................................................................................15

15 U.S.C. § 2625(o) ...........................................................................................15

18 U.S.C. §§ 207–209 ........................................................................................21

18 U.S.C. § 208(a) ............................................................................................................17

18 U.S.C. § 208(b) ............................................................................................................17

18 U.S.C. § 208(d)(2) ........................................................................................................17

33 U.S.C. §§ 1251 et seq. ....................................................................................................3

42 U.S.C. § 4365 ..............................................................................................................15

42 U.S.C. § 4365(b) ..........................................................................................................15

42 U.S.C. § 7409(d) ..........................................................................................................15

42 U.S.C. §§ 7401 et seq ......................................................................................................3

## Other Authorities

57 Fed. Reg. 35,006 (Aug. 7, 1992) ..................................................................................21

Executive Order 12,731 (Oct. 17, 1990) .............................................................................9

Executive Order 12,731 § 201(a) ................................................................................17, 20

Executive Order 12,731 § 201(c) ................................................................................17, 20

Joanna K. Sax, J.D., Ph.D., *Protecting Scientific Integrity: The Commercial Speech
    Doctrine Applied to Industry Publications*, 37 Am. J.L. & Med. 203, 206 (2011) ..........11

Lars Noah, *Scientific "Republicanism": Expert Peer Review and the Quest for
    Regulatory Deliberation*, 49 Emory L.J. 1033, 1051 (2000) .............................................13

Robert M. Sussman, *Science and EPA Decision-Making*
    12 J.L. & Pol'y 573, 578 (2004) .................................................................................7, 12

Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policymakers* 1 (1990) ....................7

*The Political Activity of Think Tanks: The Case for Mandatory Contributor
    Disclosure*, 115 Harv. L. Rev. 1502 (2002) ......................................................................10

*U.S. v. Phillip Morris USA, Inc.*
    449 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................................11

## Regulations

5 C.F.R. § 2635.101(b) .....................................................................................................21

5 C.F.R. § 2635.105(a) ................................................................................................18, 20

5 C.F.R. § 2635.105(b) .....................................................................................................18

5 C.F.R. § 2635.106(c) ...................................................................................................22

5 C.F.R. § 2635.401 ......................................................................................................20

5 C.F.R. § 2635.402(a) ....................................................................................................9

5 C.F.R. § 2635.402(b) ....................................................................................................9

5 C.F.R. § 2635.402(b)(1) ..............................................................................................20

5 C.F.R. § 2635.402(b)(3) ..............................................................................................19

5 C.F.R. § 2640.203(g) ..................................................................................................20

5 C.F.R. § 3635.102(g) ..................................................................................................19

5 C.F.R. Part 2635 ...........................................................................................................9

# I.    INTRODUCTION

The Environmental Protection Agency manages twenty-two federal advisory committees and their respective sub-committees. These advisory committees serve as crucial, independent voices and many provide robust peer review for EPA's policy, enforcement, and regulatory efforts. Most significantly, for over 40 years Congress has mandated that EPA maintain a Science Advisory Board to provide independent advice and peer review of the scientific and technical information underlying EPA's mission of combating pollutants, contamination, and other serious threats to human health and the environment.

Academic researchers from America's private and flagship state universities and other independent researchers and scientists have long played a crucial role in EPA's advisory committees. Committee members often have scientific knowledge that is unique and not easily replaced. Many of these individuals—who have dedicated their careers to researching pressing environmental and health issues affecting Americans—rely on independent research grant funds to support their work. EPA is a significant source of funding for this research; Congress requires EPA to spend a substantial portion of its annual budget to fund research grants in areas relevant to its work. Until recently, EPA has never considered the receipt of an EPA grant as posing a conflict of interest for Committee members, and for good reason. EPA's grant funding is a competitive process that is subject to peer review and awarded solely based on merit. Existing ethics rules already prevent committee members from participating in matters that would directly implicate or impact their financial interests, including decisions on any EPA grants. And, as a result, receipt of grant funding while serving on a committee has also consistently been found to be well within long-standing uniform executive branch ethics requirements.

1

Despite the lack of any documented ethical problems, in October 2017 EPA Administrator Scott Pruitt issued a directive upending the membership balance on EPA advisory committees. That directive, "Strengthening and Improving Membership on EPA Advisory Committees" (the Directive), bars all EPA grant recipients (with some limited exceptions) from serving on any EPA advisory committees. As a direct result, in early 2018 EPA told advisory committee members with current EPA grants to relinquish their grants or resign their committee memberships. And although Administrator Pruitt claimed that the Directive was aimed at stamping out conflicts of interest, the Directive did not exclude persons with funding from—or even those working directly for—regulated industries whose products, emissions, or services may be harmful to human health and the environment. Industry-funded or even industry-employed members of the Science Advisory Board thus have risen from comprising 40 percent of Board members to now comprising nearly 70 percent.

The Directive is arbitrary, capricious, and contrary to law. It in fact exacerbates the very conflicts of interest it purportedly seeks to address, while weakening EPA's ability to perform rigorous science when making critically important decisions. Furthermore, and as set out below, the Directive has significant, negative impacts on EPA's ability to carry out its core mission, to the detriment of states, regulated entities, and the American people. The Directive also weakens the ability of the states' university systems to receive EPA funding by forcing faculty to choose between receiving EPA grants or serving on critical EPA advisory committees and boards. This Court should deny Administrator Pruitt's motion to dismiss.

## II.    IDENTITY AND INTEREST OF *AMICI CURIAE*

The states of Washington, California, Illinois, Iowa, Maryland, Massachusetts, New Jersey, New York, and Oregon, and the Pennsylvania Department of Environmental Protection (*Amici* States) submit this brief as *amici curiae* in opposition to Defendant's motion to dismiss

Plaintiffs' complaint (Motion) and in support of any future motion for summary judgment brought by Plaintiffs. Plaintiffs allege that Administrator Pruitt acted unlawfully when he issued the Directive generally banning any recipients of EPA grant funds from serving on EPA's advisory committees or their respective sub-committees. This action will deprive EPA of objective advice, both when setting individual regulatory standards and establishing long-term research goals. It is therefore a matter of general public interest and of particular interest to the *Amici* States.

The Directive will injure *Amici* States in at least four respects. First, the likely diminished quality of EPA regulatory standards and EPA-funded research will harm the states' citizens and natural resources. *Amici* States have a quasi-sovereign interest "in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

Second, the *Amici* States have regulatory programs, including authorizations to implement aspects of federal environmental statutes, such as the Clean Water Act (33 U.S.C. §§ 1251 et seq.) and the Clean Air Act (42 U.S.C. §§ 7401 et seq.). These authorizations complement state environmental laws and provide, in many instances, concurrent enforcement authority to enforce EPA-promulgated federal standards within a state's jurisdiction as it exercises its sovereign role in protecting human health and the environment. Furthermore, as discussed in greater detail in Section III.A below, it is difficult to overstate the sweep of EPA's mandate. From developing water quality and air emission standards, to regulating pesticides, to combating climate change, EPA's work helps drive public health and environmental protections across the United States and impacts the ways in which the states and their residents conduct business. Given the sheer scope of this work, combined with its often complex underpinnings, EPA's execution of its workload depends on the application of good science. Excluding many scientists with the best understanding

of today's environmental problems weakens the competence of the advisory committees created to help ensure that EPA's policies and regulatory proposals are based on the best available science. This handicaps EPA's ability to perform its core functions and, in turn, harms the *Amici* States. Any failure by EPA to adopt standards based on the best available science will put additional burdens on the states to fill those resulting gaps.

Third, as with private parties, states engage in a range of proprietary functions subject to regulation under federal standards—from massive construction projects, to performing cleanups as liable parties under the federal Superfund law, to seeking federal permits for air emissions. In these roles, *Amici* States have an obvious interest in being subjected to regulations that are premised on rigorous science. Not only does the removal of some of the most qualified scientists in the country deprive advisory committees of valuable expertise, but the agency's decision in some instances to remove scientists in the middle of an advisory committee's work on an EPA standard is likely to lead to inefficiency and delay. EPA's failure to apply quality science to its regulatory agenda subjects *Amici* States, and regulated entities within *Amici* States' borders, to ineffective and/or inefficient regulatory standards.

And, fourth, while the Directive exempts employees of state agencies, faculty at state universities subject to the Directive have either been removed from service on EPA advisory committees or have been compelled to relinquished their grants. Consequently, the Directive also directly harms *Amici* States' respective university systems. Flagship state universities are among the Nation's premier research institutions and, as such, are significant recipients of EPA grant funds. For example, Washington State universities alone have received approximately $78 million

in EPA research funding over the past 10 years alone.[1] Very little of this grant funding is provided directly to faculty members; rather, most grant funding covers facilities, lab space, equipment, student and staff support, and administrative costs. First Am. Compl. ¶¶ 25–26, (Dkt. No. 20). Not only is the research conducted is invaluable to society in general—and the United States' standing globally as a leader in environmental and public health science—EPA grants also support development of our country's scientific talent, helping recipient universities attract and retain world-class faculty and recruit top students to research programs.

Similarly, service on advisory committees by faculty also provides direct benefits to employing researchers at state universities. Across the board, EPA's advisory committees—whether created by Congress, the President, or the Administrator—require highly qualified subject-matter experts, many of whom conduct cutting-edge research in their respective fields. As a result, service on an EPA advisory committee is a high-visibility opportunity within the scientific community that elevates an academic appointee's profile and enhances his or her ability to fund and perform research. This, in turn, enhances the ability to attract top students (and other faculty) to the appointee's university program.

Thus, by forcing current and potential future advisory committee members to choose between funding for their research and service on advisory committees, the Directive weakens the very bodies necessary to ensure EPA's work is scientifically sound. This weakening directly impacts the *Amici* States, both in terms of their ability to protect human health and the environment

---

[1] *See* EPA Online Grants Database,
https://yosemite.epa.gov/oarm/igms_egf.nsf/AllGrantsNarrow?SearchView&Query=(FIELD%2
2Applicant_Type%22=%22State+Institution+of+Higher+Learning%22)AND(FIELD%22Applic
ant_State%22=%22WA%22)&SearchOrder=1&SearchMax=1000&SearchWV=false&SearchFu
zzy=false&Start=1&Count=500 (last accessed on May 2, 2018).

within their respective jurisdictions, and in terms of their ability to attract top talent to state universities.

## III.    ARGUMENT

*Amici* States address two areas relevant to this Court's resolution of Defendant's Motion. First, *Amici* States address the Directive's broader impacts on the execution of EPA's core mission to protect human health and the environment. As set out below, the Directive sacrifices EPA's ability to benefit from the best scientific expertise for no discernable gain. Second, *Amici* States directly address Defendant's arguments that EPA's authority to define a new conflict of interest for advisory committee members is unfettered. To the contrary, the Directive violates both the substantive and procedural requirements placed on executive branch agencies wishing to adopt supplemental ethics policies.

## A.    The Advisory Committee Directive's Negative Impacts on EPA's Core Mission Are Unjustified and Significant

The advisory committee Directive has already caused dozens of uniquely qualified scientists to be removed from their posts on EPA advisory boards and committees, while leaving in place (and even increasing) persons affiliated with regulated industries. *See* Declaration of Dr. Charles Driscoll; Declaration of Dr. Joel Kaufman; *see also* First Am. Compl. ¶¶ 27–60, 63 (Dkt. No. 20). Because the Directive precludes service by many of the nation's preeminent experts in the fields in which EPA operates, it is broadly detrimental to EPA's work.

### 1.    The Directive handicaps the most independent voices contributing to EPA scientific decision-making under the ruse of rooting out non-existent conflicts of interest

EPA's regulatory mandate is enormous and highly dependent on top-level scientific expertise. As described by former EPA Deputy Director Robert Sussman, "EPA sets allowable ambient levels for our major air pollutants … regulates the releases of toxic chemicals from industrial facilities of all types, sets emission standards for cars and trucks, determines permissible

levels of contaminants in drinking water, and sets health-based cleanup standards for contaminated sites." Robert M. Sussman, *Science and EPA Decision-Making*, 12 J.L. & Pol'y 573, 578 (2004). EPA also "implements a regulatory regime that determines what active ingredients can be used in pesticides … reviews all new chemicals before they are introduced into commerce [and] … sets safe exposure levels for widely known and distributed environmental toxins like lead, asbestos, and radon in homes and schools." *Id.* As a result, and perhaps more so than any other federal agency, the success of EPA's core mission to protect the nation's environment and the health of all American citizens depends on the rigorous application of science.

EPA's advisory committees have helped ensure—across multiple administrations—that the scientific underpinnings of EPA's work are based on the rigorous application of the best available research and data. By serving as independent voices on EPA's technical determinations, advisory committees help curb the influence of financial and political pressures on EPA's analysis and application of relevant scientific evidence and "interject a much needed strain of competence and critical intelligence into a regulatory system that otherwise seems all too vulnerable to the demands of politics." Sheila Jasanoff, *The Fifth Branch: Science Advisers as Policymakers* 1 (1990).

In light of these critical functions, Administrator Pruitt's decision to target and disqualify scientists who receive EPA funding from serving in these positions is deeply troubling.

EPA has long depended upon assistance from academic scientists and medical professional performing cutting-edge work at universities, hospitals, or non-profits. *See* First Am. Compl. ¶ 23 (Dkt. No. 20). Because the vast majority of their work focuses on topics that benefits the public interest, academic and other non-profit researchers rely much more heavily on government funding rather than funding by industry. *See id*. And, because of the nature of EPA's mission and Congress'

directive that EPA spend a significant portion of its budget on grants, EPA is one of the primary sources of this public funding. As a result, the Directive almost exclusively applies to independent, public-interest researchers—many of whom work at state universities—rather than researchers receiving industry funding. Almost by definition, these researchers are leading experts in their respective fields. *See* Zarba Decl. ¶ 19 (Dkt. No. 31-5).

The Directive has already resulted in the removal of scores of highly qualified scientists from advisory committee roles (and will prevent countless others from serving in the future). For just two examples, in March of this year, the Directive resulted in removal of a prominent scholar from service on the Clean Air Scientific Advisory Committee's subcommittee on ambient air quality standards. The scholar, Dr. Charles Driscoll, is a Distinguished Professor of Environmental Engineering at Syracuse University who has conducted significant research on air quality issues. Declaration of Charles Driscoll at ¶¶ 3–4. Dr. Driscoll has also testified numerous times before Congress on environmental-related matters. *Id*. at ¶ 5. Due to his receipt of an EPA grant to study particulate matter, ozone, and water quality issues, EPA forced Dr. Driscoll to either relinquish his grant or resign his committee appointment. *Id*. at ¶ 8. Because relinquishing the grant would have undermined the research project and rescinded funding dedicated to a graduate student recruited to work on the research project, Dr. Driscoll reluctantly gave up his committee appointment. *Id*. at ¶¶ 8–9. Similarly, Dr. Joel Kaufman, Dean of the University of Washington's School of Public Health and a board-certified physician and epidemiologist, was forced from EPA's Particulate Matter Review Panel earlier this year. Declaration of Joel Kaufman at ¶¶ 4–7. Because he received a grant to shore up areas of uncertainty regarding the effects of fine particulate matter on cardiovascular health, Dr. Kaufman was told to relinquish his grant or resign from the Particulate Matter Review Panel. Dr. Kaufman was removed from his appointment in April 2018. *Id*. at ¶ 7.

As noted above, these and other removals, as well as future restrictions on service, cause unacceptable impacts on the *Amici* States' university systems (both public and private) by forcing faculty scientists into the untenable situation of either receiving the funding necessary to carry out critical research or relinquishing service on critical EPA advisory bodies. And by excluding some of the most capable environmental and public health scientists in the nation, these restrictions on service hobble EPA's ability to execute its core mission, as further discussed below.

Worse still, the Directive creates these harms and sacrifices the critical knowledge and insight of these researchers while getting *nothing* of value in return. The Directive identifies no actual instances of conflicts arising from academic advisory committee members' receipt of EPA grants, provides no evidence that the receipt of EPA grants would lead to a lack of independence, and fails to explain how existing mechanisms for preventing conflicts are insufficient. *See* First Am. Compl., Ex. A (Dkt. No. 20-2). In fact, committee members already must disclose any potential biases prior to service. First Am. Compl. ¶¶ 31–33 (Dkt. No. 20). And existing ethics requirements applicable to advisory committee members already prohibit participation on matters that would directly implicate or impact the financial interests of Committee members, including any EPA grants. *See* 5 C.F.R. § 2635.402(a)–(b). By disqualifying individuals from serving on any EPA advisory committee no matter how tenuously related  to any extant EPA grants they have received, the Directive creates—out of whole cloth—a new and unsupported conflict-of-interest policy that is inconsistent with decades of executive branch ethics policy. *See, generally,* 5 C.F.R. Part 2635; Executive Order 12,731 (Oct. 17, 1990).

At the same time, and far from advancing Administrator Pruitt's alleged goal of decreasing conflicts of interest and bolstering committees' independence, the Directive in fact accomplishes the exact opposite. Following its adoption, the Directive has *increased* the presence of lobbyists

and industry insiders with a vested interest in ensuring that EPA policy sways to the benefit of their employers' and sponsors' industries.[2] For example, "[a]mong the dozens of new [advisory committee] members . . . are representatives of Phillips 66 Co., Southern Co. and the North Dakota Petroleum Council."  Timothy Cama, *EPA names industry, state officials to advisory boards,* The Hill (Nov. 3, 2017).[3] Some of the new advisers have indefensible scientific views at odds with EPA's statutory mission, including an oil and chemical industry consultant who believes that certain contaminants actually yield health benefits—contrary to years of research and scientific consensus showing otherwise. *Id.*

This shift toward industry-funded scientists has serious implications for EPA's work. Industry research has been repeatedly shown to favor the sponsoring industry. *See* Besley, et al. *Perceived Conflict of Interest In Health Science Partnerships*.[4] For example, in one large-scale comparative analysis of industry-funded studies related to chemical safety, researchers discovered that while 60 percent of non-industry studies found harm in a suite of chemicals, only 26 percent of studies funded by the chemical industry found harm in the same chemicals. *The Political Activity of Think Tanks: The Case for Mandatory Contributor Disclosure*, 115 Harv. L. Rev. 1502 (2002) (*citing* Sheldon Rampton & John Stauber, *Trust Us, We're Experts!: How Industry Manipulates Science and Gambles With Your Future* at 219 (2001)). Another review found that industry-funded medical studies were eight times less likely to show results unfavorable to the sponsoring industry.

---

[2] Liza Gross, Lindsey Konkel, Elizabeth Grossman, *EPA Swamps Top Science Advisers With Industry Allies*, Reveal (Nov. 17, 2017), http://www.revealnews.org/article/epa-swaps-top-science-advisers-with-industry-allies/; *see also* Emily Holden, Anthony Adragna, *Major Trump Donor Helped Pruitt Pick EPA Science Advisors*, Politico (June 8, 2018), https://www.politico.com/story/2018/06/08/doug-deason-trump-donor-helped-pruitt-pick-epa-science-advisers-603450.

[3] http://thehill.com/policy/energy-environment/358640-epa-names-industry-state-officials-to-advisory-boards.

[4] *http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0175643*.

Joanna K. Sax, J.D., Ph.D., *Protecting Scientific Integrity: The Commercial Speech Doctrine Applied to Industry Publications*, 37 Am. J.L. & Med. 203, 206 (2011).

Certain industries also have a long and well-known history of purposefully skewing science to further their agendas. Most famously, the tobacco industry spent decades and billions of dollars funding sketchy science (and hiding good science) to counter ever-increasing evidence that smoking is harmful. In the 1980s, when it could no longer obscure the fact that smokers were being substantially endangered, the industry undertook massive efforts to undermine studies showing the dangers of second-hand smoke on non-smokers. *See U.S. v. Phillip Morris USA, Inc.*, 449 F. Supp. 2d 1, 723 (D.D.C. 2006) ("Defendants took steps to undermine independent research, to fund research designed and controlled to generate industry-favorable results, and to suppress adverse research results."); *see also* Elisa Tong, Stanton Glantz, *Tobacco Industry Efforts Undermining Evidence Linking Secondhand Smoke With Cardiovascular Disease*, Circulation, Volume 116, Issue 16, Oct. 16, 2007.[5]

More recently, a group of professors at Tennessee Tech denounced an industry-funded study of "glider" truck emissions that "[read] more like an advertisement" and that contradicted earlier studies showing that such emissions were much more harmful to human health than emissions from trucks with modern emission controls. *Tennessee Tech Professors 'Begging' Leaders to Disavow Contested Emissions Research*, Feb 19, 2018.[6] The study, paid for by a glider truck manufacturer, has been disavowed by the institution that issued it and is now the subject of

---

[5] http://circ.ahajournals.org/content/116/16/1845.full.pdf?download=true.
[6] https://www.tennessean.com/story/news/politics/2018/02/16/tennessee-tech-professors-begging-leaders-disavow-contested-emissions-research/345773002/.

an internal investigation.[7] *Id.* Replacing an entire category of highly competent scientists with industry science means that EPA's capacity to identify and appropriately counteract environmental harms will be stunted and—in a very real sense for those most vulnerable to environmental harms—more lives may be harmed and lost.

> 2.    **The Directive results in concrete harms to both EPA's mission and the entities and individuals regulated by, or reliant upon, EPA's work**

This arbitrary and unnecessary targeting of qualified scientists has potentially devastating implications for EPA's work.

Throughout its history, EPA's "greatest successes have occurred when policies, regulations, and decisions are based on the results of sound and relevant scientific research" with "the credibility of [those] decisions depend[ing] on the science underlying them." Former EPA Administrator Christine Todd Whitman, Remarks at the EPA Science Forum (May 1, 2002).[8] As noted, EPA's use of extensive peer review, provided by independent scientists traditionally chosen solely "for their expertise and their scientific accomplishments," is one of the primary means by which EPA rigorously applies science. Sussman, 12 J.L. & Pol'y at 580–81. The advisory committee Directive's shift away from the most qualified and independent participants (and toward industry-funded scientists) to perform this review will have detrimental impacts on EPA's scientific and technical work and will, in turn, negatively impact its core mission.

First, EPA failures have a large consequences. When EPA is wrong on the science, individuals—including especially vulnerable populations such as children and the elderly—can be exposed to dangerous levels of pollutants, cleanup levels for hazardous waste can be set above

---

[7] Under Administrator Pruitt, EPA subsequently used the disputed glider truck study to justify its reversal on glider trucks, a move that is certain to be challenged with the faulty science playing a prominent role.

[8] *https://archive.epa.gov/epapages/newsroom_archive/speeches/7f46885c3547108e85257 01a0052e439.html*

what is necessary to prevent long-term harms, critical habitat can be degraded, and water and air quality can be damaged. For regulated parties, including state and federal government agencies, EPA mistakes can result in inefficient expenditures if complying with regulations fail to solve the problems they purport to address or in preparing to comply with regulations that are later struck down. These harms will be especially hard to avoid given the pointed shift toward industry-funded scientists following implementation of the Directive, as detailed above, and the reduced pool of qualified applicants. *See* Zarba Decl. ¶¶ 26–27 (Dkt. No. 31-5).

Second, the Directive negatively impacts EPA's institutional legitimacy and capacity for effective and efficient governance. Advisory committee review is a "scientific seal of approval" that helps deflect criticisms of "adversaries within the EPA, from industry and environmental groups, or from the Office of Management and Budget." Lars Noah, *Scientific "Republicanism": Expert Peer Review and the Quest for Regulatory Deliberation*, 49 Emory L.J. 1033, 1051 (2000). This review also helps root out technical missteps before EPA makes final decisions on matters with potentially broad impacts on both regulated industry and the environment, and ensures EPA's work is defensible once finalized. For just one example, and as Plaintiffs point out in their complaint, the Science Advisory Board prompted EPA to remove significant errors in a 2015 report on the impacts to drinking water from hydraulic fracturing for oil and gas ("fracking"). First Am. Compl. ¶ 20 (Dkt. No. 20).

Indeed, over the years, courts have repeatedly pointed to EPA's use of advisory committee peer review in upholding EPA actions, preventing the need for EPA to re-do costly regulatory work.[9] *See, e.g., City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 716 (D.C. Cir. 2007) (upholding

---

[9] Conversely, EPA ignores the recommendations of its advisory committees at its peril. For just two examples, the Second Circuit recently overturned EPA's Vessel General Permit under the Clean Water Act after EPA failed to follow the Science Advisory Board's report

a drinking water standard based on EPA's use of "the best available, peer-reviewed science" developed by the Science Advisory Board); *Ohio Valley Environmental Coalition v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509, 523 n.16 (S.D. W.V. 2015) (upholding EPA's assignment of benchmark discharge levels and noting that "not only are there epidemiologists on the Science Advisory Board, there are some very fine epidemiologists serving in that capacity") (internal quotations omitted); *U.S. v. Vertac Chemical Corp.*, 33 F. Supp. 2d 769, 778 (E.D. Ark. 1998), *reversed on other grounds by U.S. v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001) (upholding EPA's cleanup level calculations at a Superfund site based in part on review by the Science Advisory Board). Degrading the quality and diversity of advisory committee participants will undoubtedly mean fewer mistakes are caught and corrected before they are litigated.

Third and finally, the move to limit the composition of advisory committees also risks significant damage to the credibility and deference that committee work has traditionally received. As described above, numerous industries have a long and well-documented history of pushing questionable science to further industry objectives. For good reason, that history justifies skepticism of industry research. Thus, when EPA excludes independent researchers in favor of industry-funded scientists, EPA risks losing the credibility—both with the courts and the court of public opinion—that EPA's advisory committees have built up over the decades. In short, the Directive undermines the quality and independence of EPA's advisory committees for no discernable benefit and with deeply negative consequences to EPA's mission.

---

identifying ballast-water treatment systems. *Natural Resources Defense Council v. E.P.A.*, 808 F.3d 556, 573 (2d Cir. 2015). And, in 2009, the D.C. Circuit held that EPA's decision not to strengthen the particulate matter ambient air quality standards was unlawful and, in doing so, expressly noted EPA's failure to follow the recommendations of the Clean Air Scientific Advisory Committee. *American Farm Bureau Federation v. E.P.A.*, 559 F.3d 512, 521 (D.C. Cir. 2009).

### 3. The Directive is inconsistent with Congress' vision for members of key EPA Advisory Committees

The arbitrary exclusion of grant recipients from advisory committee service is also inconsistent with congressional intent. Many advisory committees targeted by the Directive were created by statute. Among others, Congress established: (1) the Science Advisory Board in 1977 with a mandate to advise both EPA and Congress on relevant scientific matters; (2) the FIFRA Scientific Advisory Panel to advise EPA on health and environmental impacts of pesticide use; and (3) the Clean Air Scientific Advisory Committee to advise EPA on ambient air quality standards. 42 U.S.C. § 4365; 7 U.S.C. § 136w(d); 42 U.S.C. § 7409(d).

Across the board, expertise in the relevant subject matter area is the paramount factor in establishing committee memberships. Science Advisory Board members' sole requirements are the "education, training, and experience" necessary to evaluate the technical scientific data associated with EPA's work. 42 U.S.C. § 4365(b). The Science Advisory Committee on Chemicals must include individuals with "specific scientific expertise in the relationship of chemical exposures to women, children, and other … susceptible subpopulations." 15 U.S.C. § 2625(o). The FIFRA Scientific Advisory Panel must include scientists nominated by the National Institutes of Health and the National Science Foundation, with other members qualified based solely on "their professional qualifications[.]" 7 U.S.C. § 136w(d)(1).

By excluding a large swath of some of the most qualified current and potential members of EPA's advisory committees and forcing top-notch researchers to choose between receiving EPA grant funding and serving on EPA advisory committees, the Directive subverts Congress' intent that EPA receive expert technical assistance within the subject areas the Committees were designed to serve. This renders the Directive arbitrary, capricious, and contrary to law, and the Directive should be invalidated pursuant to 5 U.S.C. § 706(2).

**B.      The Pruitt Directive Violates Federal Conflict-of-Interest Law**

In the Motion to Dismiss, Defendant overstates his authority over advisory committee membership, asserting that the Administrator's discretion in this area is virtually unchallengeable. While the Administrator does have considerable discretion when making advisory committee appointments, this authority is not unfettered. As set out below, the advisory committee Directive runs afoul of procedural and substantive executive branch ethics policies and should be reversed.

**1.      The Pruitt Directive is a sharp and unsupported change from prior practice at EPA**

Until issuance of the Directive, it was common for EPA grant recipients to serve on advisory committees. Zarba Decl. ¶ 20 (Dkt. No. 31-5). Prior to issuance of the Directive, the then-current members of EPA advisory committees received a total of $77 million in EPA grants. Sharon Jacobs, *Advising EPA: The Insidious Undoing of Expert Government*, Harvard Law Review Blog (Dec. 6, 2017).[10] In 2016, for example, the majority of members on one clean-air advisory committee had received EPA grants. In defending EPA's reliance on that committee's work in litigation, EPA defended its make-up, stating that: "the mere fact that EPA has awarded research grants to the majority of panel members, who were selected to serve on the panel because they are experts in the scientific fields related to particulate matter, does not impair that independence." See *Energy & Environment Legal Institute, v. EPA* (*EELI v. EPA)*, No: 16-cv-00915 (D.D.C. 2016), ECF No. 11, at 36–37. Moreover, in a challenge filed against the National Institute of Safety and Health, the Fifth Circuit held there was no basis to exclude grant recipients from the agency's advisory committees. *Cargill Inc. v. US,* 173 F.3d 323, 339 (5th Cir. 1999). In doing so, the Court noted that "if [the agency] were required to exclude from peer review

---

[10] https://blog.harvardlawreview.org/advising-the-epa-the-insidious-undoing-of-expert-government/

committees all scientists who somehow had been affiliated with the department, it would have to eliminate many of those most qualified to give advice." *Id.* EPA's abrupt reversal in policy on grant recipients is especially suspect in light of *FCC v. Fox Television Stations*, 556 U.S. 502 (2009) (agency reversals must be based on a reasoned explanation supported by the record).

### 2. The Administrator has no discretion when it comes to complying with Office of Government Ethics regulations and requirements

Section 1 of the Directive is—at its core—a conflict of interest rule. Indeed, in adopting the Directive Administrator Pruitt described it as supplemental to "EPA's existing policies and legal requirements preventing conflicts of interest among the membership of the Agency's" advisory committees. First Am. Compl., Ex. B at 3 (Dkt. No. 20-3). The Administrator's concern was that grant-receiving advisory committee members would have conflicting interests, leading to "the appearance or reality of potential interference with [a committee member's] ability to independently and objectively serve" as a member of the committee. *Id.* The Directive, however, is contrary to governing federal law regarding conflicts of interest.

The Office of Government Ethics (OGE) is charged with promulgating policies relating to the prevention of conflicts of interest within executive branch agencies. *See* 5 App. U.S.C. § 402. OGE's authority extends to both executive branch employees and "special Government employees," and, with regard to those individuals, OGE is tasked with promulgating "uniform regulations" for conflicts of interest throughout the executive branch.[11] 18 U.S.C. § 208(a)–(b); (d)(2). The purpose of this mandate is to create "a single, comprehensive, and clear set of executive-branch standards of conduct." Executive Order 12,731 § 201(a), (c).

---

[11] The bulk of EPA advisory committee members serve as "special government employees." First Am. Compl. ¶ 18 (Dkt. No. 20).

Agencies may supplement OGE's uniform standards but to do so they must follow requisite procedure. First, agencies must "prepare and submit to the [OGE], for its concurrence and joint issuance, any agency regulations that supplement [OGE's regulations on ethics or conflicts of interest]." 5 C.F.R. § 2635.105(a). OGE must then expressly concur and sign off on any proposed supplemental regulation(s) before they can be published and ultimately codified within Title 5 of the Code of Federal Regulations. *Id*. § 2635.105(b). Any ethics rules adopted by executive agencies and not issued pursuant to this procedure are invalid. *See id*. (noting that supplemental agency regulations are valid only "after concurrence and co-signature by the [OGE] and publication in the Federal Register.").

The Directive violates OGE's procedural requirements for adopting supplemental regulations and is inconsistent with the substance of OGE regulations adopted expressly to establish *uniform* ethics policies for the Executive Branch. In terms of procedure, Defendant admits that the Administrator failed to follow OGE's regulations when he issued the advisory committee Directive. Instead, Defendant asserts that the Directive is exempt from OGE's supplemental regulations requirements because it merely addresses EPA's discretion in making advisory committee appointment priorities rather than establishing new ethics policies binding on individual employees. Def.'s Stmt P.&A. Supp. Mot. Dismiss at 41–42 (Dkt. No. 21-1). This assertion is incorrect.

Section 1 of the Directive falls squarely within the scope of OGE's procedural requirements. It directly establishes a standard of conduct that is, by its terms, binding on individual "special government employees." Specifically, the Directive treats the receipt of grant funding from EPA as a financial conflict of interest that disqualifies participation on advisory committees. *See* First Am. Compl., Ex. A (Dkt. No. 20-2). Failure to follow this policy results in

a "disciplinary action" as defined by OGE regulations—i.e., removal from Committee membership. *See id.*; 5 C.F.R. § 3635.102(g) (defining "disciplinary action" to include "removal"). Thus, Defendant's argument that the Directive merely guides how he will "apply [his] discretion in appointing persons to committees" is a mischaracterization. In fact, the Directive establishes a bright-line rule that had immediate and concrete implications for then-current special government employees: dozens of these individuals were purged from EPA advisory committees or relinquished EPA grants as a direct result of the Directive. *See, e.g.*, First Am. Compl. ¶¶ 27–60, 63 (Dkt. No. 20); Gross, et al. *supra*. And, pursuant to the Directive, any current or future advisory committee member who applies for and receives an EPA grant will similarly be removed from service or have to forgo receipt of the grant funds. Accordingly, Defendant's assertion that the Directive creates "no standard of conduct to which government employees must adhere" and has no "disciplinary consequences" Def.'s Stmt P.&A. Supp. Mot. Dismiss at 31 (Dkt. No. 21-1) is demonstrably false. Regardless of the Administrator's post-hoc explanations, Section 1 of the Directive is a supplemental ethics regulation that is contrary to the OGE procedure.

In addition to being procedurally deficient, the Directive also flatly contradicts uniform ethics rules already put in place by OGE and applicable throughout the executive branch. As noted above, OGE rules allow agency grant recipients to serve on that agency's advisory committees. While individuals are prohibited from participating in a "particular matter" that involves a "direct and predictable effect" on that individual's financial interests, such matters do not include "consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons." 5 C.F.R. § 2635.402(b)(3). Furthermore, for the "direct and predictable effect" standard to be triggered, the link between a government action and any financial impacts

must be concrete; a "speculative possibility that the matter will affect the financial interest" does not disqualify participation. *Id.* § 2635.402(b)(1).

In line with these standards, OGE regulations expressly allow advisory committee members to participate in matters of general applicability, so long as there is no direct, individualized benefit to the committee member flowing from the particular matter. *See id.* § 2640.203(g). Even in the relatively rare case where this standard is triggered, the appropriate safeguard is *recusal*, not termination from the committee entirely. *See id.* § 2635.401. The Directive conflicts with these established standards.

Moreover, the OGE regulations are not mere guidance for executive branch agencies. As noted, Executive Order 12,731 requires OGE to create and maintain "a single, comprehensive, and clear set of executive-branch standards of conduct." Executive Order 12,731 § 201(a), (c). Because it directly contradicts long-standing OGE rules and policy on disqualifying financial interests, the Directive short-circuits the very consistency and clarity Executive Order 12,731 and OGE rules require. *See id.*; 5 C.F.R. 2635.105(a) (requiring concurrence and joint issuance of supplemental standards).

### 3.    The Administrator's justifications for skirting OGE requirements do not withstand scrutiny

Administrator Pruitt's excuses for failing to comply with OGE regulations are convoluted and unpersuasive.

Administrator Pruitt first asserts that, because 5 C.F.R. § 2635.105(a) references supplementation of regulations contained "in this part" (i.e., Part 2635), OGE requirements are limited to the effectuation of Executive Order 12,731. *See* Def.'s Stmt P.&A. Supp. Mot. Dismiss at 30–31 (Dkt. No. 21-1). Specifically, in Administrator Pruitt's view, the Executive Order only directed OGE to adopt regulations interpreting the Executive Order and the criminal conflict of

interest law contained in 18 U.S.C. §§ 207–209 and, as a result, the Administrator argues that OGE's process for agency supplementation of the regulations is limited to only those agency efforts within those two areas. *Id*.

But this argument is fundamentally flawed. Executive Order 12,731, first and foremost, requires OGE to promulgate "a single, comprehensive, and clear set of executive-branch standards of conduct…." *See* 57 Fed. Reg. 35,006 (Aug. 7, 1992). Part 2635 embodies this mandate by directly addressing a wide range of conduct that qualifies as a conflict of interest, including the very conduct Administrator Pruitt's Directive purports to address. *See, generally*, 5 C.F.R. § 2635.101(b). To wit, Section 1 of the Directive establishes a conflict-of-interest rule (EPA grants are a conflict of interest) that is legally binding on current employees (Advisory Committee members that are "special government employees") and establishes disciplinary action (termination) based on violations of that rule. First Am. Compl. At 2 (Dkt. No. 20-2). The Directive is *squarely* within the ambit of Part 2635.

Defendant's argument that the Directive's non-compliance is not subject to review because it creates no enforceable rights is also incorrect. There is a strong presumption in favor of judicial review of agency action, with exemption from judicial review occurring only in very narrow circumstances. *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967); *see also Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs*, 387 U.S. at 141.

Such clear evidence is absent in this case. Defendant points to language in the OGE regulations stating that a violation of the regulations or of supplemental agency regulations "does not create any right or benefit … enforceable at law…[.]" Def.'s Stmt P.&A. Supp. Mot. Dismiss

at 35 (Dkt. No. 21-1); 5 C.F.R. § 2635.106(c). Defendant fails, however, to quote the very next sentence that clarifies this limitation is directed at third-party claims based on the failure of a government employee to follow ethics rules. *See* 5 C.F.R. § 2635.106(c) (in exemplifying the types of claims subject to the limitation, referencing individual harms caused by a government employee's failure to follow ethics rules). As a result, this provision only bars causes of action related to harms flowing from a government employee's unethical conduct. It does not shield agencies from APA claims related to the *ultra vires* adoption of supplemental ethics regulations based on their failure to conform with OGE regulations. *See id*.

Finally, the APA shield for agency actions "committed to agency discretion by law" is similarly unavailing. While the Administrator may have some discretion over whether EPA moves forward with supplemental ethics requirements, he has no discretion as to whether to follow OGE regulations mandating how those requirements are to be adopted and is prohibited from unilaterally determining the substance they can contain. In short, Administrator Pruitt exceeded his authority when he created a new ethics policy for advisory committee members, and this case does not present the extremely rare circumstance in which a final agency action may escape judicial review.

## IV.   CONCLUSION

Plaintiffs' complaint presents well-founded allegations that the advisory committee Directive is arbitrary, capricious, and contrary to law. The Directive is also anathema to EPA's mission and the very purposes for which advisory committees were created, to the great detriment of the public in general and *Amici* states in particular. On those bases, and for the reasons set out above, this Court should deny Defendant's Motion.

DATED this 27th day of June, 2018.

ROBERT W. FERGUSON
Attorney General of Washington


/s/ Kelly T. Wood
Kelly Thomas Wood, WSBA# 40067
Assistant Attorney General
Washington Attorney General's Office
Counsel for Environmental Protection
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104
(206) 326-5493
Email: kelly.wood@atg.wa.gov


ADDITIONAL COUNSEL:

For the STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
EDWARD H. OCHOA
Supervising Deputy Attorney General
James R. Potter
Deputy Attorney General
Office of the Attorney General
Environment Section
300 South Spring Street
Los Angeles, CA 90013
Tel: (213) 269-6326
Email: James.Potter@doj.ca.gov



For the STATE OF ILLINOIS

LISA MADIGAN
Attorney General of Illinois
Matthew J. Dunn
Chief, Environmental Enforcement/Asbestos Litigation Division
Daniel I. Rottenberg
Assistant Attorney General
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, Illinois 60602
(312)814-3816
For the STATE OF IOWA

THOMAS J. MILLER
Attorney General of Iowa

Office of the Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
Tel: (515) 281-5164


For the STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
Tel: (410) 576-6300



For the COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General
CHRISTOPHE COURCHESNE*
Assistant Attorney General and Chief
TURNER SMITH
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200
Email: turner.smith@state.ma.us

*Admission pending



For the STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General of New Jersey
LISA MORELLI
Deputy Attorney General
Department of Law and Public Safety
Division of Law
R.J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625-093
Tel: (609) 376-2708
Email: lisa.morelli@law.njoag.gov

For the STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General of New York
MICHAEL J. MYERS
Senior Counsel
Environmental Protection Bureau
The Capitol
Albany, New York 12224
Tel: (518) 776-2382


For the STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon
PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
Tel: (503) 947-4593
Email: paul.garrahan@doj.state.or.us


For the PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel
Pennsylvania Department of Environmental Protection
KRISTEN M. FURLAN
Department of Environmental Protection
Office of Chief Counsel
400 Market Street, 9th Floor
P.O. Box 8464
Harrisburg, PA  17105-8464
Tel: (717) 787-7060
Email: kfurlan@pa.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2018, I electronically filed a true and correct copy of the foregoing *Amici Curiae* brief with the Clerk of the Court by using the CM/ECF system, which will send notification of such filing to all registered users of the CM/ECF system.

Dated this 27th day of June, 2018.

/s/ Tricia Kealy
Tricia Kealy