**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PHYSICIANS FOR SOCIAL RESPONSIBILITY**, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> **ANDREW R. WHEELER**, *Acting Administrator, U.S. Environmental Protection Agency, in his official capacity* <br><br> Defendant. | <br><br><br> Case No. 1:17-cv-02742 (TNM) |

**MEMORANDUM OPINION**

The U.S. Environmental Protection Agency recently issued a directive announcing new

membership priorities for its federal advisory committees (the "Directive"). The Directive requires, in

part, "that no member of an EPA federal advisory committee be currently in receipt of EPA grants." The

Plaintiffs complain that this requirement is arbitrary and capricious, conflicts with several statutes and

regulations governing advisory committees, and is a shift in policy that EPA failed to explain.

EPA's Acting Administrator,[1] however, has moved to dismiss the suit under Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6). At the outset, EPA alleges that the Plaintiffs lack standing and

their claims are unripe. It also argues that because the Directive is an appointment policy, it is a matter

reserved to agency discretion and the Plaintiffs largely rely on statutes that are either inapposite or offer

no meaningful standard for review. And even if the Plaintiffs have identified applicable statutes, EPA

argues that the Plaintiffs have failed to allege a violation of any specific statutory provision. For the

reasons stated below, EPA's motion to dismiss will be granted.

---

[1]  Andrew R. Wheeler, the Acting Administrator of the EPA, is automatically substituted for former Administrator Scott Pruitt under Fed. R. Civ. P. 25(d).

# I.   BACKGROUND

EPA's mission is to protect human health and the environment.  *See* EPA, *Returning EPA to its Core Mission*, https://www.epa.gov/home/returning-epa-its-core-mission (last visited Feb. 11, 2019).  Besides developing and enforcing environmental regulations, EPA accomplishes its mission by awarding grants to state environmental programs, non-profits, and others to conduct research and implement environmental projects.  Indeed, many statutes that EPA administers authorize grant programs that fund environmental research.  *See, e.g.*, 42 U.S.C. § 7403(b)(3) (Clean Air Act); 33 U.S.C. § 1254(b)(3) (Clean Water Act).

EPA relies on 22 federal advisory committees for guidance on various environmental and health issues to ensure effective regulation.  Advisory committees can be established by statute or by the President or an agency head.  Eight of EPA's advisory committees are established by statute.[2]  EPA's advisory committees are subject to the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§ 1–15, which regulates the operations of federal advisory committees.

Agency heads have broad discretion over the composition of advisory committees.  Under the General Services Administration regulations implementing FACA, "[u]nless otherwise provided by statute, Presidential directive, or other establishment authority, advisory committee members serve at the pleasure of the appointing or inviting authority.  Membership terms are at the sole discretion of the appointing or inviting authority."  41 C.F.R. § 102–3.130(a).

FACA imposes no specific constraints or requirements on who may serve on advisory committees.  But agencies must ensure that membership is "fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. 2 § 5(b)(2).

---

[2]  The Clean Air Scientific Advisory Committee ("CASAC"), *see* 42 U.S.C. § 7409(d)(2)(A)-(B); the Science Advisory Board ("SAB"), *see* 42 U.S.C. § 4365(a)-(b); the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel, *see* 7 U.S.C. § 136w(d); the Hazardous Waste Electronic Manifest System Advisory Board, *see* 42 U.S.C. § 6939g(f); the Human Studies Review Board, *see* Dep't of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54, § 201, 119 Stat. 531 (2005); the National Drinking Water Advisory Council, *see* 42 U.S.C. § 300j-5(a); the National Environmental Education Advisory Council, *see* 20 U.S.C. § 5508(a)-(b); and the Scientific Advisory Committee on Chemicals, *see* 15 U.S.C. § 2603(e).

And there must be provisions "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 5(b)(3).

The statutes establishing particular EPA advisory committees do, however, impose some qualification requirements for committee membership. Some qualification requirements are specific—*e.g.*, the CASAC must have "at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution agencies." 42 U.S.C. § 7409(d)(2)(A). Others are general—*e.g.*, the SAB's members "shall be qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board" by statute. 42 U.S.C. § 4365(b). Members of EPA advisory committees are often scientists, academics, medical professionals, or experts in areas relevant to EPA's mission. While serving, some committee members are classified as "special government employees."[3]

The Directive announced four "principles and procedures" that EPA would apply "when establishing the membership of [advisory] committees," in order to "strengthen and improve the independence, diversity and breadth of participation on EPA federal advisory committees." Am. Compl., Ex. A ("Dir."), ECF No. 20-2. This suit relates to the Directive's first principle. It requires that "[m]embers shall be independent from EPA . . . includ[ing] a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants." *Id.* ¶ 1. The principle, however, does "not apply to state, tribal or local government agency recipients of EPA grants." *Id.* In an accompanying memorandum, EPA explained that it sought to avoid "creat[ing] the appearance or reality of potential interference with [committee members'] ability to independently and objectively serve" EPA. Am.

---

[3] *See* EPA, *Ethics for Advisory Committee Members*, https://yosemite.epa.gov/sab/sabproduct.nsf/Web/ethics?OpenDocument (last updated August 9, 2018) (cited in Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 5–6 n.2, ECF No. 31). A special government employee is "an officer or employee . . . retained, designated, appointed, or employed to perform temporary duties, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five days." 18 U.S.C. § 202.

Compl., Ex. B ("Mem.") at 3, ECF No. 20-3.  Previously, EPA allowed scientists and experts to serve on advisory committees while receiving EPA grants.

The Directive's three other principles are not at issue, but they provide context.  The Directive requires that "committee balance should reflect prominent participation from state, tribal and local governments," and "[s]uch participation should be appropriate for the committee's purpose and function." Dir. ¶ 2.  To enhance geographic diversity, the Directive requires that "membership should be balanced with individuals from different states and EPA regions," and emphasis "should be given to individuals from historically unrepresented or underrepresented states and regions."  *Id.* ¶ 3.  Finally, "[t]o encourage and promote the inclusion of new candidates with fresh perspectives and to avoid prolonged and continuous service," the Directive requires that "membership should be rotated regularly."  *Id.* ¶ 4.

The Plaintiffs in this case—Physicians for Social Responsibility, the National Hispanic Medical Association, the International Society for Children's Health and the Environment (ISCHE), Joe Arvai, Edward Avol, and Robyn Wilson (collectively, "Physicians")—are individuals and organizations representing individuals, who are serving, have served, or hope to serve on EPA advisory committees. After EPA issued the Directive, it removed Dr. Wilson from the SAB because she was receiving EPA grant funding.  *See* Am. Compl. ¶¶ 12, 57, ECF No. 20.  And EPA told ISCHE member Dr. Rob McConnell that, because of the Directive, he must choose between continued service on the CASAC Particulate Matter Review Panel and his EPA-funded research.  *See id.* ¶¶ 62–63.

Physicians' Amended Complaint brings four counts.  In Count I, Physicians allege that the Directive clashes with the conflict of interest statute, 18 U.S.C. § 208, and ethics regulations promulgated by the Office of Government Ethics ("OGE") because it bars activity that those rules allow, *see* 5 C.F.R. § 2340.203(g).  And they allege that the Directive is a shift in EPA's policy that the agency failed adequately to explain.  They allege in Count II that EPA did not comply with OGE procedural requirements for supplementing the federal ethics rules.  Physicians allege in Count III that the Directive eliminates FACA's requirements that committees be "fairly balanced" and not "inappropriately influenced," *see* 5 U.S.C. App. 2, § 5(b)(2), (3).  Finally, Physicians allege in Count IV that the Directive

violates the statutes establishing EPA advisory committees by removing otherwise qualified scientists from consideration for committee membership.

EPA, however, asks that Physicians' claims be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  EPA first argues that Physicians lack standing and their claims are not ripe.  EPA also claims that Physicians are outside the zone of interests protected by the conflict of interest statute and OGE regulations, and those authorities do not apply because the Directive is an appointment policy, not an ethics rule.  So EPA argues that the conflict of interest statute and regulations provide no meaningful standard against which to judge EPA's exercise of its discretion, making Counts I and II unreviewable.  Count III is nonjusticiable, EPA asserts, because Sections 5(b)(2) and 5(b)(3) of FACA provide no meaningful standard for judicial review.  Finally, EPA maintains that Count IV fails under Rule 12(b)(6), because Physicians have failed to allege a violation of any specific statutory requirement for membership on EPA advisory committees.

## II.     LEGAL STANDARDS

A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  To survive a motion to dismiss under Rule 12(b)(1), plaintiffs bear the burden of showing jurisdiction by a preponderance of the evidence.  *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992).  The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but it need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  *Rann v. Chao*, 154 F. Supp. 2d. 61, 64 (D.D.C. 2001).  "Because Rule 12(b)(1) concerns a court's ability to hear a claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to 12(b)(6)."  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011).  If the

court determines that it lacks jurisdiction, it must dismiss the claim or the action.  Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(6) allows a court to dismiss any count of a complaint that fails "to state a claim upon which relief can be granted."  The court still must treat the complaint's factual allegations as true and must grant the plaintiff  the benefit of all inferences that can be derived from the facts alleged.  *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006).  But it need not accept as true a legal conclusion couched as a factual allegation.  *See id.*

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  "The standard does not amount to a 'probability requirement,' but it does require more than a 'sheer possibility that a defendant has acted unlawfully.'"  *Thomas v. Wash. Met. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 678).  So a plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In evaluating a 12(b)(6) motion, the court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

#### A.  Physicians have established standing for the motion to dismiss stage.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (citing *Lujan*, 504 U.S. at 560).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element."  *Id.* (cleaned up).  So to establish standing at the motion to dismiss stage, Physicians "need only 'state a plausible claim that

[they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits.'" *Bread for the City, Inc. v. U.S. Dep't of Ag.*, 211 F. Supp. 3d 327, 330 (D.D.C. 2016) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

Dr. Wilson and ISCHE, through its member Dr. McConnell, have alleged facts establishing each element of standing to survive the dismissal stage. First, they have alleged an injury in fact. Physicians' Amended Complaint alleges that EPA removed Dr. Wilson from the SAB, denying her a "coveted and highly esteemed" position and the benefits that flow from it, *e.g.*, "recognition and even prestige," *see Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999). Am. Compl. ¶ 57. Physicians also allege that Dr. McConnell faces imminent removal from the CASAC Particulate Matter Review Panel or the loss of his EPA grant funding. *Id.* ¶¶ 62–63. Whatever choice Dr. McConnell makes, he will lose a significant benefit. Thus, at this stage of the proceedings, Physicians have sufficiently alleged that Drs. Wilson and McConnell have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

Second, Dr. Wilson's and Dr. McConnell's injuries are fairly traceable to EPA's action. Dr. Wilson "received an email notifying her that she had been removed from the SAB due to the Directive." *See* Am. Compl. ¶ 57. And "an EPA staff person . . . confirmed that Dr. McConnell must choose between his EPA-funded research and his service on the CASAC Particulate Matter Review Panel, because of the Directive." *Id.* ¶ 63. Indeed, EPA conceded at the hearing on the motion to dismiss that Dr. Wilson and ISCHE had established injuries traceable to the Directive. *See* Tr. at 41, ECF No. 42.

Finally, Physicians have sufficiently alleged redressability. If the Court invalidates the Directive, then Dr. Wilson may serve again on the SAB without sacrificing her EPA funding. And Dr. McConnell will not need to choose between EPA grant funding and service on an advisory panel.

EPA objects that the Plaintiffs other than Dr. Wilson and ISCHE have not independently established standing. It also argues that Dr. Wilson and ISCHE's standing does not extend to Counts III

and IV, if those counts relate to violations of statutory requirements for committees other than the SAB

and the CASAC Particulate Matter Review Panel.  But EPA's arguments are not persuasive.

First, Counts III and IV do not allege that particular advisory committees violate their animating

statutes or FACA.  Instead, Count III alleges that the Directive frustrates FACA's "fair balance" and

"inappropriate influence" provisions, applicable to all EPA advisory committees.  And Count IV alleges

that the EPA advisory committees established by statute have a "statutory direction to recruit the most

qualified scientists for service on EPA advisory committees," which the Directive frustrates.  Am. Compl.

¶¶ 157–59.  Whether the Directive preempts or frustrates these statutory provisions is a legal question that

is not necessarily contingent on the ultimate composition of any particular committee.  Thus, because

vacatur of the Directive based on any defect in its promulgation, including those alleged in Counts III and

IV, would address Dr. Wilson's and ISCHE's injuries, they have standing to bring all four counts.  *See*

*Sierra Club v. FERC*, 867 F.3d 1357, 1366 & n. 3 (D.C. Cir. 2017).

Second, having established Dr. Wilson's and ISCHE's standing, the Court need not consider the

other Plaintiffs' standing independently.  Physicians advance the same arguments challenging the

Directive, and "if one party has standing in an action, a court need not reach the issue of the standing of

other parties when it makes no difference to the merits of the case."  *Ry. Labor Execs.' Ass'n v. United

States*, 987 F.2d 806, 810 (D.C. Cir. 1993).

## B. Physicians' claims are ripe for review.

When evaluating whether a claim is ripe for review, courts consider "(1) whether delayed review

would cause hardship to plaintiffs; (2) whether judicial intervention would inappropriately interfere with

further administrative action; and (3) whether the courts would benefit from further factual development

of the issues presented."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).  Here the

hardship to Physicians from delaying review is obvious.  Physicians allege that Dr. Wilson has already

suffered an injury because of the Directive, and Dr. McConnell faces an imminent threat of harm.

Moreover, review of Physicians' claims would not inappropriately interfere with further administrative

action.  Finally, the Court would not benefit from further factual development.  The crux of Physicians'

complaint is that the Directive is arbitrary and capricious under the Administrative Procedure Act

("APA") and violates statutes governing membership of federal advisory committees.  This case is fit for

review "because it presents a clear-cut legal question, *i.e.*, whether the [agency's] policy is inconsistent

with the [governing statutes] or the APA."  *See Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359,

364–65 (D.C. Cir. 2005).

### C.  Physicians' alleged injuries are within the zone of interests protected by the conflict of interest statute and OGE regulations.

"The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to

make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a

particular agency decision."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  "The essential

inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge

agency disregard of the law."  *Id.* (cleaned up).  "The test is not meant to be especially demanding."  *Id.*

So a person suing under the APA need only assert an interest that is "*arguably* within the zone of interest

to be protected or regulated by the statute" allegedly violated.  *See Ass'n of Data Processing Serv. Orgs.,*

*Inc. v. Camp*, 397 U.S. 150, 153 (1970) (emphasis added).  "The test forecloses suit only when a

plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute

that it cannot be reasonably assumed that Congress intended to permit the suit.'"  *Match-E-Be-Nash-She-*

*Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke*, 479 U.S. at

399).

EPA contends that Congress issued the conflict of interest statute, 18 U.S.C. § 208, and the

accompanying regulations at issue in Counts I and II only "to protect the United States, as a Government,

from the mistakes, as well as the connivance, of its own officers and agents," *United States v. Miss.*

*Valley Generating Co.*, 364 U.S. 520, 561 (1961).  But "[a]n important countervailing consideration

cannot be ignored."  *Crandon v. United States*, 494 U.S. 152, 166 (1990).  The Supreme Court quoted

Attorney General Kennedy for the proposition that "one of the main purposes of the new legislation was

to help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is outside the Government." *Id.* (internal quotation marks omitted).

Those who trust legislative history will find ample support for this conclusion.[4]  Congress revised the prior government ethics laws because compliance was unwieldy and the Government could not recruit qualified people who were interested in government service.  *See* H.R. Rep. No. 87-748 (1961) ("House Report"); S. Rep. No. 87-2213 (1962) ("Senate Report").  Congress recognized that the prior ethics laws "often serve[d] as a possible bar to securing important personal services for the Government through excessive regulation when little or no ethical problem really exist[ed]."  House Report at 4.  "In the interest of facilitating the Government's recruitment of persons with specialized knowledge and skills for service on a part-time basis," Congress sought to "limit the impact of [conflict of interest] laws on the persons so employed without depriving the Government of protection against unethical conduct."  Senate Report at 4.  "[A]ttention was paid to the need for avoiding restrictions that would expose government employees unfairly to criminal punishment and, in the long run, deprive the federal government of the services of able men and women."  *United States v. Conlon*, 481 F. Supp. 654, 665 (D.D.C. 1979) (citing Senate Report at 2–7).  Thus, "Congress plainly expressed a . . . purpose of eliminating uncertainty and protecting *both* employees and the Government from the effects of overly broad restrictions."  *Id.* at 668 (emphasis added).

EPA counters that Congress intended to benefit only the Government, not individuals, by facilitating the recruitment of qualified persons to government service.  But the zone of interest test does not require any "indication of congressional purpose to benefit the would-be plaintiff."  *See Clarke*, 479 U.S. at 399–400.  The "zone of interest" test is concerned with "whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain

---

[4]  The use of legislative history "for the purpose of giving authoritative content to the meaning of a statutory text" is a dubious practice.  *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 622 (1991) (Scalia, J., concurring in the judgment).

of a particular agency action." *Id.* at 399.  So in *Block v. Community Nutrition Institute*, the Court held

that, while milk handlers had the right to challenge pricing orders issued by the Government, consumers

did not.  467 U.S. 340, 348 (1984).  In other words, the test is mainly concerned with *which* private party

may sue to challenge an agency action, not whether *any* party may sue at all.

Unless a particular plaintiff's asserted interests are "so marginally related to or inconsistent with

the purposes implicit in the statute," that plaintiff is within "that class of aggrieved persons who, under

§ 702, are entitled to judicial review of agency action."  *Clarke*, 479 U.S. at 395, 399 (internal quotation

marks omitted).

Physicians are well suited to challenge the Directive.  Their interest in government service is

congruent with the Government's interest in recruiting them to serve.  Physicians' interests are not "so

marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress intended to permit the suit."  *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225.  In any

event, "the benefit of any doubt goes to the plaintiff."  *Id.*

### D.  The Directive does not violate the conflict of interest statute or OGE regulations.

Turning to the substance of the case, Physicians argue in Count I that the Directive is

incompatible with the conflict of interest statute and its accompanying regulations.  The statute, 18 U.S.C.

§ 208, regulates the conduct of executive branch employees.  It prohibits government employees,

including special government employees, from participating in matters that will have a direct and

predictable effect on their own financial interests or on the financial interests of close associates.

18 U.S.C. § 208(a).  Violators are subject to criminal and civil sanctions under 18 U.S.C. § 216.  *Id.*

But there are exceptions.  *See id.* § 208(b).  For example, special government employees will not

be face liability under Section 208(a) when the appointing official has certified in writing "that the need

for the individual's services outweighs the potential for a conflict of interest created by the financial

interest involved."  *Id.* § 208(b)(3).  And Section 208(a) does not apply when OGE has determined by

regulation that a particular financial interest should be exempted for "being too remote or too inconsequential to affect the integrity of the services" of the employee.  *Id.* § 208(b)(2).

OGE is tasked with interpreting and implementing Section 208.  *See* 5 C.F.R. § 2635.401–403.  It must promulgate "uniform regulations" for the "issuance of waivers and exemptions under subsection (b)," including "provid[ing] guidance [on] the types of interest that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee."  18 U.S.C. § 208(d).

Under this requirement, OGE has issued "regulatory exemptions of general applicability . . . based on its determination that particular interests are too remote or too inconsequential" to affect the integrity if an employee's service.  5 C.F.R. § 2635.402(d)(1); *see* 5 C.F.R. § 2640.201–203 (Interpretation, Exemptions, and Waiver Guidance Concerning 18 U.S.C. § 208).  Relevant here, OGE has determined that "[a] special Government employee serving on an advisory committee . . . may participate in any particular matter of general applicability . . . provided that the matter will not have a special or distinct effect on the employee or employer other than as part of a class."  5 C.F.R. § 2640.203(g).  For instance:

> A chemist employed by a major pharmaceutical company has been appointed to serve on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials involving human subjects.  Even though the chemist's employer is in the process of developing an experimental AIDS vaccine and therefore will be affected by the new standards, the chemist may participate in formulating the advisory committee's recommendations.

*Id.* at Example 1.

So under OGE's regulations, grant recipients may serve on federal advisory committees without incurring liability under Section 208(a), as long as they do not participate in matters that would have a special or distinct effect on the member or his employer.  *See* 5 C.F.R. § 2640.203(g).  But under EPA's Directive, grant recipients will not serve on its advisory committees, even on matters of general applicability.  Dir. ¶ 1.

Physicians argue that this disconnect evidences a fatal incompatibility between the Directive on the one hand and Section 208 and its implementing regulations on the other. Am. Compl. ¶ 124–34. Not so. The statute and OGE regulations prohibit government *employees* from participating in certain activities. *See* 18 U.S.C. § 208(a) ("[W]hoever, being an officer or employee. . . participates personally and substantially" in a particular matter in which he has a financial interest is subject to penalties set forth in 18 U.S.C. § 216.); 5 C.F.R. § 2635.402(a) ("An employee is prohibited by criminal statute . . . from participating personally and substantially" in any particular matter in which he has a financial interest.). The Directive, however, is a statement of EPA *policy*, explaining who EPA will consider for appointment to advisory committees. *See* Dir. at Preamble (". . . [EPA] shall, consistent with applicable laws and regulations, apply the following principles and procedures when establishing the membership of such committees."). That someone *may* serve on an advisory committee without incurring liability under the conflict of interest statute does not dictate that an agency *must* appoint him as a member. While EPA clearly cannot appoint someone to an advisory committee that Section 208 prohibits, Section 208 does not require EPA to appoint anyone not otherwise excluded under the statute. In other words, Section 208 and the OGE regulations function as a floor, not a ceiling, for acceptable government service.

Physicians, however, argue that OGE is responsible for promulgating "a single, comprehensive, and clear set of executive-branch standards of conduct," Executive Order 12,731 § 201(a), and "*uniform* regulations for the issuance of waivers and exemptions under" 18 U.S.C. § 208(d) (emphasis added). Thus, they reason that if a financial interest would not be disqualifying under the conflict of interest statute and OGE regulations, then the Administrator may not make it disqualifying when crafting agency appointment priorities. Otherwise the regulations do not apply uniformly.

But Section 208(d)(2) gives OGE authority to issue "uniform" regulations only for determining when certain financial interests will be exempt from criminal and civil liability under Section 208(a). It provides that OGE "shall issue uniform regulations for the issuance of waivers and exemptions under subsection (b)," and subsection (b) describes only when subsection (a) and its penalties will not apply. The Directive is different in scope and means from the authorities that Physicians claim are in conflict. It,

for instance, does not threaten criminal or civil penalties under Section 208(a) for noncompliance.  And the Directive is addressed to the agency—announcing the Administrator's priorities for membership of advisory committees—not to individual employees.  Thus, the Directive is better understood as an appointment policy promulgated under the Administrator's broad appointment discretion.  While this policy is guided by ethics concerns, it is distinct from the conflict of interest statute and OGE regulations.[5]

Next, Physicians contend that, under FACA, agency appointments are subject to the conflict of interest statute and the OGE regulations.[6]  Congress enacted FACA to regulate the operations of federal advisory committees.  *See* 5 U.S.C. App. 2 § 2.  In developing guidelines to implement FACA, agency heads must address the appointment and terms of advisory committee members.  *See* 41 C.F.R. § 102-3.130(a).  FACA requires that agencies' guidelines and controls accord with the GSA's uniform guidelines for advisory committees.  *See* 5 U.S.C. App. 2 § 8(a).  And GSA requires that agency heads ensure "that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statutes, regulations issued by [OGE] including any supplemental agency requirements, and other Federal ethics rules."  41 C.F.R. § 102.3-105(h).  So Physicians argue that the conflict of interest statute and OGE regulations constrain agency heads' appointment discretion.  *See* Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 45–47, ECF No. 31.

Fair enough.  Agency heads' appointment discretion is not unbounded.  They have complete discretion "[u]nless otherwise provided by statute, Presidential directive, or other establishment authority."  *See* 41 C.F.R. § 102-3.130(a).

To be sure, because agencies must ensure that committee members are not conflicted, 41 C.F.R. § 102-3.105(h), agency heads may not craft appointment policies that disregard applicable ethics rules.

---

[5]  At times in its briefing, EPA suggests that the Directive has nothing at all to do with ethics, but that is clearly not the case.  Even so, for the reasons already described, agencies' authority to establish policies for determining membership on advisory committees is different in scope and means from ethics statutes that regulate individuals' conduct and financial interests.

[6]  Physicians address this argument under Count III of its briefing, *see* Pl.'s Opp'n at 34–36, but the Court considers this argument most relevant here.

*See Lorillard, Inc. v. FDA*, 56 F. Supp. 3d 37, 51–57 (D.D.C. 2014), *vacated on other grounds sub nom. R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827 (D.C. Cir. 2016).  But the Directive does no such thing.  The Directive is "in addition to EPA's existing policies and legal requirements preventing conflicts of interest."  Mem. at 3.

And Section 208 and the OGE regulations do not dictate whom Administrators must, or even should, appoint to federal advisory committees.  To say that certain individuals may not serve is very different than saying that the rest must serve.  Agency heads retain substantial discretion to determine membership on federal advisory committees.  *See* 41 C.F.R. § 102-3.130(a).  "[A]dvisory committee members serve at the pleasure of the appointing or inviting authority," and "[m]embership terms are at the sole discretion of the appointing or inviting authority."  *Id.*  And if an agency selects advisory committee members under a higher ethical standard than what the conflict of interest statute and OGE regulations require, that is entirely compliant with FACA's requirement that committee members not be conflicted.  *See* 41 C.F.R. § 102.3-105(h).  So the conflict of interest statute and OGE regulations establish only a uniform ethical floor that agency heads may not dip below.  They do not, however, constrain an agency's ability to appoint and retain individuals under a higher ethical standard.  *See, e.g.*, Lobbyists on Agency Boards and Commissions ("Obama Memo"), 75 Fed. Reg. 35,955 (June 18, 2010).[7]

What is more, while Physicians have alleged that the Directive has been used to remove grant recipients, such removals are not "disciplinary actions" as contemplated in the OGE regulations.  *See* 5 C.F.R. §§ 2635.102, 2635.106, 735.103.  Instead, the removals are means of effectuating the Administrator's discretionary appointment policy, and "[m]embership terms are at the *sole discretion* of the appointing or inviting authority."  *See* 41 C.F.R. § 102-3.130 (emphasis added).

---

[7] President Obama's directive not to appoint federally registered lobbyists to advisory committees shows that ethics concerns are appropriate considerations in crafting appointment policies, separate and apart from Section 208 and the OGE regulations.  *See* Obama Memo, 75 Fed. Reg. 35,955.  It was rooted in concerns that lobbyists' service on committees and boards "can perpetuate the culture of special interest access" and "drown[] out the voices of ordinary Americans."  *Id.*  And President Obama directed the Office of Management and Budget, not OGE, to issue guidance to agencies about the Obama Memo.  *Id.*

In sum, Physicians have not plausibly alleged a conflict between the Directive and the conflict of interest statute and OGE regulations.  It is still true that grant recipients *can* participate on EPA advisory committees without incurring liability under Section 208, and the Directive does not threaten or purport to impose sanctions.  But the Administrator has *chosen*—under his broad discretion to shape advisory committee membership—not to have grant recipients participate.  This is permissible.  Neither the conflict of interest statute nor OGE regulations dictate who agency heads *must* appoint or retain under the broad discretion afforded by FACA.

### E.  OGE's regulations preclude judicial review of Count II, and in any event, Physicians have failed to state a claim for which relief may be granted.

In Count II, Physicians claim that EPA had to obtain OGE's concurrence before issuing the Directive.  When an agency wishes to supplement the uniform federal ethics rules, it must prepare and submit the proposed supplemental regulation to OGE, "for its concurrence and joint issuance."  5 C.F.R. § 2635.105(a).  Only "[a]fter concurrence and co-signature by [OGE]," may the agency submit its supplemental regulations for publication and codification in the Code of Federal Regulations.  *Id.* § 2635.105(b).  And supplemental agency regulations "are effective only after concurrence and co-signature by [OGE] and publication in the Federal Register."  *Id.*

Courts, however, are precluded from reviewing alleged violations of these procedural requirements.  Under 5 C.F.R. § 2635.106(c), a "violation of this part . . . does not create any right or benefit, substantive or procedural, enforceable at law by any person against the United States, its agencies, its officers, or any other person."  OGE adopted that language to "more closely reflect[] section 504 of Executive Order 12,674," *see* 57 Fed. Reg. 35,006, 35,011 (Aug. 7, 1992), which addresses "Judicial Review," *see* 54 Fed. Reg. 15,159, 15,162 (Apr. 12, 1989).  Section 504 provides that "[t]his order is intended only to improve the internal management of the executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person."  54 Fed. Reg. 15162.

The D.C. Circuit has interpreted nearly identical language in an executive order to preclude private enforcement through an APA action. *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8–9 (D.C. Cir. 1999); *see also Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120–21 (D.D.C. 2011). "Although petitioner indicated that it d[id] not seek to assert rights under the order but [wa]s merely referencing it to provide evidence of the arbitrary and capricious nature of the FAA's decision," the D.C. Circuit explained that "such an argument [wa]s nothing more than an indirect—and impermissible—attempt to enforce rights under the order." *Air Transport Ass'n of Am.*, 169 F.3d at 8–9. Physicians may not try to enforce a provision that precludes private enforcement simply by framing their challenge under the APA.

Physicians respond that "it is only statutes, not agency regulations, that can preclude otherwise available judicial review." Pl.'s Opp'n at 54 (quoting *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998)). True enough, but review is not "otherwise available" here. The regulation Physicians seeks to enforce itself prohibits judicial review. As the D.C. Circuit explained, Physicians may not enforce rights under a regulation that explicitly precludes private enforcement through the backdoor of an APA claim. *See Air Transport Ass'n of Am.*, 169 F.3d at 8–9.

Next, Physicians and amici argue that Section 2635.106(c) precludes review only of an employee's violation of the ethics regulations, not of violations of the agency's procedural obligations. In support of their arguments, Physicians first point to Section 2635.106's title, "Standards of Ethical Conduct for Employees of the Executive Branch." But "headings and titles are not meant to take the place of the detailed provisions of the text." *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528 (1947).

Finally, Physicians point to Section 2635.106(c)'s "example." *See also* Amicus Brief for States ("State Amicus") at 21–22, ECF No. 35. After explaining that a violation of the OGE regulations "does not create any right or benefit . . . enforceable at law," Section 2635.106(c) states, "for example, an individual who alleges that an employee has failed to adhere to laws and regulations that provide equal opportunity regardless of race, color, religion, sex, national origin, age, or handicap is required to follow applicable statutory and regulatory procedures, including those of the Equal Employment Opportunity

Commission." But just as a section heading or preamble does not override the plain text of a regulation, so an exemplar does not re-write the regulatory text either. *Cf. Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004) ("language in the preamble of a regulation is not controlling over the language of the regulation itself").

In any event, 5 C.F.R. § 2635.105(a) applies only when an agency "wishes to supplement this part." As discussed above, the Directive does not supplement OGE's ethics regulations. EPA promulgated the Directive under authority separate from the conflict of interest statute and the OGE regulations. It is a statement of how the Administrator will exercise his discretion—under FACA and the GSA regulations—to determine committee membership. EPA thus was not required to issue the Directive in consultation with OGE.

### F.   Sections 5(b)(2) and 5(b)(3) of FACA provide no meaningful standard for review.

Physicians allege in Count III that the Directive frustrates FACA's requirements that (1) advisory committees be "fairly balanced," 5 U.S.C. App. 2 § 5(b)(2), and (2) EPA ensure that the advice or recommendations of its committees not be "inappropriately influenced," 5 U.S.C. App. 2 § 5(b)(3). Physicians' claims fail, however, because neither Section 5(b)(2) nor 5(b)(3) provide a meaningful standard against which to judge the agency's exercise of its discretion. So 5 U.S.C. § 701(a)(2) precludes judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Judges Silberman and Edwards debated the justiciability of Sections 5(b)(2) and 5(b)(3) in *Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods* ("*Microbiological*"), 886 F.2d 419 (D.C. Cir. 1989) (per curiam). *Microbiological* involved a challenge to the composition of the Department of Agriculture's National Advisory Committee on Microbiological Criteria for Foods. *See id.* at 431–32. The plaintiffs argued that the committee violated FACA's fair balance requirement, Section 5(b)(2), because it lacked a consumer representative or advocate and was thus being inappropriately influenced by food industry representatives in violation of Section 5(b)(3). *See id.* at

423–26.  The district court dismissed the plaintiffs' claims, and the D.C. Circuit affirmed the district court in a per curiam opinion with three separate opinions.  *See id.* at 419–20.

The two judges who voted to affirm did so for different reasons.  Judge Silberman found that Sections 5(b)(2) and 5(b)(3) are nonjusticiable because neither provides a meaningful standard for reviewing the agency head's appointment decisions.  *Id.* at 426–31 (Silberman, J. concurring).  Judge Friedman affirmed the district court on the merits, but he did not address Judge Silberman's justiciability arguments.  *Id.* at 420–26 (Friedman, J. concurring).  Judge Edwards rejected Judge Silberman's justiciability analysis, citing *National Anti-Hunger Coalition v. Executive Committee*, 711 F.2d 1071 (D.C. Cir. 1983), where the D.C. Circuit had previously reached the merits of a claim under Section 5 of FACA.  *Microbiological,* 886 F.2d at 431–38 (Edwards, J. concurring in part and dissenting in part).

Physicians argue that *Microbiological* established binding precedent that Sections 5(b)(2) and 5(b)(3) are justiciable.  *See* Pl.'s Opp'n at 37–39 (claiming that *Microbiological* determined that *National Anti-Hunger Coalition* "settled the reviewability issue").  Not so.  Shortly after *Microbiological*, Judge Hogan held that the justiciability of Section 5(b)(2) remained an open question, because "Judge Friedman's opinion affirmed [the district court] on the merits without addressing justiciability or standing."  *Pub. Citizen v. Dep't of Health and Human Servs.*, 795 F. Supp. 1212, 1213–23 (D.D.C. 1992) (conducting a thorough review of case law).  Judge Sporkin agreed.  *See Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996); *but see Lorillard, Inc. v. FDA*, 2012 WL 3542228, at *2 (D.D.C. Aug. 1, 2012).  And they both favorably cite Judge Silberman's justiciability analysis.  *See Fertilizer Inst.*, 938 F. Supp. at 54–55; *Pub. Citizen*, 795 F. Supp. at 1220–22.  Courts in other circuits also have cited Judge Silberman's concurrence favorably.  *See Ctr. for Policy Analysis on Trade & Health* ("*CPATH*") *v. Office of the U.S. Trade Rep.*, 540 F.3d 940, 945 (9th Cir. 2008); *Doe v. Shalala*, 862 F. Supp. 1421, 1430–31 (D. Md. 1994).  The Court agrees with Judges Hogan and Sporkin that *Microbiological* does not require finding Sections 5(b)(2) and 5(b)(3) justiciable, and it agrees with Judge Silberman that neither section provides a meaningful standard for review.

Section 5(b)(2) requires that the membership of advisory committees "be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." But "FACA does not define what constitutes a 'fairly balanced' committee—in terms of points of view represented or functionality—or how the balance is to be determined." *CPATH*, 540 F.3d at 943. Indeed, "even before the points of view on an advisory committee can be balanced at all—'fairly' or otherwise— it must first be determined *which* points of view should be balanced." *Microbiological*, 886 F.2d at 426 (Silberman, J., concurring) (emphasis in original). But there is no "principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees." *Id.* The "relevant points of view on issues to be considered by an advisory committee are virtually infinite." *Id.* Nor is there a "principled way" to determine whether those views are fairly balanced. *See id.* at 427–28; *see also Fertilizer Inst.*, 938 F. Supp. at 54–55.

At the motion hearing, however, Physicians suggested that because EPA "scientific advisory committees [] are providing peer review, there is no viewpoint balance. It's functional balance." Tr. at 26. But Section 5(b)(2)'s command is in the conjunctive, meaning every advisory committee—even those providing peer review—must be balanced not just in function but also viewpoints. So the concerns raised in Judge Silberman's concurrence in *Microbiological* remain. Indeed, the committee at issue in *Microbiological* was "primarily technical and scientific." 886 F.2d at 420 (Friedman, J. concurring).

And it is reasonable to believe that even members of technical committees are not of one view about research priorities or the import of certain findings. The amicus briefs here make this abundantly clear. They complain that "[s]ome of the new advisors have indefensible scientific *views* at odds with EPA's statutory mission." State Amicus at 10 (emphasis added). And they argue that a "shift toward industry-funded scientists has serious implications for EPA's work," because "[i]ndustry research has been shown to favor the sponsoring industry." *Id.* But to determine whether those views are "fairly balanced" on the committees, the Court would need to make "arbitrary judgments" about "which organizations or individuals qualif[y] as bona fide" representatives of particular policy views. *Microbiological*, 886 F.2d at 428–29 (Silberman, J. concurring).

Suppose that the Court could divine committee members' scientific and policy views and sought to balance membership between members who represent Physicians' views with members who represent opposing views.  How would the Court determine whether the views of a particular committee member are close enough to those of Physicians' to find them representative?  "Would the court rule, for instance, that when two parties agree on a certain percentage (what percentage?) of issues (which issues?) one may be deemed "representative" of the other?"  *Id.* at 428.

And even if the Court could separate viewpoint and functional balance for scientific advisory panels, committees' functions, like the relevant viewpoints on issues they consider, are many.  For example, the CASAC must:

> (1) complete a review of the criteria published under 42 U.S.C. § 7408 and the national primary and secondary ambient air quality standards promulgated under 42 U.S.C. § 7409; (2) recommend to the EPA administrator any new ambient air quality standards and revisions of existing criteria and standards as may be appropriate; (3) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (4) describe the research efforts necessary to provide the required information, (5) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (6) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

*See* 42 U.S.C. § 7409(d)(2)(B), (C).  Given these many functions, several skillsets and qualifications may be necessary.  For example, a member might be able to contribute to the committee's scientific review functions but be less effective at advising the Administrator on the "social" or "economic" effects of different strategies.  Section 5(b)(2) provides no standard for determining whether a committee is fairly balanced functionally.

Physicians argue that rather than rely on Judge Silberman's concurrence in *Microbiological*, the Court should accept the reasoning of *Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999).  There, the Fifth Circuit held that Section 5(b)(2)'s functional balance requirement is justiciable.  But *Cargill*'s reasoning does not persuade the Court.  Indeed, "the *Cargill* decision offers little explanation *why*

FACA's fairly balanced requirement is justiciable." *CPATH*, 540 F.3d at 946 (emphasis in original).  The

Court agrees with other judges of this circuit that a "function-based" standard offers "little guidance."

*See Pub. Citizen*, 795 F. Supp. at 1221.  "Is the Court to engage in continuous oversight so that for each

separate 'function' that a particular committee engages in, the Court can reassess whether the committee

was 'fairly balanced' to engage in that function?"  *Id.*  This is a particularly vexing question here, where

Physicians allege that the Directive has caused *all* EPA advisory committees—each with different

functions specific to its policy duties—to become unbalanced.[8]

Physicians' reliance on Section 5(b)(3), which requires agencies to ensure that "the advice and

recommendation of the advisory committee[s] will not be inappropriately influenced by the appointing

authority or by any special interest," is similarly unavailing.  Physicians complain that the Directive

"leaves EPA advisory committees at greater risk of capture by special interest groups."  *See* Am. Compl.

¶¶ 122, 153.  And they again point to *Cargill* to support the justiciability of their claim.

But Congress did not define "inappropriately influenced" or "special interest."  As Judge

Silberman explained, the Court would need to determine "when an interest is 'special' as opposed to

'general[,]'" but in the context of this statute, courts have no way to determine what "special interest"

means for judicial review.  *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring).  Moreover,

"[t]he statute does not give us any guidance as to when the line is crossed between appropriate and

inappropriate influence."  *Colo. Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004) (per

curiam).  "[W]hat legally discernible principles could be employed to determine when a particular special

interest is overly represented—when its influence is 'inappropriate?'"  *Microbiological*, 886 F.2d at 431

(Silberman, J., concurring).  Of course, statutes direct the Administrator to make appointment decisions

for advisory committees, *see, e.g.*, 42 U.S.C. § 7409(d)(2)(A), and he is likely to select candidates that

---

[8] What is more, Physicians have not explained *how* the Directive's principle that grant recipients will not serve on advisory committees frustrates FACA's fair balance requirement.  Indeed, at the motions hearing, they conceded that it is possible to "have a committee, at the end of the day, [that] has no government grantees and is balanced to perform a function."  Tr. at 29.

reflect his policy preferences.  But that was true before the Directive.  At what point does his influence become inappropriate?  *Cf. Microbiological*, 886 F.2d at 431 (Silberman, J., concurring).

And Physicians have not articulated how the Directive would frustrate the agency's procedures for preventing "inappropriate influence."  Section 5(b)(3) "is directed to the establishment of *procedures* to prevent 'inappropriate' external influences on an already constituted advisory committee by . . . the appointing body," *Microbiological*, 886 F.2d at 430, (Silberman, J. concurring).  Indeed, Judge Silberman expressed "doubt . . . that [Section 5(b)(3)] has any applicability to a committee's *membership*."  *Id.* (emphasis in original).  Section 5(b)(3) offers no suggestion of what those procedures must look like.  The Court declines to craft them from whole cloth with no guidance from the statute.  Thus, Physicians' claims that the Directive violates Sections 5(b)(2) and 5(b)(3) are nonjusticiable because neither section provides a meaningful standard for review.  *See Heckler*, 470 U.S. at 830.

### G.  Physicians' claim that the Directive violates statutes establishing EPA advisory committees fails to state a claim upon which relief can be granted.

Physicians and amici allege that the Directive diminishes EPA's ability to make science-based decisions, because it frustrates the "statutory direction to recruit the most qualified scientists" and "make subject matter expertise the principal factor in determining membership."  Am. Compl. ¶¶ 157–59; *see* States Amicus, ECF No. 35, pp. 6–15; Amicus Brief of Former EPA Officials ("Officials Amicus") at 15–20, ECF No. 38.  But while many statutes establishing EPA advisory committees have specific qualification requirements for members, they do not explicitly require EPA to appoint the "most qualified" scientists or make subject matter expertise the "principle factor in determining membership." More fundamentally, even if the Court inferred such a statutory directive, assessing the relative qualifications of potential committee members is precisely the kind of decision that is committed to agency discretion under 5 U.S.C. § 701(a)(2).  Scientists who do not receive EPA grant funding can be qualified to serve on EPA's committees.  And Physicians have not alleged that EPA has appointed members to any advisory committee in violation of explicit statutory requirements.

Fulfilling EPA's statutory mandate requires the agency and its advisory committees to rely on science-based decision-making.  Officials Amicus at 5–10.  EPA must base its decisions on "the best, peer-reviewed science."  *See, e.g.*, 42 U.S.C. § 300g-1(b)(3)(A)(i) (Safe Drinking Water Act).  And since an advisory committee's role is to review and recommend EPA regulations, it is to EPA's benefit to have experts capable of rendering informed recommendations.  The Directive says as much in its preamble: "it is in the public interest to select the most qualified, knowledgeable, and experienced candidates."  Dir. at Preamble.  Indeed, EPA acknowledged that the "Administrator should choose qualified candidates to serve on the EPA's" advisory committees.  Mem. at 2.  And "[a]dvisory committees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed."  41 C.F.R. § 102-3.60(b)(3) (cited at Mem. at 2 n.13).

But the statutes establishing EPA advisory committees do not require EPA "to recruit the most qualified scientists."  For example, 42 U.S.C. § 300j-5(a), establishing the National Drinking Water Advisory Council, requires that "[f]ive members . . . be appointed from the *general public*."  And even statutes that specify that some committee members must have particular qualifications do not require subject matter expertise to be "the principal factor" in staffing committees.  For example, while CASAC must have "at least one member of the National Academy of Sciences," the statute does not specify or define a required "subject matter expertise" for this individual.  *See* 42 U.S.C. § 7409(d)(2)(A).  The National Academy of Sciences has countless experts who have expertise in many subject matters.  But Section 7409(d)(2)(A) does suggest which subject matter expertise is "the principal factor" for selecting a member for the CASAC.

No doubt EPA aspires to recruit the "most qualified" scientists and subject matter experts, *see, e.g.*, Dir. at Preamble, but evaluating the relative qualifications of potential committee members is exactly the kind of discretionary decision making that is precluded from judicial review.  "[U]nder § 701(a)(2) agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law."  *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (internal quotation marks omitted).

That is, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.  So courts generally may not review an agency decision—like whether to institute an enforcement proceeding or how to allocate funds—that "involves a complicated balancing of a number of factors which are peculiarly within its expertise," including what "best fits the agency's overall policies."  *See Lincoln*, 508 U.S. at 191, 193.

Weighing the qualifications of potential members for advisory committees requires this "complicated balancing," and the statutes that establish EPA's advisory committees offer no meaningful standard for assessing whether the agency has selected the "most qualified" potential member.  For example, is a Medical Doctor a more qualified "physician" than a Doctor of Osteopathic Medicine to serve on the CASAC?  Is a cardiologist more qualified than a pulmonologist?  There are virtually infinite metrics to assess potential members' relative qualifications, and the statute offers no clues how to weigh them.  The Court will not second guess EPA's exercise of its discretion in an area peculiarly within its expertise.  Ultimately, Physicians' Count IV relies on "statutory directives" that, even if they were explicit in the statutes, would be nonjusticiable.

And Physicians have not alleged that EPA has appointed members to any advisory committee in violation of explicit statutory requirements.  For example, there is no allegation that the CASAC is missing a member of the National Academy of Sciences.  Amici, however, argue that by electing not to appoint grant recipients under the Directive, EPA undermines the efficacy of its advisory committees. *See* State Amicus at 12–15; Officials Amicus at 15–20.  But no one has identified any allegedly unqualified scientist that EPA has recruited, or any allegedly "more qualified" scientist dismissed or not recruited because of the Directive.  Under the Directive there remains a universe of qualified scientists, academics, physicians, and experts capable of conducting the scientific decision-making EPA needs.  Even under the Directive, EPA can fulfill its duty to "consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committees."

41 C.F.R. 102-3.60(b)(3).  Thus, because Physicians have not alleged a violation of any statutory

provisions that are subject to review, they have failed to state a claim upon which relief may be granted.

### H.  EPA has adequately explained its change in policy.

Throughout Counts I, III, and IV of the Amended Complaint, Physicians allege that the Directive

is a change in EPA's policy that required explanation.  *See* Am. Compl., ECF No. 20 ¶¶ 133, 146, 159.

Before the Directive, EPA appointed grant recipients to its advisory committees.  Now it does not.

Physicians and amici are clearly correct that the Directive is a shift in EPA's practice.

But while an agency may not depart from a prior policy *sub silentio*, EPA sufficiently explained

its change in policy through the Directive and the accompanying memorandum, both attached to

Physicians' Amended Complaint.[9]  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

When an agency departs from its prior policy, it must display awareness that it is changing position, and it

"must show that there are good reasons for the new policy."  *Id.*  But it need not establish "that the

reasons for the new policy are *better* than the reason for the old one; it suffices that the new policy is

permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better,

which the conscious change of course adequately indicates."  *Id.* (emphasis in original).

For the reasons already given, the Directive is permissible under FACA and the conflicts statute

and regulations.  *See supra* Sections III-D, E.  And Physicians have pointed to no other authority that

would provide a meaningful standard for assessing the Administrator's use of his discretion.  The APA's

"arbitrary and capricious" standard, 7 U.S.C. § 706(2)(a), cannot be enough by itself to provide the

requisite "meaningful standard" for courts.  *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir.

2003).  "If agency actions could be challenged as 'arbitrary and capricious,' without reference to *any*

other standard, then § 706(a)(2)'s limitation on APA review would amount to no limitation at all, and

nothing would ever be 'committed to agency discretion by law.'"  *Id.* (emphasis in original).

---

[9] "In ruling on a Rule 12(b)(6) motion to dismiss, the Court may consider any document either attached to or
incorporated in the complaint without converting the motion to dismiss into one for summary judgment." *Cureton v.
Duke*, 272 F. Supp. 3d 56, 61 (D.D.C. 2017) (cleaned up); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688
(9th Cir. 2001).

And EPA knew that the Directive represented a policy shift.  The Directive's title is "*Strengthening and Improving* Membership on EPA Federal Advisory Committees," and its goal was to "strengthen and improve the independence, diversity and breadth of participation on EPA federal advisory committees."  *See* Dir. (emphasis added).  Indeed, the accompanying memorandum explained that EPA sought to "strengthen[] the integrity, objectivity and reliability of EPA" advisory committees through the Directive.  Mem. at 3.  The memorandum also gives plausible justifications for its policy: "A vital part of ensuring integrity and confidence in EPA's [advisory committees] comes from guaranteeing that [committee] members remain independent of the Agency during their service," and "members in direct receipt of EPA grants while serving on an EPA [advisory committee] can create the appearance or reality of potential interference with their ability to independently and objectively serve as [committee] members."  *Id.*  Indeed, in one of the EPA guidance documents cited by Physicians, EPA observed that while receipt of grant funds from the EPA may not constitute a financial conflict of interest, receipt of that funding could raise independence concerns depending on the nature of the research conducted and the issues addressed by the committee.  EPA Office of Inspector General, "EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees," EPA Report 13-P-0387, at 10 (Sept. 11, 2013) (cited in Am. Compl. ¶ 38 n.12).

EPA believes its new appointment policy is better, and EPA sufficiently gave its reason for adopting it.  *Fox Television Stations* does not require more.  Ultimately, "the agency need not always provide a more detailed justification than what would suffice for a new policy created from a blank slate." *Fox Television Stations*, 556 U.S. at 514.  And "an agency's exercise of discretion must be both reasonable and reasonably explained."  *Multicul. Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017).  "That 'reasonable and reasonably explained' standard is deferential," so long as "the agency's action—and the agency's explanation for that action—falls within a zone of reasonableness."  *Id.*  The Directive is a reasonable exercise of the Administrator's broad appointment discretion, and EPA's explanation that it sought to "ensur[e] integrity and confidence in [its] [advisory committees]," Mem. at 3, fits comfortably within the zone of reasonableness.

Ultimately, a reviewing court may not set aside an agency action that is rational, based on consideration of the relevant factors and under the authority delegated to the agency by the statute.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 462 U.S. 29, 42–43 (1983).  Physicians have not plausibly alleged that the Directive is irrational, especially when the four interrelated parts are viewed holistically.  FACA delegates significant authority to agency heads in crafting their appointment policies.  The memorandum attached to the Directive evidences that EPA considered factors relevant to crafting its appointment policy, *e.g.*, "all [advisory committees] must be 'fairly balanced in terms of the points of view represented and function to be performed by the committee," and "[t]he EPA Administrator should choose qualified candidates to serve on the EPA's" advisory committees.  Mem. at 2.  Thus, the Administrator did not need to provide more explanation of EPA's change to its discretionary appoint policy.  *See Fox Television Stations*, 556 U.S. at 514.

## IV.    CONCLUSION

For all these reasons, the EPA's Motion to Dismiss Counts I, II, III, and IV will be granted.  A separate order will issue.

Dated: February 12, 2019                              TREVOR N. McFADDEN, U.S.D.J.